UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| SAMUEL MONTINI, Derivatively on Behalf of EXXON MOBIL CORPORATION, | ) ) ) | Case No. |
| | ) | |
| Plaintiff, | ) ) | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR |
| v. | ) ) | VIOLATIONS OF THE FEDERAL SECURITIES LAWS, BREACH OF |
| DARREN W. WOODS, ANDREW P. SWIGER, DAVID S. ROSENTHAL, JEFFREY J. WOODBURY, STEVEN S. REINEMUND, MICHAEL J. BOSKIN, SAMUEL J. PALMISANO, KENNETH C. FRAZIER, URSULA M. BURNS, HENRIETTA H. FORE, WILLIAM C. WELDON, REX W. TILLERSON, WILLIAM W. GEORGE, LARRY R. FAULKNER, DOUGLAS R. OBERHELMAN, and PETER BRABECK-LETMATHE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT |
| | ) | |
| Defendants, | ) ) | |
| -and- | ) ) | |
| EXXON MOBIL CORPORATION, a New Jersey corporation, | ) ) ) | |
| | ) | |
| Nominal Defendant. | ) ) | |
| | ) ) | |
| | ) | |
| | ) | DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS

**Page**

I.      NATURE AND SUMMARY OF THE ACTION ..............................................................1

II.     JURISDICTION AND VENUE ...........................................................................10

III.    THE PARTIES .................................................................................................10

      A.      Plaintiff ...........................................................................................10

      B.      Nominal Defendant ........................................................................11

      C.      Individual Defendants ....................................................................11

IV.     STATEMENT OF FACTS ...............................................................................18

      A.      Oil And Gas Industry Background .................................................18

            1.      Reporting Requirements For "Proved" Oil And Gas Reserves ................20

            2.      Capitalized Oil And Gas Projects Impairments ...........................22

            3.      Oil And Gas Pricing .........................................................23

      B.      Exxon's Business Operations .........................................................24

            1.      Crude Bitumen ..................................................................29

            2.      Natural Gas Expansion ......................................................33

      C.      Oil And Gas Prices Began  A Prolonged Slump In 2014 ......................35

            1.      Exxon's Competitors Took  Massive Impairment Write-Downs ..............36

            2.      Exxon Refused To Record Any Impairment Write-Downs ......................38

      D.      Exxon's Use Of Proxy Cost Of Carbon ............................................40

      E.      Rocky Mount Dry Gas Operations .................................................46

      F.      Canadian Bitumen Operations .......................................................50

      G.      Exxon's Kearl Operations ..............................................................52

      H.      Exxon's $12 Billion March 2016 Debt Offering ..............................55

I.     Exxon "De-Books" And Takes $2 Billion Impairment Charge After Its Investment And Valuation Process And Reporting Came Under Fire ................56

V.     DEFENDANTS' IMPROPER STATEMENTS ........................................................62

    A.     Defendants' Misstatements And Omissions ........................................................62

       1.     Defendants' 2014 Misstatements And Omissions ....................................62

       2.     Defendants' 2015 Misstatements And Omissions ....................................66

       3.     Defendants' 2016 Misstatements And Omissions ....................................75

    B.     Defendants' Violations Of GAAP And SEC Accounting And Disclosure Rules ........................................................100

       1.     Relevant GAAP And SEC Provisions ....................................................101

           a.     Materiality Of Misstatements And Omissions:  SEC Staff Accounting Bulletin No. 99 – Materiality ...................................101

           b.     ASC 360-10-35, Impairment Or Disposal Of Long-Lived Assets ........................................................103

               (1)     Trigger Events.................................................................104

               (2)     Impairment Testing And Loss Recognition....................104

           c.     Proved Reserve Accounting Overview:  ASC 932, Extractive Industries: Oil And Gas And SEC Regulation S-X Rule 4-10........................................................105

           d.     ASC 275 – Risks And Uncertainties...........................................107

           e.     SEC Regulation S-K Item 303 – Management's Discussion And Analysis........................................................109

       2.     Failure To Disclose The Canadian  Bitumen Operations Were Operating At A Loss ........................................................109

       3.     Failure To Disclose Likelihood That The Kearl Operation  Would Not Qualify As Proved Reserves At Year-End 2016.............................111

       4.     Failure To Disclose That Carbon "Proxy Cost" Was Not Used In Processes For The Canadian Bitumen Operations...................................113

       5.     Failure To Incorporate A Carbon "Proxy Cost" Into Proved Reserves And Asset Impairment Calculations.........................................115

6.      Failure To Record An Asset Impairment  Charge For Rocky Mountain Dry Gas Operations .................................................116

VI.     DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES .....................................120

    A.      Derivative Allegations ........................................................120

    B.      Fiduciary Duties....................................................................121

    C.      Breaches Of Fiduciary Duties Including Demand Refusal................................122

VII.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION.............127

VIII.   DAMAGES TO EXXON ............................................................128

COUNT I .........................................................................130

    Against the Individual Defendants for Breach of Fiduciary Duty ...................................130

COUNT II ........................................................................132

    Against the Individual Defendants for Waste of Corporate Assets ................................132

COUNT III........................................................................133

    Against the Individual Defendants for Unjust Enrichment............................................133

COUNT IV........................................................................133

    Against the Class Action Defendants for Contribution Under Section 10(b) and 21D of the Exchange Act ..................................................133

COUNT V ........................................................................134

    Against the Class Action Defendants for Violations of Section 29(b) of the Exchange Act..................................................................134

PRAYER FOR RELIEF .......................................................135

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint for Violations of the Federal Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff which are based on personal knowledge.  This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiff on behalf of Nominal Defendant Exxon Mobil Corporation ("Exxon" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.  These wrongs resulted in hundreds of millions of dollars in damages to Exxon's goodwill and business reputation. Moreover, the misconduct has exposed the Company to billions of dollars in potential liability for violations of state and federal law.

2.      Exxon's corporate worth is closely tied to the amount and value of its oil and gas reserves.   These assets consist primarily of extremely expensive long-term hydrocarbon exploration and extraction projects.  As detailed herein, Exxon has a well-documented history of intentionally misleading the public concerning global climate change and its connection to fossil fuel usage, as well as the impact the changing climate will have on Exxon's reserve values and long-term business prospects.

3.      On March 31, 2014, Exxon released a report entitled "Energy and Carbon – Managing the Risks" (the "MTR Report") to settle an ongoing negotiation with several

shareholders.[1]  In exchange, these shareholders agreed to withdraw their proposed shareholder resolution that sought additional disclosures concerning the potential risks global climate change posed to Exxon's reserves and long-term business prospects.

4.      The purpose of the MTR Report was to "address important questions raised recently by several stakeholder organizations on the topics of global energy demand and supply, climate change policy, and carbon asset risk."  The MTR Report also stated that "[Exxon] makes long-term investment decisions based in part on our rigorous, comprehensive annual analysis of the global outlook for energy" (the "Outlook").  The MTR Report also assured investors that, "[b]ased on this analysis, we are confident that none of our hydrocarbon reserves are now or will become 'stranded.'"

5.      Exxon's purported use of a "*proxy cost of carbon*" was described in the MTR Report.  For example, the MTR Report represented that Exxon "address[es] the *potential for future climate-related controls*, including the potential for restriction on emissions, through the use of a *proxy cost of carbon*."  The MTR Report further stated that "[t]he proxy cost seeks to reflect all types of actions and policies that governments may take over the Outlook period relating to the exploration, development, production, transportation or use of carbon-based fuels."  And, the MTR Report described the proxy cost of carbon as being "*embedded*" in the Company's Outlook which served as the *primary basis* for Exxon's assurance to investors that *none* of the Company's hydrocarbon reserves were or would become "'stranded.'"

---

[1]  A true and correct copy of the MTR Report is attached as Exhibit 1 to the Affirmation of John Oleske in Opposition to Exxon's Motion to Quash and in Support of the Office of the Attorney General's Cross-Motion to Compel (N.Y. Sup. Ct., N.Y. Cty. June 2, 2017) ("Oleske Affirmation") which is attached as Exhibit A to this complaint.

6.      Also on March 31, 2014, Exxon issued a report entitled "Energy and Climate" (the "E&C Report"), representing that "in the OECD nations [which include Canada and the United States], *we apply a proxy cost that is about $80 per ton in 2040*."  Exxon further disclosed that "[t]his GHG proxy cost is *integral* to ExxonMobil's planning."[2]

7.      The MTR Report and the E&C Report contained material misrepresentations concerning Exxon's purported use of a carbon "proxy cost."  According to internal Exxon documents produced to the New York Office of the Attorney General ("NYOAG") and a sworn affirmation provided by the NYOAG under penalty of perjury, Exxon's actual investment and asset valuation processes did not comport with the Company's public representations concerning its supposed use of a carbon "proxy cost."  Specifically, and contrary to Exxon's public statements: (i) the Company's internal policies actually prescribed the use of a *separate, undisclosed* set of proxy costs that were *significantly lower* than those described in the MTR Report, the E&C Report, and Exxon's other public statements concerning its investment and asset valuation processes; (ii) contrary both to Exxon's internal policies and its representations to investors, Exxon used no carbon "*proxy costs*" at all in connection with its investment and asset valuation processes for certain projects, including its bitumen heavy crude operations in Alberta, Canada (the "Canadian Bitumen Operations"); and (iii) until at least 2016, Exxon used no carbon "proxy costs" at all in connection with the Company's asset impairment determinations for its reserve assets. Accordingly, Exxon's statements to investors were improper.

---

[2] All references herein to "GHG" refer to "greenhouse gas."  With regard to Exxon's purported use of proxy costs, the terms "carbon" and "GHG" are used interchangeably throughout this complaint.

8.     Moreover, as detailed in the Declaration[3] of Charlotte J. Wright, Ph.D., CPA, an accomplished oil and gas accounting and economic expert with 35 years of experience , Exxon's failure to employ carbon proxy cost policies that actually corresponded to its public statements violated Generally Accepted Accounting Principles ("GAAP"), SEC accounting and disclosure requirements, and established accounting practices and guidance.

9.     Shortly after Exxon issued the MTR Report and E&C Report in 2014, world-wide oil and gas prices declined swiftly.  The reported causes for the dramatic price decline included, among other things, a shift in the global economy to become "less fuel intensive" as a result of the information technology revolution and "[c]oncerns over climate change."[4]

10.     In response to the sustained decline in oil and gas prices, Exxon's peers wrote off or abandon *more than $200 billion* worth of oil and gas reserves, acknowledging that such assets were no longer viable investments capable of generating a profit.  Exxon, however, remained steadfast, repeatedly assuring investors that the Company's superior investment processes and project management distinguished Exxon from its competitors and effectively allowed the Company to avoid the consequences befalling oil and gas companies around the world.  In 2015, Defendant Rex W. Tillerson ("Tillerson") typified the Company's brazen attitude by flatly declaring: "We don't do write-downs."

11.     Despite statements to the contrary, Exxon was not immune to the challenges imposed by the historic oil and gas price declines.  Indeed, by the end of 2015, Exxon had declining

---

[3] A copy of the Declaration of Charlotte J. Wright, Ph.D., CPA ("Wright Declaration" or "Wright Decl."), which includes a copy of Dr. Wright's curriculum vitae, is attached as Exhibit B to this complaint.

[4] International Energy Agency, 2015 Medium-Term Oil Report, Feb. 11, 2015.

profits, rapidly rising levels of debt, and an increasingly unsustainable commitment to shareholder payouts.  As a result, the Company risked losing its treasured 67-year old AAA credit rating.

12.     Moreover, Exxon's key reserves were struggling by year-end 2015.  For example, the Company's expensive and controversial Canadian Bitumen Operations were losing money.  And, an open-pit mining operation at Kearl Lake (the "Kearl Operation") was on the verge of losing its "proved" reserve classification.  At the time, the 3.6 billion barrels of purportedly proved reserves at the Kearl Operation represented approximately 14% of Exxon's entire proved reserves portfolio.  Finally, Exxon recorded a significant asset impairment charge for the Company's Rocky Mountain dry gas operations in its Form 10-K because they no longer justified their applicable "carrying value" on Exxon's financial statements.[5]

13.     But Exxon did not disclose these facts because doing so would contradict Exxon's repeated assertions that it was unaffected by the problems plaguing its competitors, and more importantly, would place the Company's prized AAA credit rating in significant jeopardy.  Moreover, the AAA credit rating was particularly important to Exxon at that time given the Company's upcoming $12 billion public debt offering scheduled for March 2016.   Exxon desperately needed this offering in order to support its operations and continue paying a shareholder dividend, a key component of the Company's reputation and stock price.  Any decline in Exxon's credit rating would have had significant, negative implications for the Company's upcoming debt offering, and Exxon's ability to maintain its dividend at current levels, which motivated Exxon to refrain from disclosing additional unfavorable news in early 2016.

---

[5] The terms "Form 10-K" and "Form 10-Q" are used to refer, respectively, to Exxon's year-end Form 10-K reports and quarterly Form 10-Q reports filed with the SEC.

14.     Rather than disclose that the Canadian Bitumen Operations had lost money for several months in the Company's 2015 Form 10-K (filed on February 24, 2016), Exxon reported that all was well with those operations, detailing an average profit of $5 per barrel over the course of 2015.[6]  Exxon also failed to disclose the significant asset impairments concerning its Rocky Mountain dry gas operations in the 2015 Form 10-K, which was materially misleading as a result. Moreover, as detailed in the Wright Declaration, Defendants' failure to disclose the above problems concerning the Canadian Bitumen Operations and Exxon's Rocky Mountain dry gas operations violated GAAP, SEC accounting and disclosure requirements, and other established accounting practices and guidance.

15.     Only one month after Exxon issued its improper 2015 Form 10-K, the Company successfully completed its $12 billion debt offering.  The next month, Standard & Poor's ("S&P") did in fact strip Exxon of its prized AAA rating, downgrading the Company to AA+ on April 26, 2016.  Matters worsened for Exxon when the SEC began investigating the Company's ability to somehow avoid the significant asset impairments and write-downs that had plagued the rest of the oil and gas industry over the past two years.  At that time, Exxon also continued to face similar ongoing investigations from several state Attorneys General.

16.     By October 2016, Exxon gave in to the pressure and, despite the significant rise in oil prices during the second half of 2016, belatedly admitted it was not immune to the impacts of the oil and gas price declines dating back to 2014.  Specifically, on October 28, 2016, the Company issued a news release announcing its financial results for the third quarter ended September 30, 2016.  In the release, Exxon disclosed that *nearly 20%* of the Company's proved oil and gas

---

[6] Unless otherwise noted, all prices set forth herein are provided in units of U.S. Dollars ("USD").

reserves might no longer satisfy the SEC's "proved reserves" definition at year-end, which would require such assets to be "de-booked" as proved reserves. Exxon stated that "[i]f the average prices seen during the first nine months of 2016 persist for the remainder of the year, under the SEC definition of proved reserves, certain quantities of oil, such as those associated with the Kearl oil sands operations in Canada, will not qualify as proved reserves at year-end 2016." In response, the market punished Exxon's stock as market capitalization fell by $14.9 billion, or 4.14%.

17.     But Exxon's October 28, 2016 disclosure only partially revealed the truth regarding the Individual Defendants' breaches of fiduciary duty and improper statements. Contrary to Exxon's warning that de-booking would be required "[i]f the average prices seen during the first nine months of 2016 persist for the remainder of the year," the truth was that de-booking was all but certain, even if prices increased significantly. Indeed, at the time Exxon issued its October 28, 2016 news release, the Company knew that it could only avoid de-booking and asset impairment changes by refraining from full disclosure.

18.     Next, on January 31, 2017, Exxon revealed that it would be recording an impairment charge of $2 billion largely related to its Rocky Mountains dry gas operations and that the Kearl Operation's proved reserves would, in fact, be de-booked when Exxon announced its final year-end reserves in the next couple of weeks. This news shocked the market and Exxon's stock price fell nearly $2 per share or 2.26% as a result.

19.     In response to the foregoing misrepresentations and revelations, a related securities class action was filed on behalf of a proposed class of harmed investors (Dkt. No. 62 in Civil Action No. 3:16-cv-03111-K) ("Related Securities Class Action"). On August 14, 2018, this Court issued its Memorandum Opinion and Order in the Related Securities Class Action finding the lead plaintiff adequately pleaded securities fraud claims under Section 10(b), Rule 10b-5, and

Section 20(a) against the Company, Tillerson, Defendant Andrew P. Swiger ("Swiger"), and David S. Rosenthal ("Rosenthal"), and under Section 20(a) against Jeffrey J. Woodbury ("Woodbury").

20.    Specifically, this Court found, *inter alia*, that the plaintiff in the Related Securities Class Action adequately alleged falsity in that: (i) Exxon made material misstatements regarding the Company's use of proxy costs in formulating business and investment plans; (ii) Exxon made a material misrepresentation by failing to recognize an impairment of its Rocky Mountain dry gas operations in 2015, despite a number of red flags arising in 2015 that indicated Exxon's Rocky Mountain dry gas operations were impaired; (iii) Exxon made a material misstatement by failing to disclose the Canadian Bitumen Operations operated at a loss for three months; and (iv) Exxon made material misstatements by failing to inform or sufficiently warn investors of the high likelihood that the Kearl Operations would be de-booked by year-end 2016; and (v) Exxon's Form 10-Ks and Form 10-Qs throughout the class period contained materially misleading information and violated GAAP based on their use of a lower proxy price than publicly disclosed and their failure to sufficiently warn investors of the high risk of impairment and de-booking of certain proved reserves.

21.    Moreover, this Court found that scienter was adequately plead in the Related Securities Class Action in that: (i) as members of the Management Committee, Defendants Tillerson and Swiger would have extensive knowledge of the proxy cost of carbon and should have known a different proxy cost was stated in the Outlook than was actually applied to business operations and investments; (ii) Defendants Tillerson, Swiger, and Rosenthal had reason to know the financial statements in Exxon's Form 10-Ks and Form 10-Qs were materially misleading; (iii) the Board of Directors and the Management Committee received in-depth briefings on and

actively engaged in discussions on ExxonMobil's financial position and risks of climate change; and (iv) the Company, through Defendant Tillerson, knowingly used a lower internal proxy cost than what Exxon told the public and investors it used in making investment and business decisions.

22.     On October 24, 2018, the NYOAG filed a complaint against Exxon for violations of the Martin Act Securities Fraud, Persistent Fraud and Illegality, Actual Fraud, and Equitable Fraud.   The NYOAG complaint claims that Exxon "employed internal practices that were inconsistent with its representations, were undisclosed to investors, and exposed the [C]ompany to greater risk from climate change regulation than investors were led to believe."  The NYOAG complaint subjects Exxon to tens of millions of dollars in damages as a result of the Individual Defendants' breaches of fiduciary duty.

23.     On July 7, 2017, Plaintiff sent a litigation demand to the Board of Directors of Exxon (the "Board") demanding that the Board: (i) investigate the foregoing facts and claims arising from them, and (ii) commence litigation against the corporate fiduciaries responsible for damaging Exxon, including certain of the Company's current and former officers and directors (the "Demand" – a true and correct copy of which is attached hereto as Exhibit C).

24.     More than 22 months have now passed since Plaintiff demanded that the Board investigate the allegations detailed herein.  However, the Board has yet to provide Plaintiff with a response to the Demand and has failed to explain the delay.  Accordingly, the Board has had more than enough time to conduct an investigation and to determine on the basis of that investigation whether the Demand's factual allegations and legal claims have merit.

25.     For these reasons and as set forth in greater detail herein, including the Board's unreasonable delay in investigating these matters, Plaintiff now files this action against the

Individual Defendants who abandoned their fiduciary duties and should now be held accountable for the financial and reputational harm suffered by Exxon and its shareholders.

## II.    JURISDICTION AND VENUE

26.    The Court has jurisdiction over all claims under 28 U.S.C. § 1331 in that the Complaint states a federal question.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

27.    This Court has jurisdiction over each Defendant herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

28.    Venue is proper in this Court in accordance with 28 U.S.C. § 1391(a) because: (i) Exxon maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Exxon, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.    THE PARTIES

### A.    Plaintiff

29.    Plaintiff Samuel Montini has been a shareholder of Exxon since at least 2013, has continuously been a shareholder since that time, and is a current Exxon shareholder.

- 10 -

B.    **Nominal Defendant**

30.    Nominal Defendant Exxon is a New Jersey corporation whose principal business is energy, including exploration for, and production of, crude oil and natural gas, manufacturing of petroleum products, and the transportation and sale of crude oil, natural gas, and petroleum products.  As of December 31, 2016, the number of regular employees at Exxon was 71,100, and the number of Company-operated retail sites employees was 1,600.  Exxon is a citizen of New Jersey and Texas, with its corporate headquarters located at 5959 Las Colinas Blvd., Irving, Texas.

C.    **Individual Defendants**

31.    <u>Defendant Darren W. Woods ("Woods")</u> is Exxon's Chief Executive Officer and Chairman and has been since January 2017.  Defendant Woods is also a director and has been since January 2016.  Defendant Woods is, and was at all relevant times, a member of Exxon's Management Committee.  Defendant Woods was Exxon's Senior Vice President from June 2014 to December 2015, President of ExxonMobil Refining & Supply Company from August 2012 to July 2014, Vice President, Supply & Transportation, ExxonMobil Refining & Supply Company from July 2010 to July 2012, and has held various positions with the Company and its predecessors since 1992.  Defendant Woods was the Chairman of Exxon's Finance Committee from at least April 2017 to present.  Exxon paid Defendant Woods the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Change in Pension Value | Total |
|------|--------|-------|--------------|---------------|-------------------------|-------|
| 2016 | $1,000,000 | $1,232,000 | $12,014,215 | $2,179,208 | $421,505 | $16,846,928 |
| 2015 | $736,667 | $1,219,000 | $7,241,492 | $954,492 | $143,221 | $10,294,872 |

32.    <u>Defendant Andrew P. Swiger ("Swiger")</u> is and has been Exxon's Principal Financial Officer since January 2013 and is and has been its Senior Vice President since April 2009.  Defendant Swiger is, and was at all relevant times, a member of Exxon's Management Committee.   Defendant Swiger was also Exxon's President of ExxonMobil Gas & Power

Marketing from 2006 to April 2013; Executive Vice President of ExxonMobil Production Company from 2004 to 2006 and has held various positions with the Company and its predecessors beginning in 1978.  Defendant Swiger is named as a defendant in a Related Securities Class Action complaint that alleges he violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Exxon paid Defendant Swiger the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Change in Pension Value | Total |
|------|--------|-------|-------------|--------------|------------------------|-------|
| 2016 | $1,287,500 | $986,000 | $9,330,748 | $3,805,931 | $146,568 | $15,556,747 |
| 2015 | $1,228,750 | $1,409,000 | $8,648,192 | $3,489,861 | $126,559 | $14,902,362 |
| 2014 | $1,142,500 | $1,876,000 | $8,644,160 | $4,355,277 | $116,619 | $16,134,556 |

33.     Defendant David S. Rosenthal ("Rosenthal") is Exxon's Vice President and has been since October 2008.  He has served as Controller since September 2014.  Defendant Rosenthal was also Exxon's Assistant Controller from June 2006 to September 2014, Controller of ExxonMobil Production Company from April 2002 to May 2006, and has held various positions with the Company and its predecessors beginning in 1979.  Defendant Rosenthal is named as a defendant in a Related Securities Class Action complaint that alleges he violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

34.     Defendant Jeffrey J. Woodbury ("Woodbury") was Exxon's Vice President of Investor Relations and Secretary from September 2014 to July 2018.  Defendant Woodbury was also Exxon's Vice President, Safety, Security, Health and Environment from July 2011 to August 2014.  He served as Executive Vice President of ExxonMobil Development Company from April 2009 to June 2011 and held various positions with the Company and its predecessors beginning in 1983.  Defendant Woodbury is named as a defendant in a Related Securities Class

Action complaint that alleges he violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.[7]

35.   Defendant Steven S. Reinemund ("Reinemund") is Exxon's Presiding Director and has been since May 2016.  He has served as a director of the Company since May 2007.  Defendant Reinemund was the Chairman of Exxon's Public Issues and Contributions Committee from at least April 2015 to April 2017 and a member of that committee from at least April 2014 to at least May 2017.  He served as a member of the Board Affairs Committee from at least April 2014 to at least May 2017 and a member of the Audit and Finance Committees from at least April 2013.  Exxon paid Defendant Reinemund the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $115,989 | $193,000 | $239 | $309,228 |
| 2015 | $110,000 | $231,075 | $340 | $341,415 |
| 2014 | $110,000 | $250,175 | $338 | $360,513 |

36.   Defendant Michael J. Boskin ("Boskin") was an Exxon director from January 1996 to May 2018.  He was the Chairman of Exxon's Public Issues and Contributions Committee from at least May 2017 and a member of that committee from at least April 2015 to at least May 2017.  Defendant Boskin was also the Chairman of the Audit Committee from at least April 2013 to at least April 2014 and a member of the Finance Committee from at least April 2013 to at least April 2014.  Exxon paid Defendant Boskin the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $110,000 | $193,000 | $239 | $303,239 |
| 2015 | $110,000 | $231,075 | $340 | $341,415 |
| 2014 | $114,093 | $250,175 | $338 | $364,606 |

---

[7] On August 14, 2018, the Court granted Exxon's motion to dismiss in the Related Securities Class Action as to the plaintiff's Section 10(b) and Rule 10b-5 securities claim against Woodbury, but did not dismiss the Section 20(a) control person liability claim against him.

37.     Defendant Samuel J. Palmisano ("Palmisano") is an Exxon director and has been since January 2006.  Defendant Palmisano was Exxon's Presiding Director from May 2008 to May 2013.  He was also a member of Exxon's Board Affairs Committee from at least April 2013 to at least May 2017.  Exxon paid Defendant Palmisano the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $120,000 | $193,000 | $239 | $313,239 |
| 2015 | $120,000 | $231,075 | $340 | $351,415 |
| 2014 | $120,000 | $250,175 | $338 | $370,513 |

38.     Defendant Kenneth C. Frazier ("Frazier") is an Exxon director and has been since May 2009.  Defendant Frazier was the Chairman of Exxon's Board Affairs Committee from at least April 2013 to at least May 2017 and a member of the Public Issues and Contribution Committee from at least April 2013 to at least April 2017.  Exxon paid Defendant Frazier the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $110,000 | $193,000 | $239 | $303,239 |
| 2015 | $110,000 | $231,075 | $340 | $341,415 |
| 2014 | $110,000 | $250,175 | $338 | $360,513 |

39.     Defendant Ursula M. Burns ("Burns") is an Exxon director and has been since November 2012.  Defendant Burns was the Chairman of Exxon's Audit Committee since at least May 2017 and a member of that committee from at least April 2013 to at least May 2017.  She was a member of the Finance Committee from at least April 2013 to at least May 2017.  Exxon paid Defendant Burns the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $110,000 | $193,000 | $239 | $303,239 |
| 2015 | $110,000 | $231,075 | $340 | $341,415 |
| 2014 | $110,000 | $250,175 | $338 | $360,513 |

40.     Defendant Henrietta H. Fore ("Fore") was an Exxon director from February 2012 to December 2017.  Defendant Fore was a member of Exxon's Audit Committee and Finance Committee from at least April 2017 to at least May 2017, and a member of the Board Affairs Committee and Public Issues and Contributions Committee from at least April 2013 to at least April 2016.  Exxon paid Defendant Fore the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $110,000 | $193,000 | $239 | $303,239 |
| 2015 | $110,000 | $231,075 | $340 | $341,415 |
| 2014 | $110,000 | $250,175 | $338 | $360,513 |

41.     Defendant William C. Weldon ("Weldon") is an Exxon director and has been since May 2013.  Defendant Weldon was a member of Exxon's Audit Committee and Finance Committee from at least May 2017, and a member of the Board Affairs Committee from at least April 2014 to at least April 2017.  Exxon paid Defendant Weldon the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $110,000 | $193,000 | $239 | $303,239 |
| 2015 | $110,000 | $231,075 | $340 | $341,415 |
| 2014 | $110,000 | $250,175 | $338 | $360,513 |

42.     Defendant Rex W. Tillerson ("Tillerson") was Exxon's Chief Executive Officer and Chairman from January 2006 to December 2016, a director from March 2004 to December 2016, President from March 2004 to January 2016, and has held various positions with the Company and its predecessors beginning in 1975.  Defendant Tillerson was the Chairman of Exxon's Finance Committee from at least April 2013 to at least April 2016.  He was a member of Exxon's Management Committee from at least April 2005 until his retirement on December 31, 2016.  Defendant Tillerson is named as a defendant in a Related Securities Class Action complaint that alleges he violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

Defendant Tillerson is a citizen of Texas.  Exxon paid Defendant Tillerson the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Change in Pension Value | Total |
|------|--------|-------|--------------|---------------|-------------------------|-------|
| 2016 | $3,167,000 | $1,670,000 | $19,731,375 | $2,249,342 | $575,850 | $27,393,567 |
| 2015 | $3,047,000 | $2,386,000 | $18,288,000 | $3,036,167 | $540,291 | $27,297,458 |
| 2014 | $2,867,000 | $3,670,000 | $21,420,000 | $4,683,892 | $455,420 | $33,096,312 |

43.    Defendant William W. George ("George") was an Exxon director from May 2005 to May 2015.  He was also a member of Exxon's Audit Committee and Finance Committee from at least April 2014 to at least April 2015 and a member of the Board Affairs Committee from May 2005 until May 2013.  Exxon paid Defendant George the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|-------------|-------------------|--------------|------------------------|-------|
| 2015 | $44,726 | $231,075 | $142 | $275,943 |
| 2014 | $110,000 | $250,175 | $338 | $360,513 |

44.    Defendant Larry R. Faulkner ("Faulkner") was an Exxon director from January 2008 to May 2017.  Defendant Faulkner was also the Chairman of Exxon's Audit Committee from at least April 2015 to at least April 2017 and a member of that committee from at least April 2013 to at least April 2017, and a member of the Finance Committee from April 2013 to at least April 2017.  Exxon paid Defendant Faulkner the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|-------------|-------------------|--------------|------------------------|-------|
| 2016 | $120,000 | $193,000 | $239 | $313,239 |
| 2015 | $120,000 | $231,075 | $340 | $351,415 |
| 2014 | $115,907 | $250,175 | $338 | $366,420 |

45.    Defendant Douglas R. Oberhelman ("Oberhelman") is an Exxon director and has been since May 2015.  Since at least May 2015, Defendant Oberhelman has been a member of the

Audit Committee and Finance Committee.  Exxon paid Defendant Oberhelman the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $110,000 | $193,000 | $239 | $303,239 |
| 2015 | $65,274 | $682,640 | $193 | $748,107 |

46.   Defendant Peter Brabeck-Letmathe ("Brabeck-Letmathe") was an Exxon director from May 2010 to May 2017.  He was also a member of Exxon's Audit Committee and Finance Committee from at least April 2013 to at least April 2017.  Exxon paid Defendant Brabeck-Letmathe the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $110,000 | $193,000 | $239 | $303,239 |
| 2015 | $110,000 | $231,075 | $340 | $341,415 |
| 2014 | $110,000 | $250,175 | $338 | $360,513 |

47.   The defendants identified in ¶¶ 31-34, 42 are referred to herein as the "Officer Defendants."   The defendants identified in ¶¶ 35-46 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶ 35-36, 39-41, 43-46 are referred to herein as the "Audit Committee Defendants."  The Defendants identified in ¶¶ 32-34, 42 are referred to herein as the "Class Action Defendants."  Collectively, the Defendants identified in ¶¶ 31-46 are referred to herein as the "Individual Defendants."

48.   As further described herein, the Officer Defendants knowingly, recklessly, or with gross negligence and the Director Defendants knowingly or recklessly made improper material statements and omissions in the Company's press releases and public filings concerning Exxon's: (i) use of a proxy cost of carbon that differed materially in value in internal documents than the value disclosed to the public; (ii) failure to recognize an impairment of its Rocky Mountain dry gas operations; (iii) refusal to disclose material losses from its Canadian Bitumen Operations; and

(iv) inadequate attempt to warn investors of the high likelihood that the Kearl Operation would be "de-booked" by year-end 2016.

## IV.    STATEMENT OF FACTS

### A.    Oil And Gas Industry Background

49.    The oil and gas industry is separated into three main parts: "upstream," "midstream," and "downstream" operations.  Upstream operations encompass the exploration, acquisition, development, and extraction of raw oil and gas commodities.  Companies that operate exclusively in the upstream segment are referred to as "independents" or "E&P" companies.  Midstream operators provide the necessary link to gather and transport the raw upstream products from often remote petroleum-producing regions in the world, to the downstream operators, where the products can be refined, marketed, and sold.

50.    Downstream operations include the processing and refining of the raw products extracted by upstream operators, and also include oil refineries, petrochemical plants, fuel distributors, and retail fuel outlets that provide a myriad of refined petroleum-based products, including gasoline, diesel, aviation fuel, heating oil, natural gas, lubricants, chemicals, plastics, and fertilizers.  Companies engaged in both upstream and downstream activities are considered "integrated" oil and gas companies.  The largest integrated oil and gas companies are known as "majors."  The largest handful of such "majors" are often referred to as "supermajors."  Exxon is considered a supermajor.

51.    Exxon's operations and financial reporting have three relevant components here: (i) the size and nature of the capital investments and various costs associated with an upstream oil and gas operation; (ii) the definition and significance of "proved reserves"; and (iii) the recognition of asset impairment charges in connection with capitalized oil and gas reserves.

52.     In light of the oil and gas industry's commodity-based nature, the financial performance of any company operating within the oil and gas industry is significantly impacted by changes in crude oil and natural gas prices, or by changes in the profit margins of refined petroleum products in the downstream segment.  As such, increases in supply or reductions in demand for petroleum-based commodities can materially impact earnings negatively.

53.     Economies of scale is a major driver for the profitability of upstream petroleum production.  Specifically, the size of the petroleum deposits in a particular area or reservoir is important.  In order to benefit from such economies of scale, upstream operators are required to invest massive amounts of capital to develop large, technologically complex projects, such as, for example, in the Canadian oil sands, which consist of large unconventional petroleum reserves made up of extremely heavy and viscous bitumen located in remote areas in Alberta, Canada.

54.     The specific capital investment and operating costs associated with upstream operators' efforts to find and produce petroleum products ("upstream costs") are classified by four categories that roughly correspond to the order in which the costs are incurred:

(i)     Acquisition costs.  Costs incurred in acquiring the rights to explore for, drill and produce oil and natural gas.

(ii)    Exploration costs.  Costs incurred in exploring a property, often with geophysical techniques, or by drilling test wells.

(iii)   Development costs.  Costs incurred in preparing proved reserves for production, including costs of development wells, installing facilities for extracting and treating, gathering and storing oil and gas.

(iv)    Production costs.  Costs to lift the oil and gas to the surface and in gathering, treating and storing the oil or gas.  These costs also include the costs to operate and maintain the plant and equipment, as well as royalties, transportation costs, certain taxes, GHG emission-related expenses, and certain administrative costs.

55.     Long before a single barrel ("bbl") of petroleum is ever recovered or sold, the first three categories of upstream costs can account for as much as half of a complex project's total

cost.  Companies that use the "full cost" method of accounting capitalize and amortize all of their costs associated with these three categories over the anticipated production life of a given project.

56.     Other companies, including Exxon, employ the "successful efforts" method of accounting, which requires them to capitalize and amortize all of their acquisition and development costs, but only a portion of their exploration costs.  Specifically, those exploration costs generally attributable to successful exploration efforts.  Regardless of accounting method, all production costs are generally not capitalized but rather are expensed as incurred.

### 1.     Reporting Requirements For "Proved" Oil And Gas Reserves

57.     An oil and gas company's most valuable asset (*i.e.*, "reserves"), is the amount of hydrocarbons underground that the company has rights to or owns.  The total estimated amount of oil or gas in a petroleum reservoir is referred to as the volume of petroleum "in place." Significantly, due to economic considerations, only the fraction of the petroleum in place that is technologically and commercially feasible to recover can be classified as "reserves" under the widely accepted definitions.

58.     Reserves for which the total estimated revenue generated by the hydrocarbons exceeds the upstream costs plus an acceptable margin or profit are referred to as "commercial feasible reserves".  These reserves are further classified as either "proved," "probable," or "possible," in order of the likelihood that they will yield an economically profitable recovery.

59.     The main category of reserves disclosed in an oil companies' public financial statements are "proved reserves".  These reserves must satisfy the SEC and FASB "proved reserves" definition and represent the amount of hydrocarbons in a particular reservoir with the highest confidence of economically feasible recovery at the commodity's current price at the time.

60.     Proved oil and gas reserves represent the future cash flow of an upstream oil and gas company.  The successful discovery, development, production, and ongoing replacement of such proved oil and gas reserves are all critical factors to the financial survival of an upstream oil and gas company.  Indeed, because Wall Street research analysts and investors use reported proved reserve amounts to value upstream companies and make predictions concerning their revenue and earnings, the quantity, type, and replacement ratio of proved reserves have a significant effect on an oil and gas company's stock price.

61.     The SEC and FASB require all public companies engaged in significant oil and gas activities to supplement their public financial statements with additional reserve disclosures required by the FASB Financial Accounting Standards Codification Topic 932, *Extractive Activities – Oil and Gas* ("ASC 932").  ASC 932 requires supplemental reporting of information about oil and gas reserves, including the following: (i) proved oil and gas reserve quantities; (ii) capitalized costs relating to oil and gas producing activities; (iii) costs incurred for property acquisition, exploration, and development activities; (iv) results of operations for oil and gas producing activities; and (v) a standardized measure of discounted future net cash flows relating to proved oil gas reserve amounts.

62.     Because proved reserves are a critical measure of the potential future profitability of an upstream oil and gas company or business segment, the SEC's Regulation S-X Rule 4-10 defines the strict criteria under which reserves can be considered "proved," and includes the crucial hurdle that such reserves must be "economically" produced at a profit in the economic environment existing when the public financial statements are filed.  The determination of whether certain reserves meet the SEC's "economic producibility" under "existing economic conditions" test for proved reserves requires consideration of both historical prices and expected future costs.  SEC

Rule 4-10(a)(22)(v) has defined the assumed future sales price to be used in the test for every barrel of estimated proved reserve to be the "lookback" arithmetic average price of the first-day-of-the-month prices for the prior 12 months of the reporting period, unless future sales price commitments are defined by contractual arrangements, as further detailed herein.

63.     The first-day-of-the-month prices must be adjusted to reflect the physical location and quality of the proved reserves.  Forecasted petroleum prices, futures prices, or inflation are not to be used.  The estimated cost of each barrel of reserve to be used in the proved reserve calculation is the period end cost level applied to each year in the future for which there will be production of the proved reserves.  While inflation escalations cannot be considered, known cost changes in the future, including tax and royalty changes and major maintenance, must be included.

64.     Finally, SEC rules require disclosure of the "revision" of the previously estimated proved reserves quantity when applying these updated calculations results in a determination that previously classified proved reserves are no longer economically producible under the economic conditions existing at the end of the new reporting period.  This revision, often referred to as a "de-booking" of proved reserves, appears in the supplement to the notes to the financial statements as a negative revision to the beginning of the year proved reserves quantities.

### 2.     Capitalized Oil And Gas Projects Impairments

65.     Exxon and other oil and gas operators are required to capitalize a significant amount of the costs associated with their acquisition, exploration, and development of oil and gas producing projects as assets on their corporate balance sheets.  Such assets represent resources that are expected to generate future cash flows in excess of the capitalized costs associated with the project.  Should a time come, however, when the project's forecasted future net cash flows are no longer expected to exceed the capitalized project costs, the asset is said to be "impaired," and must be written down to its actual fair value through the recording of an impairment charge against the

company's earnings.  Accordingly, recognition of an impairment charge reduces the amount of profits the company reports to its shareholders and the investing market generally.

66.     As detailed herein, financial accounting rules outline broad circumstances in which an oil and gas company's long-lived assets might be impaired and prescribe specific tests to measure projected future cash flows to determine if this is the case.  Persistently low oil or gas prices are often the cause of asset impairment charges in the oil and gas industry, as expected future petroleum price levels directly impact future cash flow and profitability and, therefore, whether the huge upfront costs related to the acquisition and development of a project will ultimately be recovered.  As detailed herein, during the global collapse of oil and gas prices during 2014 and 2015, oil and gas companies worldwide were forced to record hundreds of billions of dollars' worth of asset impairment charges

### 3.     Oil And Gas Pricing

67.     An oil or gas "benchmark" refers to a specific, established hydrocarbon product with a defined chemical composition that is bought and sold at a specific regional location. Because there are a myriad of different types and grades of oil and gas products and the transportation costs associated with getting the products to their desired locations can be significant, each specific commodity is generally priced by referencing the "benchmark price" for a known composition at a known location.  Next, a discount, or "differential," is applied that reflects the commodity's quality compared to the benchmark and the additional transportation costs associated with the specific location at which the particular commodity is purchased.

68.     The "breakeven price" for an operation seeks to define the average price an operator needs to sell its product for in order to adequately cover its costs for the operation and turn a profit, or breakeven.  Breakeven prices can be defined from both a "full cycle costs" perspective and "current cash costs" perspective.

69.     The "full cycle costs" for an upstream project refers to the full set of upstream costs, projected over the complete life of the project, plus a reasonable return on investment (including a risk premium for investing in the oil business).   Accordingly, as used herein, the "full cycle breakeven price" is derived by dividing the total full cycle costs over the life of the project by the estimated total barrels of reserves expected to be available over the life of the project.  The resulting figure – the full cycle breakeven price – provides an estimate of the average per barrel sales price needed over the life of the project in order for the operation to recover its full cycle costs and make a profit over the span of the operation's projected life.

70.     Alternatively, the term "cash breakeven" price, as used herein, refers to the average per barrel sales price needed by an operator at a given point in time in order to cover the operation's current out-of-pocket expenses during the period in question (*i.e.*, the expenses and costs associated with the actual production and sale of the particular operation's hydrocarbon product).

71.     If the prices received for the commodity produced from an upstream operation generally stay at or above the full cycle breakeven price, the operator has an incentive to sustain investment and activity in the project.  Alternatively, if the prices received fall below the full cycle breakeven price, the operations will not be sustainable over time.

**B.      Exxon's Business Operations**

72.     Headquarter in Irving, Texas, Exxon is the world's largest oil company and one of the ten largest companies in the world.  A New Jersey corporation since 1882, the ExxonMobil conglomerate resulted from the merger of Exxon and Mobil Corporation in 1999.  Exxon has three primary business segments: (1) an upstream segment, which includes its exploration and production operations (commonly referred to as E&P); (2) a downstream segment, which includes its refineries and retail operations; and (3) a chemicals segment, which includes the manufacturing and sale of various petrochemicals.

73.     Exxon's upstream business segment has historically been responsible for the majority of the Company's profits.  For example, in 2014, Exxon's upstream operations generated approximately $27.5 billion of net income or nearly 85% of the Company's total net income of $32.5 billion.  In 2015, Exxon's upstream operations generated approximately $7.1 billion of net income, which represented only about 40% of Company's total net income of $16.2 billion, but was still the largest percentage contribution among Exxon's three primary business segments.  In 2016, however, this trend shifted significantly, with Exxon's upstream operations generating only approximately $196 million of the Company's total net income of $7.8 billion or approximately 2.5%.  Exxon 2016 10-K at 36.

74.     Exxon has frequently touted the strategies for its upstream business segment as being focused on acquiring new hydrocarbon resources, exercising a disciplined approach to investing and cost management, developing and applying high-impact technologies, pursuing productivity and efficiency gains, growing profitable oil and gas production, and capitalizing on growing natural gas and power markets.

75.     The Company's upstream operations are centered on investments in risky, capital-intensive development projects.  Exxon's business model is dependent upon seeking out large oil and gas fields that require significant investments of capital over many years in order to establish an acceptable rate of return.  For the most part, Exxon's upstream growth is through acquisitions, as opposed to organic growth.  For example, at the time that Exxon acquired XTO Energy in 2010, that single acquisition accounted for 80% of all of the oil reserves Exxon added that year.

76.     The SEC requires E&P companies to disclose their oil and gas reserves on an annual basis.  These reserves reports include all oil and gas reserves, both proved reserves and

overall reserves.   During the relevant period, Exxon disclosed declining year-end reserves of 25.3 billion oil-equivalent barrels (2014), 24.8 billion (2015), and 20 billion (2016).

77.     Exxon's need to aggressively acquire new resources was reflected in its reporting of "Reserves Replacement" statistics which is a key indicator of a company's long-term ability to maintain or expand crude and gas output.   On February 23, 2015, the Company issued a press release reporting that its 2014 reserves replacement rate was 104% for the 2014 year.   Exxon further boasted to the market that its reserve replacement rate exceeded 100% for the 21st consecutive year.   However, for the year-end 2015, Exxon reported a proved reserves replacement rate of only 67% and an overall liquids replacement rate of 219%.   Exxon claimed a "long reserve life of 16 years," which "lead[s] competition."   In reporting these rates, Exxon claimed it used "[r]igorous reserves evaluation process[es]" and maintained "the highest integrity."   Transcript of March 2, 2016 Exxon Mobil Corp. Analyst Meeting at 8.

78.     Exxon claimed that since 2012, the Company had "started up 22 major Upstream projects, adding more than 940,000 oil-equivalent barrels per day of working interest production capacity."   Exxon also stated it was "on track to start up 10 new Upstream projects in 2016 and 2017, adding 450,000 oil-equivalent barrels per day of working-interest production capacity."   Press Release, Exxon, *Exxon Mobil Focuses on Business Fundamentals; Paced, Disciplined Investing* (Mar. 2, 2016).

79.     Historically, Exxon has been committed to issuing shareholder dividends.   Exxon has increased its dividend for 34 consecutive years, with an annual increase of 10% per year over the past ten years.   On average, $0.40 of every dollar generated by Exxon businesses during the last five years has been distributed to shareholders.   On May 28, 2014, Defendant Tillerson articulated the degree of Exxon's unwavering commitment to paying its shareholder dividend by

stating: "we have a lot of dollars, and levers and knobs we can turn and push and pull to ensure that we can continue to deliver the kind of dividend performance that you've come to expect of us.  We're certainly committed to do that."  Two years later when Exxon issued its $12 billion public offering, Defendant Tillerson further confirmed the importance of Exxon's dividend to the Company's reputation and corporate identity in connection with the offering, stating "yes, the dividend is a high priority, because it's part of why we are important to long-term shareholders."

80.     In addition to its dividend, Exxon has also aggressively repurchased shares of its common stock.  Since the Exxon and Mobil merger in 1999, Exxon reports it has reduced the overall outstanding shares of its stock by 40%, buying back about $210 billion of its own stock. In March of 2016, Exxon reported that it had "tapered" this program in 2015, only repurchasing $3 billion of its shares that year and only doing so to offset dilution, effectively discontinuing the Company's previous plan to purchase its own shares for the purpose of reducing the total number of Exxon shares outstanding.

81.     Exxon has also consistently stated that it surpasses its competitors in key performance metrics:

- "ExxonMobil's return on capital employed continues to outperform our peers.  The 2014 ROCE of 16.2% was more than 5 percentage points higher than our nearest competitor.  Over the past 5 years, ROCE averaged 21%, again about 5 percentage points higher than the next best competitor." Defendant Tillerson, Transcript of Exxon Mobil Corporation 2015 Analyst Meeting, Mar. 4, 2015, at 8.

- "Our sustained leadership and capital efficiency reflects our proven approach, which combines a disciplined investment approach [and] best-in-class project development capabilities . . . ." *Id.*

- "ExxonMobil's upstream profitability led the competitor group in 2014 . . . ." *Id.*

- "We're very well positioned to continue the same level of superior performance in the future, and we think that all underpins the strong credit rating that we have." Defendant Woodbury, Transcript of Q4 2015 Exxon Mobil Corp. Earnings Call, Feb. 2, 2016, at 20.

- 27 -

- "The Corporation is uniquely suited to endure these conditions and outperform competition, leaving us best-positioned to capture value in the upturn." Defendant Tillerson, Transcript of Exxon Mobil Corp. Analyst Meeting, Mar. 2, 2016, at 4.

82.     Similarly, during a March 2, 2016 meeting with analysts, Exxon claimed its superior performance over its peers was in part due to its "selectively investing in attractive opportunities" and its "[e]ffective project execution [which] provides the lowest installed capital cost."  The Company has repeatedly asserted that its financial performance is best in class and that it provides "industry-leading returns."  For example, in a March 2, 2016 press release, Defendant Tillerson stated:

> Exxon Mobil Corporation . . . is achieving industry-leading financial performance throughout the commodity price cycle by maintaining a focus on the fundamentals, selectively investing in the business and paying a reliable and growing dividend.

83.     Exxon has regularly boasted about its credit rating to support its superior performance claims.  For example, during a March 4, 2015 analyst meeting, Exxon cited its Standard & Poor's AAA credit rating to investors, boasting that its AAA rating gave it "[s]ubstantial flexibility to respond to opportunities"; and that it provided "[u]nmatched access to capital on the most attractive terms."  The Company also stressed to investors that its AAA credit rating was better than its peers Chevron (AA-), Shell (A+) and BP (A-).  S&P had a AAA rating on Exxon's debt for 67 years, dating back to July 5, 1949.  That credit rating was changed, however, when S&P downgraded Exxon's debit rating on April 26, 2016.

84.     Despite all its claims concerning superior performance, Exxon has failed to disclose details concerning many of its internal metrics and accounting standards, including how Exxon: (i) performs reserves analyses; (ii) conducts impairment analyses; and (iii) how it values and accounts for various actual and projected carbon costs, including taxes and regulatory issues. Moreover, Exxon also has a long history of refusing to record write-downs or impairments in

connection with its reserve assets.  Indeed, in 2015, Defendant Tillerson publicly stated in an interview with *Energy Intelligence* that "We don't do write-downs.  We are not going to bail you out by writing it down.  That is the message to our organization."

### 1.    Crude Bitumen

85.    The world's largest crude bitumen reserves are located in northern Alberta, Canada. Prior to the late-1990s and early-2000s, due to its complex and unconventional nature, extracting this resource in large quantities was generally not considered economically feasible.  However, rising oil prices between 2007 and 2014 caused unprecedented expansion of the oil industry, including bitumen reserves.  Bitumen is an unconventional petroleum source because it is almost solid at room temperature and too heavy or thick to flow or be pumped without being diluted or heated.  Bitumen requires significantly more processing than light crude oil before it can be used by refineries to produce usable fuels such as gasoline and diesel, which is one of the reasons bitumen is one of the world's most costly hydrocarbons to produce.

86.    Exxon has two important upstream projects in Alberta, Canada that involve the costly processing of bitumen-based crude oil: (i) the "Kearl Operation" and (ii) the "Cold Lake Operation" (previously collectively defined herein as the "Canadian Bitumen Operations").

87.    Canada's heavy, bitumen-based crude is not only some of the most expensive oil in the world to produce, it also sells at a very high discount relative to other global crude streams. After processing and cleaning, bitumen must be blended with a light-petroleum based mixing agent called diluent to enable it to flow through a pipeline.  For every ten barrels of raw bitumen, about three barrels of diluent are required.  This is significant because diluent is relatively expensive. There are other costs associated with bitumen as well, including high transportation costs for remote locations in Canada and the purchaser's higher refining costs incurring in removing the impurities from the heavier crude.

88.     In its 2015 Form 10-K, Exxon reported a total 4.56 billion bbls of proved reserves from the Canadian Bitumen Operations, roughly 75% of which were attributable to the Kearl Operations and the balance to the Cold Lake Operations.  At that time, the proved reserves from the Canadian Bitumen Operations comprised an enormous portion of Exxon's total worldwide proved reserves, accounting for 31% of Exxon's total liquids proved reserves and 18% of combined liquids and natural gas worldwide proved reserves.

89.     The Canadian Bitumen Operations were also important because of the outsized contribution they made to Exxon's important reported reserve replacement ratios.  Indeed, in Exxon's 2015 Form 10-K, the Company reported that proved reserve additions from the Canadian Bitumen Operations in 2014 and 2015 were 669 million bbls and 433 million bbls, respectively. This was Exxon's largest proved reserve additions of all the Company's geographic segments for 2014, and the second largest for 2015.  Without the Canadian Bitumen Operations' outsized proved reserve additions in 2014 and 2015, Exxon's reserve replacement ratios would have been a paltry 59% and 39% for 2014 and 2015, respectively, compared to the 67% and 104% Exxon reported for those years.

90.     The Kearl Operation occupies a seventy-five square mile leased tract of land in a remote forested area fifty miles northeast of Fort McMurray in Alberta, Canada.  The Kearl Operation first began production in mid-2013.  Canadian petroleum company Imperial Oil Limited ("Imperial") holds a 70.96% interest in Kearl, while ExxonMobil Canada holds the other 29.04% interest.  Exxon owns a majority controlling stake in Imperial, Exxon's fully consolidated subsidiary, which made a landmark discovery of oil at Leduc that marked the beginning of western Canada's great oil development in 1947.  While Imperial is a publicly traded company, its operations are fully consolidated onto Exxon's financial statements, because it is 69.9% owned by

Exxon.  In fact, the Company has owned and controlled Imperial for over 116 years.  ExxonMobil Canada is the Company's 100% owned subsidiary and was formed in 1999 when Exxon acquired Mobil Canada.

91.     The size of Exxon's capital expenditure commitment to acquire, explore, and develop the Kearl Operation before it eventually opened in 2013 was enormous.  According to *The Wall Street Journal*, "[f]or its Kearl oil sands project in Alberta, Exxon invested more than $20 billion."[8] To put this figure in perspective, in 2015, Exxon's total acquisition, exploration, and development costs for all of its projects worldwide was $23.4 billion.  Significantly, the costs described above are only the capital expenditures to explore and build the Kearl Operation's infrastructure and do not include the annual recurring production costs needed to actually operate the mine which in 2015, totaled approximately $1.4 billion.

92.     The economic viability of the Kearl Operation quickly evaporated with the collapse of oil prices by 2015.  In 2008, the year Exxon announced the completion of the Kearl Operation engineering and design work, the WCS crude benchmark price climbed as high as $129/bbl.  By the time Exxon had completed construction, commenced production, and began the phase 2 mine expansion at Kearl in 2013, oil prices had averaged roughly $72/bbl for three straight years.  By the time Exxon filed its 2015 public financial statements on February 24, 2016, the WCS benchmark price of heavy Canadian crude had experienced a steady 20-month collapse from a high of $87.23/bbl on June 12, 2014, to $14.50/bbl on January 20, 2016.

93.     Imperial's 100%-owned Cold Lake Operation is one of the largest, longest-running bitumen operations in Alberta, Canada.  Like the Kearl Operation, the tar-like bitumen product

---

[8] S. Kent, B. Olsen & G. Kantchev, Energy Companies Face Crude Reality: Better to Leave It in the Ground, Wall St. J., Feb. 17, 2017.

from Cold Lake requires the addition of diluent for transport to refineries via pipeline or railcar. Significantly, as part of its massive Canadian Bitumen Operations proved reserves revision at year-end 2016, Exxon disclosed that 200 million bbls of Cold Lake bitumen proved reserves were de-booked.  Imperial's SEC filings disclose that Cold Lake required periodic material capital expenditures for additional production wells and facilities.  Imperial ceased drilling new wells by year-end 2015, with no new wells drilled in 2016.  While Imperial had planned to significantly expand production capabilities at the Cold Lake Operation and applied for regulatory approval in early 2016 to have that option, Imperial's 2016 10-K discloses that "no final investment decision has been made" for the Cold Lake expansion plan.

94.     Beginning in 2007, the Province of Alberta, Canada began implementing a series of regulations aimed at addressing the amount of carbon dioxide ("$CO_2$") being emitted by large companies.  Alberta implemented the Specific Gas Emitters Regulation ("SGER"), which established the Climate Change and Emissions Management Fund ("CCEMC" or "Fund") and gave the Minister of the SGER authority to fund the CCEMC through a carbon pricing initiative, *i.e.*, a carbon tax.  Subject to these regulations, Exxon has been well over the minimum threshold.

95.     Additional regulations on GHG emissions have followed.  In November 2015, the government of Alberta announced a supplemental plan to establish an economy-wide carbon tax and impose a cap on emissions on the oil sands.  In June 2016, the OECD issued a report supporting this mission, stating that "Canada needs to step up its efforts to fight climate change."  OECD, *Promoting Green and Inclusive Growth in Canada* (June 2016), at Foreword.  The report noted that Alberta, which accounted for 36.8% of Canada's 726 megatons of carbon dioxide equivalent ("Mt $CO_2e$") emitted in 2013, has "high energy-related emissions and relatively low effective carbon prices." *Id.* at 32.  In 2017, Alberta began transitioning to the economy-wide carbon pricing

system through implementation of a carbon tax that will work alongside the SGER.  This carbon tax will not replace the Fund, but rather puts a price on GHG that were not covered under the existing carbon pricing initiative.

### 2.    Natural Gas Expansion

96.    In the late-2000s, Exxon was ranked as only the ninth largest natural gas producer in the United States and was facing difficulties in replenishing its natural gas resources.  Exxon was keenly aware that its technological capabilities in the natural gas extraction field were falling behind competitors.  The Company had essentially missed out on the extensive expansion in hydraulic fracturing or "fracking," which was being used to extract "tight" gas resources.

97.    Exxon reported its worst years ever for its reserve replacement rates in 2007 through 2009.  While Exxon officially reported a reserve replacement rate of 108% in 2008, this was only achieved after the SEC changed the definition to permit unconventional sources to be included within reserve calculations.  This allowed Exxon to include controversial oil sands (e.g., bitumen) in its reserve reporting.  Removing this addition from the calculation, Exxon's reserve replacement rate was only 27% in 2008.

98.    In response, Exxon began considering strategic transactions, including the acquisition of a large, domestic natural gas company with technological capabilities in fracking. In December of 2009, Exxon announced its acquisition of XTO Energy, Inc. ("XTO") – one of the largest natural gas producers in the United States – for about $40 billion in stock.  At year-end 2009, XTO reported 14.8 trillion cubic feet of proved reserves of natural gas.  The vast majority of XTO's production, over 80%, came from tight gas, conventional gas, and coal-bed methane reservoirs, as opposed to conventional shale gas.

99.    By acquiring XTO, Exxon became the largest domestic natural gas producer in the United States and gained approximately 45 trillion cubic feet of gas resources, including shale gas,

tight gas, coal bed methane, and shale oil.  As of 2017, Exxon owned approximately 1.7 million acres of land for dry gas production in the U.S. Rocky Mountain region, nearly all of which were obtained through the XTO acquisition.

100.    As of December 14, 2009, the Henry Hub price for natural gas was $5.41 per million British thermal units ("BTUs").  Shortly after Exxon's acquisition of XTO, the price for natural gas began to decline.  By April 20, 2012, the Henry Hub pricing for natural gas had fallen as low as $1.82 per million BTUs.  On June 27, 2012, Defendant Tillerson said the following before the Council on Foreign Relations in New York about the natural gas market: "'We are all losing our shirts today. . . .  We're making no money.  It's all in the red.'"  J. DiColo & T. Fowler, *Exxon: 'Losing Our Shirts' on Natural Gas*, Wall St. J., June 27, 2012.

101.    On May 8, 2013, the SEC sent a letter to Exxon requesting that it explain whether Exxon had performed an impairment analysis in 2012 as a result of the significant decline in the price of natural gas.  On June 19, 2013, Exxon responded, admitting that it had not performed an impairment analysis, claiming that Exxon, "does not view temporarily low prices or margins as a trigger event for conducting impairment tests."

102.    On September 20, 2013, the SEC again confronted Exxon about its failure to consider low natural gas prices as a triggering event requiring the Company to undertake an impairment review pursuant to the applicable SEC guidelines.  In response, on October 18, 2013, Exxon admitted it had not performed an impairment review of its North American upstream assets, but claimed that it was not required to do so under the applicable SEC rules because, among other things, the assets "were not subject to a significant decrease in market value" and "did not undergo a significant adverse change in the extent or manner in which they were being used" or "in the legal environment, the business climate, or action by a regulator."

C.     **Oil And Gas Prices Began**
**A Prolonged Slump In 2014**

103.    In 2014, oil and gas prices began a spectacular multi-year collapse after years of relatively stable, record-high global oil price levels.  In what became known as the great oil crash of 2014, global prices fell at least 75% by 2016.  The benchmark for oil produced by Exxon's Canadian Bitumen Operations, WCS, fell a staggering 83% from its June 2014 high of $87.23 per barrel to $14.50 per barrel in January 2016.

104.    On February 11, 2015, the International Energy Agency ("IEA") published its 2015 Medium-Term Oil Market Report, which described the perfect storm of converging factors that made the current collapse unique and the prospects of recovery bleak: "[u]nlike earlier price drops, this one is both supply- and demand-driven, with record non-OPEC supply growth in 2014 providing only one of the factors behind it, unexpectedly weak demand growth another. . . .  The global economy, reshaped by the information technology revolution, has generally become less fuel intensive.  Concerns over climate change are recasting energy policies."

105.    Exxon's own independent accounting firm stated that the underlying factors contributing to the price collapse would not improve in 2016.  Rather, PwC predicted that conditions would continue to deteriorate for the remainder of the year, "The sensational drop in oil prices—below US$40 per barrel at the end of 2015, down more than 60 percent from their high in the summer of 2014—reflects rampant supply and weak global demand amid concerns over slowing economic growth around the world, especially in China.  This imbalance is only going to worsen this year."

106.    At the same time, the fossil fuel industry was also facing increased competition from renewable energy resources, further weakening global demand for oil.  In 2015, the trend toward renewable energy continued to set new records and place additional strain on the already

struggling fossil fuel industry.  According to the 2016 Global Trends in Renewable Energy Investment report commissioned by the United Nations Environment Programme, investment and new capacity in renewables outpaced that of fossil fuels in 2015.  The chief economist of the IEA noted the dramatic shift away from fossil fuels, stating: "'Oil and gas was the largest investment source for 100 years.  This changed in 2016 . . . .  With robust investment in renewable energy, increased investment into electricity networks, electricity is now the biggest area of capital investment.'"

107.    The increased competition from clean energy coupled with the negative impact of the price collapse on integrated and upstream oil companies was severe.  As PwC observed, upstream profits for fossil fuel companies like Exxon evaporated in 2014 and 2015, and the industry was forced to institute massive cost cutting measures, layoffs, and project cancellations to stem the financial hemorrhaging: "Twelve months later, upstream profits had been wiped out.  In response, companies are slashing outlays.  They are expected to cut capital expenditures by 30 percent in 2016.  Already, some $200 billion worth of projects have been canceled or postponed."

108.    Natural gas prices also steeply descended.  In early 2014, the Henry Hub benchmark price for gas reversed course and slid for almost 2 years, dropping an incredible *80%* from the February 2014 price of $8.15/per million BTU to $1.63/per million BTU in December 2015.

**1.      Exxon's Competitors Took
        Massive Impairment Write-Downs**

109.    The value of a company's capitalized oil and gas assets are tied to the current and expected future price of oil and gas.  Because of this, the global price collapse, combined with persistently low oil prices and a darkly pessimistic global price outlook, caused massive industrywide write-offs in 2014 and 2015.  On September 13, 2015, *The Wall Street Journal*

reported that in the first two quarters of the year, U.S. oil and gas companies had already "written down the value of their drilling fields by more in 2015 than any full year in history, as the rout in commodity prices makes properties across the country not worth drilling."

110.    According to IHS Herold, over 60 oil and gas producers took impairment charges totaling $59.8 billion through June 2015, and an IHS analyst predicted that "[t]here will be pricing impairments for the next two quarters, at least."  In fact, by year-end 2015, U.S. oil companies, many with significant Canadian oil sands holdings, took almost $200 billion in project-related asset impairments.  Indeed, Exxon's refusal to record impairment during 2014 and 2015 stood in stark contrast to its peers such as Royal Dutch Shell, Total S.A., BP Plc., Chevron, and ConocoPhillips, which took billions of dollars in impairments during this timeframe.

111.    Notably, by 2015, Exxon's peers had recognized huge asset impairment write-downs in the same Rocky Mountain and Canadian regions where Exxon was operating.  Canadian oil sands operators were hit particularly hard, as low oil prices led to the cancellation or indefinite postponement of at least 17 large oil sands projects.  In March 2016, Canadian economist and energy expert Jeff Rubin wrote: "[o]f the 33 largest oil and gas projects in the world that were cancelled in 2015, almost half were oil sands projects."

112.    Accordingly, small and large oil companies alike were walking away from current projects, shelving future expansion plans, and recording significant asset impairments for existing oil sands projects.  For example, Royal Dutch Shell took a $2 billion impairment charge and de-booked 420 million barrels of proved bitumen reserves, walking away from a major oil-sands project in northern Alberta.  The president of Shell Canada, Lorraine Mitchelmore, said that the company's oil business needs Brent crude, the global oil benchmark, to trade above $70 a barrel to meet internal yardsticks for profitability.

113.    Many other global oil companies recorded significant asset impairments to oil sands operations in 2014 and 2015, including several multi-billion dollar impairments.  On February 17, 2017, *The Wall Street Journal* reported that "Global companies such as Statoil ASA and Royal Dutch Shell PLC that raced to build massive industrial projects in Canada have been forced to lower the value of their oil sands investments.  Since 2012, the write-downs from those companies and Canadian producers have exceed [sic] $20 billion." For example, a significant portion of the multi-billion dollar impairment charges taken in 2014 or 2015 by each of ConocoPhillips, Total S.A., Chevron, BP plc, CNOOC, PetroChina, Devon Energy Corp., and Murphy Oil Corp were related to oil sands projects.

114.    A significant number of Exxon's peers in the natural gas business also took impairment charges in 2014 and 2015.  For example, companies that took impairments in developed and undeveloped natural gas operations in the Rocky Mountain Region throughout 2014 and 2015 included: Ultra Petroleum Corp. ("Ultra Petroleum") ($3.1 billion impairment charge); Vanguard Natural Resources, LLC ("Vanguard") ($1.8 billion impairment charge); and Breitburn Energy Partners LP ("Breitburn") ($2.4 billion impairment charge, including $147.9 million related to Rocky Mountain natural gas).  A review of the 2014 10-K and 2015 10-K filings for each of these operators reveals that declining prices were a primary factor for impairment.

### 2.    Exxon Refused To Record Any Impairment Write-Downs

115.    The price collapse had a severe impact on Exxon, particularly in the Company's all-important upstream segment.  Indeed, Exxon's upstream segment revenues dropped from $37.2 billion in 2014, to $20.2 billion in 2016, a 46% drop over two years.  Moreover, upstream segment earnings fell off a cliff during this same period: from $27.5 billion in 2014 to just $200 million in 2016, *a 99% decrease in two years*.  Cash flows from operations also plummeted $15 billion, or 33%, from 2014 to 2015.

116.    Without sufficient cash flow from operations, Exxon had to borrow to fund shareholder dividends and stock repurchases.  Consequently, Exxon's long-term debt ballooned from $6.9 billion in 2013 to $19.9 billion at year-end 2015.  Capital and exploration expenditures were also slashed.  For example, despite trumpeting future plans to complete a third and fourth expansion phase at the Kearl mine to increase production, after low oil prices continued to persist into early 2015, such plans were quietly shelved.

117.    Unlike its competitors, however, Exxon took no discernable asset impairments in 2014 or 2015.  Despite vanishing upstream profits, industry-wide slashing of capital expenditures, widespread cancellation of new projects, layoffs throughout the industry, and terrible supply and demand dynamics for oil and gas producers, Exxon was the lone "supermajor" oil and gas company that failed to record significant asset impairments during the prolonged price collapse.

118.    Exxon's failure to record any such impairments, despite astonishing 85% and 80% drops in oil and gas prices, respectively, from 2014 to early 2016, was particularly noteworthy given that Exxon was operating in the same geographic areas and was subject to the same market forces as its peers.  Additionally, Exxon's peers, both domestic and international, followed uniform accounting standards.   Yet Exxon failed to respond to the declining market conditions by recognizing asset impairments even though most or all of the Company's peers did.

119.    Industry commentators noticed Exxon's unique failure to record any discernable impairment write-downs.  For example, on September 16, 2016, *The Wall Street Journal* reported that "Exxon's ability to avoid write-downs . . . has been among the factors helping the company outperform rivals since prices began falling in mid-2014.  Exxon shares have fallen by about half of the average of Chevron Corp., Shell, Total SA and BP PLC.  Since 2014, those four have booked more than $50 billion overall in write-downs and impairments."

120.    On October 26, 2016, the Institute for Energy Economics and Financial Analysis ("IEEFA") noted: "Every major oil company other than Exxon has written down assets on their balance sheets as a result of the down market, capital-expenditure reductions and weak price outlooks."  T. Sanzillo, *Red Flags on ExxonMobil (XOM) – A Note to Institutional Investors*, IEEFA, Oct. 26, 2016, at 20.  Analyst Paul Sankey noted that Exxon's failure to write down any of its reserve assets "raises serious questions of financial stewardship,'" and that "'[i]t is *impossible to believe that no assets have been impaired*."

### D.    Exxon's Use Of Proxy Cost Of Carbon

121.    Exxon has repeatedly assured the market that the Company's assets could withstand increasingly stringent future climate change-related policies and climate change-related and consumer-driven market impacts.  For example, Exxon claimed to "rigorously consider the risk of climate change" in its "planning bases and investments," and has repeatedly represented to investors that a "proxy cost" of carbon is included in all of its investment decisions, internal reserve estimates, and impairment decisions.

122.    Exxon's representations were false and misleading concerning its use of proxy cost of carbon.  The Company used a single proxy cost that materially differed in value in internal documents than the value disclosed to the market, materially misleading investors.  Moreover, Exxon failed to disclose the actual proxy cost of carbon it used (and at times failed to use) when calculating capital expenditures and making business and investment decisions.

123.    Exxon began publicly disseminating its energy forecast called the "Outlook" beginning in 2007.  Referred to as the "the foundation" for Exxon's investment planning and business decisions, Exxon's Board and Management Committee reviewed and discussed the Outlook "extensively" prior to release, according to the E&C Report.  In numerous public statements, Exxon has claimed to "address the potential for future climate-related controls,

including the potential for restriction on emissions, through the use of a proxy cost of carbon," which, according to Exxon, is "embedded" in Outlook.  Specifically, in its E&C Report, Exxon stated that "in the OECD nations [which include Canada and the United States], we apply a proxy cost that is about $80 per ton in 2040."  The E&C Report also stated that Exxon "requires that all business units use a consistent corporate planning basis, including the proxy cost of carbon . . . , in evaluating capital expenditures and developing business plans."

124.    Exxon has represented that the proxy cost of carbon applied to OECD nations is intended to account for potential future climate-related policies, including the expectation that future government policies to reduce GHG emissions will become more restrictive over time. According to Exxon, the proxy cost is intended to "reasonably reflect the types of actions and policies that governments may take over the outlook period relating to the exploration, development, production, transportation, or use of carbon-based fuels."   In submissions to the Carbon Disclosure Project ("CDP"), Exxon stated that "approximately 90 percent of petroleum-related GHG emissions are generated when customers use our products and the remaining 10 percent are generated by industry operations."

125.    In 2010, Exxon's Outlook predicted that the cost of $CO_2$ emissions in OECD nations would reach $30 per ton by 2020 and $60 per ton in 2030.  Exxon estimated this doubling of the rate over ten years because many governments were seeking to enact policies that put a cost on $CO_2$ emissions.  Exxon acknowledged that "[a]s $CO_2$ costs go up, economics shift. . . .  This shift becomes even more pronounced if $CO_2$ costs rise to $60 per ton, which is where we anticipate policies in the OECD will drive costs by 2030."

126.    Exxon's 2012 Outlook expanded based upon the expectation that governments would set policies imposing costs on $CO_2$ and other emissions.  These expectations were "integral"

to the Company's forecast and led it to anticipate that costs in the OECD nations would reach $80 per ton by 2040.

127.    In 2013, Exxon informed the CDP that "OECD countries will continue to lead the way in adopting [emissions] policies, with developing nations gradually following, led by China." The Company further assured investors that the increasingly stringent proxy cost had been "embedded in our outlook since 2007" and that Exxon's "investment decisions are based on our long-term business outlook."

128.    The Individual Defendants made numerous public representations concerning the Company's purported use of a carbon or GHG proxy cost in Exxon's SEC filings, during conference calls and meetings with investors and analysts, and in various other Exxon public statements.  For example, Defendant Tillerson represented that Exxon's proxy cost of carbon was applied across all of the Company's corporate decisions, specifically stating in May 2016 that Exxon, unlike many of its competitors, "for many years included a price of carbon in our outlook" and that the "price of carbon gets put into all of our economic models when we make investment decisions as well."  Tillerson further stated "[i]t's a proxy. . . whatever policies are, ultimately, they come back to either your revenues or your cost . . . we choose to put it in as a cost."  Finally, Tillerson confirmed that Exxon "accommodated that uncertainty in the future, and everything gets tested against it."

129.    According to internal Exxon documents produced to the NYOAG and a sworn affirmation provided by the NYOAG under penalty of perjury, Exxon's statements regarding the Company's purported use of a carbon or GHG proxy cost were improper.[9]  Indeed, contrary to

---

[9]  Exxon's internal documents discussed in this section (the "Oleske Exhibits") and the Oleske Affirmation (collectively with the Oleske Exhibits, the "NYOAG Evidence") have been made

Defendant Tillerson's statement to investors, "everything" did not get tested against Exxon's purported carbon proxy cost.  Among other things, the NYOAG Evidence reveals that:

    (i)    Exxon's internal policies mandate the use of a separate, undisclosed set of carbon proxy costs that were significantly lower than those described by the Company's numerous public statements concerning Exxon's investment and asset valuation processes (see Oleske Affirmation, ¶¶ 21-27);

    (ii)    "Exxon has not applied a proxy cost of GHGs at all with respect to many of its oil and gas projects," including the Canadian Bitumen Operations (id., ¶¶ 28-37);

    (iii)    "[I]n the few instances where Exxon tried to apply some semblance of a proxy-cost, Exxon failed to include costs relating to end use, or Scope 3, emissions," contrary to Defendants' public representations that "[t]he proxy cost seeks to reflect all types of actions and policies that governments may take over the Outlook period relating to . . . transportation or use of carbo-based fuels" (id., ¶¶ 38-40; Oleske Affirmation, Ex. 1); and

    (iv)    "[A]t least until 2016, Exxon failed to apply a proxy cost of GHGs in determining whether its long-lived assets, such as oil and gas reserves and resources, were impaired, rendering its representations false and misleading" (Oleske Affirmation, ¶¶ 41-52).

      130.    The Oleske Affirmation's sworn testimony also states that "Exxon represented to investors and the public that it was incorporating higher costs of GHG regulation into its business decisions than documents indicate that it actually was using, thereby potentially misleading investors and the public about the extent to which [Exxon] was protecting its business from regulatory risks related to climate change." *Id.*, ¶ 21.  Specifically, the Oleske Affirmation states: "Exxon publicly stated in the MTR Report and its Outlook for Energy reports that for projects in developed countries [including Canada and the U.S.], it applied proxy costs that reached $60/ton

---

publicly available through filings in connection with civil litigation pending in the Supreme Court of the State of New York.  *See People of the State of New York v. PricewaterhouseCoopers LLP, et al.*, No. 451962/2016 (N.Y. Sup. Ct., N.Y. Cty.) ("NYOAG Subpoena Action").  The NYOAG Subpoena Action concerns the NYOAG's efforts to enforce compliance with subpoenas issued to Exxon and PricewaterhouseCoopers LLP ("PwC"), in connection with the NYOAG's investigation of Exxon.

of GHGs by 2030, and $80/ton by 2040.  In fact, contrary to public statements, the proxy cost figures Exxon used for internal planning and budgeting reached only $40/ton by 2030." *Id.*, ¶ 22; *see also* Oleske Affirmation, Exs. 3-5.

131.    Moreover, according to the NYOAG Evidence, the discrepancy between Exxon's internal policies and public representations "was known at Exxon's highest levels."  Oleske Affirmation, ¶¶ 23-24; Oleske Affirmation, Exs. 3-5.  For example, in an April 2011 email exchange between Exxon's Corporate Greenhouse Gas Manager and an Exxon Corporate Strategic Planning Manager discussing the two different sets of proxy costs, the latter stated: "I have pointed out the difference in past reviews – we've been at $60 for the [Outlook] and $40 for the plan circa 2030 for several years.  [Defendant] Rex [Tillerson] has seemed happy with the difference previously."  Oleske Affirmation, Ex. 4; Oleske Affirmation, ¶ 24.  In an April 2010 email exchange between the same two employees, Exxon's Corporate Greenhouse Gas Manager acknowledged that the publicly disclosed proxy cost figures were "'more realistic'" than those that Exxon actually used.  Oleske Affirmation, ¶ 23; Oleske Affirmation, Ex. 3.

132.    Moreover, "[i]t was not until June 2014 that Exxon sought to eliminate this glaring inconsistency between external and internal figures."  Oleske Affirmation, ¶ 25.  At that time, Exxon's new Corporate Greenhouse Gas Manager acknowledged Exxon's "'nonconservative'" internal GHG proxy costs, and specifically noted that "'we have implied that we use the [publicly-disclosed] basis for proxy cost of carbon when evaluating investments.'"  *Id.*; Oleske Affirmation, Ex. 5.  A subsequent email exchange between Imperial Development Planner Jason Iwanika and Exxon's Corporate Greenhouse Gas Manager confirmed that the undisclosed alignment of Exxon's internal and external proxy cost figures in 2014 was a "'huge change.'"  Oleske Affirmation, ¶ 26; Oleske Affirmation, Ex. 6.  By that juncture, however, numerous investment decisions, including

those concerning the Canadian Bitumen Operations and Exxon's acquisition of XTO, had been subject to the application of internal policies that prescribed the use of significantly lower carbon proxy costs than those the Company represented it used in connection with its business decisions.

133.    Also, Exxon had "not applied a proxy cost of GHGs at all with respect to many of its oil and gas projects," in direct contrast to the Company's representations to the market. Oleske Affirmation, ¶ 28. Indeed, "by 2015, [Exxon] faced a problem with respect to" the profitability of the Canadian Bitumen Operations. *Id.*, ¶ 29. As a result, "according to evidence reviewed by OAG," application of Exxon's publicly stated carbon proxy costs to the Canadian Bitumen Operation "may have rendered at least one [such] project[] unprofitable over the life of the project." *Id.* And, the "company's response was not to faithfully apply the proxy-cost analysis and recognize losses as appropriate," instead, "Exxon decided in the fall of 2015 to abandon the proxy-cost figures applicable to [the Canadian Bitumen Operations] that were set out in its internal policies, and decided instead to apply the current, much lower GHG tax that existed under Alberta law at that time." *Id.*, ¶ 30.

134.    Specifically, according to the Oleske Affirmation's sworn testimony:

> The proxy cost analysis set out in Exxon's internal policies required the incorporation of an escalating GHG cost, reaching $80/ton of carbon dioxide (or $CO_2$ equivalent in other GHGs) by 2040, into the company's economic forecasting for purposes of corporate decision-making. Instead of applying this analysis, Exxon applied the Alberta GHG tax, which did not exceed $24/ton (U.S. currency), and held that figure flat indefinitely into the future . . . [in a manner that] result[ed] in an effective cost of less than $4/ton.

Oleske Affirmation, ¶ 31.

135.    By applying only a portion of an already existing GHG tax, and holding "that figure flat indefinitely into the future," Exxon's actual practices contradicted both the Company's internal policies and Defendants' representations to investors. Indeed, Exxon's representations to investors indicated that the Company applied its GHG or carbon "proxy cost" as a means for "model[ing] a

wide variety of potential policies that might be adopted by governments to help stem GHG emissions" (Oleske Affirmation, Ex. 6), and specifically stated that "in the OECD nations [which include Canada], we [the Company] apply a proxy cost that is about $80 per ton in 2040."

136.    In addition, the Oleske Affirmation establishes that, "at least until 2016, Exxon failed to apply a proxy cost of GHGs in determining whether its long-lived assets, such as oil and gas reserves and resources, were impaired, rendering its representations false and misleading." Oleske Affirmation, ¶ 41.  Exxon represented to investors that "[c]ash flows used in impairment evaluations . . . make use of the Corporation's price, margin, volume, and cost assumptions developed in the annual planning and budgeting process, and are consistent with the criteria management uses to evaluate investment opportunities."  2015 Form 10-K at 70.

137.    Contrary to the foregoing, the Oleske Affirmation establishes that Exxon made "no attempt at all . . . to incorporate a proxy cost of GHGs into the economic models of cash flows used in determining whether a trigger for impairment testing existed or whether Exxon's assets were actually impaired prior to 2016," notwithstanding representations to investors that the use of a carbon proxy cost constituted a critical component of Exxon's business decisions and investment evaluation processes.  Oleske Affirmation, ¶¶ 47-49.

### E.    Rocky Mount Dry Gas Operations

138.    Exxon failed to recognize an impairment of its Rocky Mountain dry gas operations in 2015.  Indeed, numerous red flags arose in 2015 that indicated Exxon's Rocky Mountain dry gas operations were impaired, but the Company did not disclose an asset impairment of this operation until January 31, 2017.  Exxon later confirmed the impairment in the Company's 2016 Form 10-K filed on February 22, 2017, which recognized an asset impairment charge of over $2 billion, the majority of which concerned the Rocky Mountain dry gas operations.

139.    Numerous red flags, including persistently low gas prices and Exxon's failure to incorporate the GHG "proxy cost" into its asset impairment tests prior to 2016, indicate that a significant portion of the Company's Rocky Mountain dry gas operations were impaired at year-end 2015.  Wright Decl., ¶¶ 87-104.  Exxon capitalizes much of the large up-front costs of acquiring and developing oil and gas assets, such as its Rocky Mountain dry gas operations.  However, when the future net cash flows are no longer expected to exceed the capitalized costs over the life of the project, the asset becomes "impaired" and Exxon must write it down.  Exxon was required to take an asset impairment because low gas prices and other significant factors at year-end 2015 indicated that the future net cash flows associated with the Rocky Mountain dry gas operations were no longer expected to exceed the capitalized costs over the life of the assets.  Wright Decl., ¶¶ 87-104.

140.    In order to avoid a write-down in 2015, Exxon downplayed significant adverse changes in the business climate that required the Company to test for impairment, stating that Exxon "[did] not view temporarily low prices or margins as a trigger event for conducting impairment tests."  Exxon's defiance, however, did not change the fact that the prolonged price slump was indeed a trigger event, requiring the Company to test its Rocky Mountain dry gas operations for impairment at year-end 2015.  Wright Decl., ¶¶ 88-95.

141.    The fact that Exxon's peers took write-downs at this time further confirm that the persistent, severely low gas prices were an impairment "trigger event."  *Id.*, ¶¶ 92-94.  Specifically, as a result of the extremely low gas price environment throughout 2014 and 2015, many other companies operating in the Rocky Mountain dry gas regions recorded significant impairment charges for their gas operations in 2014 and 2015.  Indeed, it was reported that the entire Rocky Mountain dry gas region was under stress in 2015, primarily due to "low commodity prices."

142.    Additional red flags indicating an impairment trigger event occurred during this period as well.  Wright Decl., ¶¶ 96-104.  Exxon, however, needed to avoid a write-down in order to preserve the Company's façade that it "*[doesn't] do write-downs*," and to avoid additional scrutiny from the rating agencies at a time when it needed its AAA rating to raise additional financing for its operations and to fund its dividends.  Exxon defiantly refused to write down its assets in 2015, declaring instead: "*We don't do write-downs*."

143.    Without question, Exxon's year-end 2016 impairment was long overdue.  Additional facts show that Exxon's write-down was required at least a year earlier, *when conditions were actually much worse*.  For example, production costs for Exxon and other operators in the Rocky Mountain dry gas region were generally higher in 2015 than 2016.  Wright Decl., ¶ 98.  In addition, Henry Hub natural gas spot prices were *much higher* at year-end 2016 (when Exxon was finally forced to take the 2016 dry gas impairment charge) than they were a year earlier at year-end 2015.  *Id*., ¶ 96.  The Henry Hub natural gas price finally began to rebound, and continued to rise throughout the second half of 2016, ultimately reaching $3.71/per million BTU by December 30, 2016—a 62% improvement over the price a year earlier at year-end 2015.  In short, Exxon's Rocky Mountain dry gas operations were clearly better off at year-end 2016 due to improved pricing and costs.  Accordingly, if Exxon's Rocky Mountain dry gas operations were impaired at year-end 2016, such assets *must have* been similarly impaired at year-end 2015.  *See* Wright Decl., ¶¶ 96-104.

144.    Moreover, Exxon's 2015 Form 10-K failed to recognize any impairment of the Rocky Mountain dry gas operations and claimed that Exxon complied with GAAP in making all impairment determinations – meaning Exxon applied a proxy cost of carbon.  This was contradicted by the NYOAG Evidence that confirmed, prior to 2016, "Exxon failed to apply a

proxy cost of GHGs in determining whether its long-lived assets, such as oil and gas reserves and resources, were impaired, rendering its representations false and misleading." Oleske Affirmation, ¶ 41; Wright Decl., ¶¶ 105-107. Significantly, Exxon made "no attempt at all . . . to incorporate a proxy cost of GHGs into the economic models of cash flows used in determining whether a trigger for impairment testing existed or whether Exxon's assets were actually impaired prior to 2016." Oleske Affirmation, ¶¶ 47-49.

145.    Exxon repeatedly represented to investors that it incorporated GHG "proxy costs" into its investment and planning decisions. It follows that Exxon was required to include the GHG "proxy costs" used for its internal business planning purposes in connection with the Company's asset impairment calculations for the its Rocky Mountain dry gas operations. Wright Decl., ¶ 106. Exxon's internal policies during 2015 would have required the Company to apply a $10 per ton proxy cost for emissions from its Rocky Mountain dry gas operations starting in 2018, which would "ris[e] linearly" to $60 per ton in 2030. Oleske Affirmation, Ex. 5; Wright Decl., ¶ 106.

146.    Had Exxon properly incorporated the proxy costs into the asset impairment calculations for its Rocky Mountain dry gas operations prior to 2016, the impact would have been significant. Using standard conversion rates, a proxy cost of $10/ton would have added additional costs of approximately $0.53 per million BTU, while a proxy cost of $60/ton would have resulted in additional costs of approximately $3.19 per million BTU. Wright Decl., ¶¶ 106-107. Considering that the benchmark Henry Hub spot price for natural gas was only $2.28 per million BTU at December 31, 2015, an additional cost of $0.53 would have been significant, and an additional cost of $3.19 would have been untenable.

147.    Not surprisingly, once Exxon began including GHG proxy costs in its asset impairment analyses in 2016, it announced that its Rocky Mountain dry gas operations were

impaired.  Indeed, only after feeling pressure from the SEC and the NYOAG's investigation did Defendants finally take action, belatedly recording the $2 billion post-tax ($3.3 billion pre-tax) 2016 dry gas impairment charge in the Company's 2016 year-end Form 10-K.

### F.   Canadian Bitumen Operations

148.    Exxon's Canadian Bitumen Operations were operating at a significant loss by at least mid-November 2015.  This material negative trend was even more prolonged and significant by the time Exxon filed the Company's 2015 Form 10-K on February 24, 2016.  Yet, Defendants concealed this fact when they filed Exxon's 2015 Form 10-K, instead reporting only that the Canadian Bitumen Operations had generated an *average profit* of $5/bbl over the course of 2015, and thereby misleading investors and violating GAAP.  Because the Canadian Bitumen Operations represented approximately 31% of Exxon Mobil's total liquids proved reserves and 18% of its combined worldwide proved reserves at year-end 2015, it was materially misleading to imply the Canadian Bitumen Operations made a consistent profit when instead, it had operated at loss for three months.

149.    An analysis of the cash breakeven price for the Canadian Bitumen Operations during 2015 and 2016 confirms this fact.  The cash breakeven price represents the average price per barrel needed in order for an upstream operation to cover its current-period out-of-pocket expenses.  For the Canadian Bitumen Operations, the current-period out-of-pocket expenses include, at a minimum, the operations' production and royalty costs.  Significantly, the cash breakeven price does not account for previously capitalized exploration and development costs, provide for future development expenditures, or provide a positive rate of return on the operator's investment in the operation.

150.    The Canadian Bitumen Operations' production and royalty costs for 2015-2016 were disclosed in Imperial's annual Report 51-101F1, *Statement of Reserves Data and Other Oil*

*and Gas Information* filings for 2015 and 2016.  As detailed in the Wright Declaration, and summarized by the table below, the Canadian Bitumen Operations' reported production and royalty costs figures can be converted to USD using daily end-of-day Canadian exchange rates provided by the Bank of Canada. Wright Decl., ¶ 43.  These figures represent the Canadian Bitumen Operations' average cash breakeven price for each quarter throughout 2015 and 2016.  These figures can subsequently be converted to WCS cash breakeven prices by calculating the average quarterly WCS price discount differentials for the Canadian Bitumen Operations and adding those figures to Canadian Bitumen Operations' average cash breakeven price.  The results of this analysis, which is further detailed in the Wright Declaration, are set forth below:

**Canadian Bitumen Operations' Average Minimum WCS Cash Breakeven Prices for 2015-2016**

|  | Units | 2015 | | | | 2016 | | | |
|---|---|---|---|---|---|---|---|---|---|
|  |  | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| Avg. Total Production And Royalty Cost/bbl | USD/bbl | 27.24 | 24.31 | 20.61 | 17.94 | fic. .57 | 20.75 | 22.24 | 21.41 |
| Avg. WCS Price Discount Differential | USD/bbl | 11.32 | 4.48 | 3.63 | 9.19 | 10.55 | 6.86 | 5.15 | 5.99 |
| Avg. Minimum WCS Breakeven Price | USD/bbl | 38.56 | 28.80 | 24.23 | 27.12 | 28.13 | 27.61 | 27.40 | 27.39 |

151.    The average minimum WCS cash breakeven prices set forth in the above table represent the minimum average WCS benchmark spot price that would be required in any given quarter in order for the Canadian Bitumen Operations to avoid losing money (*i.e.,* in order to cover the minimum average total production costs and royalties paid in connection with the production of bitumen from the Canadian Bitumen Operations).  *Id.*, ¶ 51.

152.    Moreover, the daily spot price of WCS crude fell below the Canadian Bitumen Operations' average minimum WCS cash breakeven price for the majority of the time from mid-November 2015 through mid-April of 2016.  Indeed, during the period of November 12, 2015 through April 18, 2016, the WCS daily spot price fell below the Canadian Bitumen Operations'

average minimum WCS cash breakeven price on all but eight days.  Accordingly, for at least this five-month period, the Canadian Bitumen Operations were not able to cover the combined costs associated with their production and royalties owed to the Alberta government, let alone recoup any of the massive capitalized costs Exxon had already sunk into the project.

### G.    Exxon's Kearl Operations

153.    At the time Exxon filed its 2015 Form 10-K on February 22, 2016, and throughout 2016, Exxon was aware that its Kearl Operations would not satisfy the SEC's definition of proved reserves by year-end 2016.  Exxon failed to warn investors that the Kearl Operation was highly likely to be de-booked at year-end 2016.  As previously alleged herein, at this time, bitumen prices had significantly declined.  Moreover, the Kearl Operation represented a substantial portion of Exxon's bitumen reserves and was operating at a loss in late 2015.  Under such circumstances, GAAP, pursuant to ASC 275 and 932, required Exxon to update its proved reserves disclosures in interim financial reports, which the Company failed to do.

154.    Moreover, the Kearl Operations likely would *not* have satisfied the SEC's definition for proved reserves at year-end 2015 if a GHG proxy cost was included, consistent with public representations and obligations under GAAP and SEC accounting and disclosure rules.  *See* Wright Decl., ¶¶ 58-69, 73-81.  As detailed by the analysis set forth in the Wright Declaration, at year-end 2015, the average WCS benchmark spot price was, *at most*, $1.52/bbl away from triggering a de-booking of the entire amount of the Kearl Operation's purportedly proved reserves—*without* the inclusion of *any* GHG proxy costs.  Wright Decl., ¶¶ 58-67, 77-81. Given the small de-booking "buffer" of $1.52/bbl at year-end 2015 and the material costs that would have been associated with the application of Exxon's stated GHG proxy costs to the Kearl Operation (as much as $5.70/bbl), if Defendants had properly applied a GHG proxy cost to their proved reserve calculations for the Kearl Operation at year-end 2015, as they were required to do by

GAAP and SEC accounting and disclosure rules (Wright Decl., ¶¶ 73-81), it is highly likely that the extra costs would have precluded the Kearl Operation's reserves from satisfying the SEC's definition for proved reserves at year-end 2015. See Wright Decl., ¶¶ 77-81.

155.    Specifically, based on an analysis of the "standardized measure of discounted future net cash flows related to proved oil and gas reserves" schedule reported in Imperial's 2015 Form 10-K, filed with the SEC on February 24, 2016, the Kearl Operation would no longer satisfy the SEC's definition for proved reserves at year-end 2016, if the average WCS spot price dropped by $1.52/bbl or more. *Id.*, ¶¶ 58-67.  Thus, based on the average WCS price for 2015, as reported by *Bloomberg* ($37.12/bbl), the Individual Defendants knew that the Kearl Operation would no longer satisfy the SEC's definition for proved reserves at year-end 2016 unless the average WCS spot price for the year was *at least* $35.61/bbl. *Id.*

156.    As a result, by no later than the beginning of February 2016, it was apparent to the Individual Defendants that the Kearl Operation bitumen reserves would no longer satisfy the SEC definition for proved reserves at year-end 2016, even *without* the inclusion of Exxon's stated GHG proxy costs, absent an extraordinary and unexpected rise in the price of oil.  Wright Decl., ¶¶ 68-69.  Moreover, this fact would have only become more and more apparent as the year progressed because during 2016 the Year-to-Date Average WCS Price ranged from a low of $19.83/bbl (February 2016) to a high of only $28.88/bbl (December 2016) for all of 2016 – far lower than the $35.61/bbl required.

**Minimum Average WCS Price Required to Avoid De-Booking**

| Month | WCS Daily Spot Price in Effect on First Day of Month (USD/bbl) | Year-to-Date Average WCS Price (USD/bbl) | Minimum Average WCS Price Needed Over Remainder of Year to Avoid De-Booking (USD/bbl) |
|---|---|---|---|
| January 2016 | $23.79 | $23.59 | $36.68 |
| February 2016 | $15.87 | $19.83 | $38.77 |
| March 2016 | $22.00 | $20.55 | $40.63 |
| April 2016 | $23.54 | $21.30 | $42.77 |

| | | | |
|---|---|---|---|
| May 2016 | $32.57 | $23.55 | $44.22 |
| June 2016 | $37.16 | $25.82 | $45.40 |
| July 2016 | $35.19 | $27.16 | $47.44 |
| August 2016 | $25.31 | $26.93 | $52.97 |
| September 2016 | $29.11 | $27.17 | $60.93 |
| October 2016 | $34.24 | $27.88 | $74.27 |
| November 2016 | $32.27 | $28.28 | $116.27 |
| December 2016 | $35.56 | $28.88 | n/a |

157.   As demonstrated by the above table above, by the time Exxon filed its 2015 Form 10-K, the year-to-date average WCS spot price was only $19.83/bbl, far below the price Defendants knew they needed in order to avoid de-booking Kearl at year-end 2016.  Wright Decl., ¶ 70.  In order to make up the difference, Exxon needed the WCS average spot price to rise to $38.77/bbl for the remainder of 2016, a price that was almost *twice* as high as the year-to-date average at that point.  *See* Wright Decl., ¶ 70.  Defendants also knew that a *doubling* in the average WCS spot price was highly unlikely.  A year-end 2015 reserve report filed by Imperial with the Canadian Securities Administrators on February 24, 2016 forecasted the average annual WCS benchmark price for 2016 of only $33.91/bbl—far more optimistic than the average year-to-date WCS spot price of $19.83/bbl, but still well short of the average $38.77/bbl WCS spot price needed for the remainder of 2016 to avoid de-booking all the Kearl Operation's proved reserves.  *Id.*, ¶¶ 69-70.

158.   As each month in 2016 progressed, the likelihood of de-booking Kearl's proved reserves became more and more a certainty, but Exxon continued to conceal this fact from investors.  Indeed, by the time Exxon warned investors on October 28, 2016 that a de-booking would be required "[i]f the average prices seen during the first nine months of 2016 persist for the remainder of the year," it was already a virtual certainty.  Specifically, as depicted by the table above, when Exxon made its October 28, 2016 disclosure, Defendants knew that they could only avoid de-booking Kearl's proved reserves if oil prices nearly *tripled* in the final two months of the year, a virtual impossibility that was neither probable nor expected. Wright Decl., ¶ 71.

- 54 -

159.    Exxon's management knew that continued capital expenditures to develop proved reserves in the Canadian oil sands made little economic sense, and at year-end 2015 Exxon accordingly slashed its planned development costs.  Imperial's 2014 and 2015 forecasts for future capital expenditures to develop proved reserves paint drastically different pictures. During 2015, management aggressively cut future reserve development spending.  Specifically, expenditures were cut in 2016, 2017, and 2019 by a whopping 35%, 36%, and 43%, respectively.

160.    But even these drastic cuts were not enough to stem Exxon's losses.  After already reducing 2016 capital spending by 35%, Imperial cut an *additional 50%* from its actual 2016 development costs.  Despite Defendants' knowledge that Exxon's Canadian Bitumen Operations, including the Kearl Operation, were operating at a loss and the Company's desperate need for deep cuts to its reserve development costs, Defendants nonetheless failed to disclose the near certainty that all of the Kearl Operation's proved reserves – which at the start of 2016 represented nearly 14% of Exxon's total proved reserves – would need to be de-booked at year-end.

### H.    Exxon's $12 Billion March 2016 Debt Offering

161.    Based on declining profits, increasing debt, and unsustainable commitment to shareholder payouts, Exxon found itself in dire need of an infusion of capital at the start of 2016. Accordingly, Exxon's eight-tranche $12 billion public debt offering (the "March 2016 Debt Offering") scheduled for March 2, 2016, became increasingly vital to the Company's survival.

162.    As with any debt offering, the effectiveness of the March 2016 Debt Offering was largely dependent upon Exxon's current credit rating.  Credit risk, especially that reflected in the credit ratings provided by agencies like S&P, was a material consideration for Exxon's bond investors.  Asset values and their associated ratios play a very significant role in assessing the credit characteristics of a company.  Credit rating criteria also specifically recognizes the importance of reserves to the financial health and prospects of oil and gas companies.  In fact, S&P

notes that reserves are "critical" in their assessment of a company's scale, scope, and diversity, "[h]ydrocarbon reserves are the key asset of an E&P company and their characteristics are a critical aspect of our assessment of its scale, scope, and diversity."

163.   Based on Exxon's dire financial situation at the start of 2016, the Individual Defendants were aware Exxon was perilously close to losing its coveted AAA rating in advance of the March 2016 Debt Offering.  Indeed, on February 2, 2016, S&P placed Exxon's long-term corporate credit rating on "CreditWatch" with "negative" implications.  Similarly, on February 25, 2016, Moody's dropped Exxon's outlook from "stable" to "negative" based in part on concerns over Exxon's "'reserve replacement and production profile in the latter part of this decade.'"

164.   The Individual Defendants were also aware that any negative change in Exxon's credit rating would have a significantly negative impact on the March 2016 Debt Offering.  Had Exxon's credit rating been lowered to AA+ prior to the March 2016 Debt Offering, for example, Exxon would have incurred substantial additional costs in connection with the offering. Specifically, Exxon's operations, access to the financial markets, disclosure requirements, covenant terms, counterparty relationships, and general relationships with employees and customers are all influenced by changes to the Company's credit rating.

165.   Accordingly, prior to the completion of the March 2016 Debt Offering, the Individual Defendants did not risk disclosing any of the true facts concerning Exxon's struggling Canadian Bitumen Operations, impaired Rocky Mountain dry gas operations, or failure to properly incorporate a "proxy cost" of carbon into investment and asset valuation analysis.

I.   **Exxon "De-Books" And Takes $2 Billion Impairment Charge After Its Investment And Valuation Process And Reporting Came Under Fire**

166.   New York Attorney General Eric T. Schneiderman ("NY AG Schneiderman") subpoenaed Exxon in November 2015 seeking documents and information concerning, *inter alia*,

Exxon's investment and valuation processes regarding its oil and gas reserves.  Specifically, the NY AG focused on Exxon's failure to record any meaningful asset impairment or write-down in response to the industry's prolonged price downturn.

167.    Events during the NYOAG's investigation of Exxon revealed the Company's deliberate actions led to the destruction of critical evidence from Exxon's top executives, including Defendant Tillerson, concerning, among other things, climate change risk-management issues concerning the purported use of a GHG "carbon proxy" cost in connection with Exxon's reserve investment and valuation processes.  Specifically, on March 13, 2017, the NYOAG submitted a letter (the "March 13, 2017 Letter") to the Honorable Barry Ostrager of the Supreme Court for New York County (the "New York Court"), revealing that Defendant Tillerson used an alias email account, Wayne.Tracker@ExxonMobil.com ("Wayne Tracker"), to discuss sensitive "risk-management issues related to climate change" and other matters relevant to Exxon's reserve asset valuation processes.  Defendant Tillerson used the pseudonym Wayne Tracker account "from at least 2008 through 2015" to discuss these secretive matters with Exxon's senior management.  Among other things, the NYOAG's March 13, 2017 Letter revealed that "neither Exxon nor its counsel have ever disclosed that this separate email account was a vehicle for Mr. Tillerson's relevant communications at Exxon, and no documents appear to have been collected from this email account, which also does ***not appear on Exxon's list of preserved custodial sources*** for its privilege logs."

168.    Exxon's failure to disclose and preserve evidence from Defendant Tillerson's alias Wayne Tracker account was not an accident.  For example, on June 2, 2017, the NYOAG filed, among other things, the Oleske Affirmation and the attached Oleske Exhibits.  Included in the Olseke Exhibits was deposition testimony from Exxon's outside counsel, which confirmed that

Exxon's attorneys were aware of the Wayne Tracker emails in "the first part of 2016." Yet, Exxon's outside counsel further testified that no attempt to preserve the Wayne Tracker emails was made, despite counsel's admitted knowledge concerning the account's existence. Oleske Affirmation, Ex. 16 at 140-42. Exxon's outside counsel's testimony further confirmed that the failure to place the Wayne Tracker email account under a preservation hold resulted in a full year's worth of Wayne Tracker emails being destroyed. *Id.*

169.   On November 9, 2015, *The Guardian* revealed that the focus of the NYOAG's investigation into Exxon encompassed claims that the Company lied to investors about "the dangers and potential business risks" that Exxon faced due to climate change. Sources cited in the report confirmed that "the investigation will focus on any inconsistencies between the company's knowledge of climate change . . . and its filings to the Securities Exchange Commission and other government regulatory agencies." Investors responded negatively to this news, causing Exxon's stock price t fall $2.52 per share, or 2.98%.

170.   On January 20, 2016, the *Los Angeles Times* reported that California Attorney General Kamala Harris was investigating whether Exxon repeatedly lied to the public and investors about the risks to its business from climate change, specifically whether Exxon's actions "could amount to securities fraud and violations of environmental laws." Investors responded negatively to this news, causing Exxon's stock price to fall $3.22 per share, or 4.21%.

171.   In March 2016, NY AG Schneiderman and the attorneys general of 17 other states and territories, including Massachusetts Attorney General Maura Healey ("MA AG Healey") and California Attorney General Harris, announced that they had formed a formal coalition to pursue climate change litigation against big energy companies, including Exxon (the "State AG Climate Change Coalition"). Later, on June 15, 2016, Exxon filed an action for declaratory relief in this

Court styled *Exxon Mobil Corp. v. Healey*, No. 4:16-cv-00469-K (N.D. Tex. June 15, 2016) (the "Healey Complaint").  In its complaint, Exxon sought an injunction "barring enforcement" of a civil investigative demand served on Exxon by MA AG Healey.  Healey Complaint, ¶ 14.  In an Order dated March 29, 2017, this Court transferred the Healey case to the Southern District of New York, 1:17-cv-02301.  On March 29, 2018, Judge Valerie Caproni of the Southern District of New York entered an Order dismissing the Healey Complaint with prejudice.  On April 20, 2018, Exxon filed a Notice of Appeal appealing that decision to the Second Circuit, No. 18-1170.

172.    On August 19, 2016, *The New York Times* published a report detailing an "extensive interview" during which NY AG Schneiderman reportedly told *The New York Times* that his investigation and the investigations by the other state attorneys general were not limited to what Exxon had done in the past, but also whether Exxon was potentially defrauding its investors by overstating the value of its reserves on its books.  *The New York Times* pointed out the fallacy with Exxon's justification for its reporting: "[b]y that logic, Exxon Mobil [would] have to leave much of its oil in the ground, which means the company's valuation of its reserves is off by a significant amount," and quoted NY AG Schneiderman as explicitly stating that if Exxon's own internal research showed that Exxon knew better, "'there may be massive securities fraud here.'"

173.    On September 16, 2016, *The Wall Street Journal* published an exposé further confirming that NY AG Schneiderman was investigating Exxon for potentially defrauding investors.  Noting that Exxon had "for years . . . kept the value of its huge oil and gas reserves steady in the face of slumping energy prices while rivals since 2014 have slashed $200 billion off their combined holdings," *The Wall Street Journal* emphasized that NY AG Schneiderman was "examining accounting practices at the nation's largest energy company," citing "people familiar with the matter."  According to *The Wall Street Journal*, NY AG Schneiderman's office was

"adding scrutiny of [Exxon's] reserve values to its probe into Exxon's past knowledge of the impact of climate change and how it could affect its future business."

174.    On September 20, 2016, *The Wall Street Journal* reported that the SEC had been investigating Exxon's reserve accounting related to climate change and its failure to write down oil and gas reserves in the face of declining global oil prices.  According to the report, the "SEC sought information and documents in August from Exxon and the company's auditor, [PwC]," again citing undisclosed "people familiar with the matter."  *The Wall Street Journal* quoted its undisclosed sources as stating that "[a] potential sticking point in the probe is what price Exxon uses to assess the 'price of carbon'—the cost of regulations such as a carbon tax or a cap-and-trade system to push down emissions—when evaluating certain future oil and gas prospects," adding that the "SEC [was] asking how Exxon's carbon price affects its balance sheet and the outlook for its future." According to *The Wall Street Journal*, "[w]hen such a theoretical price for carbon is low, more oil and gas wells would be commercially viable.  Conversely, a high carbon price would make more of Exxon's assets look uneconomic to pull out of the ground in future years."

175.    On October 28, 2016, Exxon issued a news release in connection with its third quarter 2016 financial results disclosing that ***nearly 20%*** of the Company's proved oil and gas reserves might no longer satisfy the SEC's proved reserves definition at year-end, which would require such assets to be "de-booked" as proved reserves.  Specifically, Exxon stated that "[i]f the average prices seen during the first nine months of 2016 persist for the remainder of the year, under the SEC definition of proved reserves, certain quantities of oil, such as those associated with the Kearl oil sands operations in Canada, will not qualify as proved reserves at year-end 2016."  The release further clarified that the specific assets subject to the potential de-booking included "approximately 3.6 billion barrels of bitumen at Kearl, and about 1 billion oil-equivalent barrels

in other North America operations." Investors responded negatively to this news causing Exxon's stock price to decline $2.14 per share, or 2.46%, and causing the Company's stock price to decline an additional $1.46 per share, or 1.72%, on October 31, 2016.

176.    Exxon's October 28, 2016 news release, however, revealed only a fraction of the truth regarding the Individual Defendants' breaches of fiduciary duty. Contrary to Exxon's warning that de-booking would be required "[i]f the average prices seen during the first nine months of 2016 persist for the remainder of the year," the truth was that de-booking was all but certain, even if prices increased significantly. Indeed, at the time Exxon issued its October 28, 2016 news release, the Individual Defendants knew that the only way it could avoid de-booking the Kearl Operation reserves at year-end was if the average price of oil over the last two months of the year was approximately three times what it had been over the first ten months of the year.

177.    On January 31, 2017, Exxon announced its 2016 fourth quarter and year-end financial results in an earnings press release that revealed the Company would take a $2 billion asset impairment charge primarily related to "dry gas operations in the Rocky Mountains region" (the "2016 Dry Gas Impairment Charge"). Investors reacted negatively to this news and over the two trading days following Exxon's January 31, 2017 disclosure, causing the Company's stock price to decline $1.92 per share, or 2.26%.

178.    On February 22, 2017, Exxon announced its 2016 year-end reserves in a press release that confirmed that the entire proved reserve from the Kearl Operation would be de-booked. Following this revelation, Exxon's credit rating continued to decline. On May 24, 2017, S&P Global Ratings issued a negative outlook on Exxon as a result of its debt, indicating a "potential for a downgrade" without improvement. *S&P Issues Negative Outlook on ExxonMobil*, Barron's, May 24, 2017.

## V.   DEFENDANTS' IMPROPER STATEMENTS

### A.   Defendants' Misstatements And Omissions

179.   During the wrongdoing complained of herein, the Individual Defendants made the statements set forth below (the "Alleged Misstatements") regarding, *inter alia*, the value and amount of Exxon's oil and gas reserves, and the Company's purported efforts to incorporate carbon or GHG proxy costs into its investment and valuation processes concerning such assets.

180.   The Alleged Misstatements were each materially false and misleading at the time they were made, as a result of Defendants' failure to disclose, as specified below, the following facts (the "Alleged Omitted Information"):

(i)   Exxon's actual investment and asset valuation processes did not incorporate GHG or carbon "proxy costs" in a manner that was consistent with the Company's public representations or Exxon's own internal policies;

(ii)   Exxon did not incorporate GHG or carbon "proxy costs" into their asset impairment evaluation processes;

(iii)   Exxon's Canadian Bitumen Operations were operating at a loss;

(iv)   Exxon knew the Kearl Operation could not satisfy the SEC definition for proved reserves at year-end 2016, absent an extraordinary—and, by Exxon's own internal estimates, unexpected—rise in the price of oil; and

(v)   A significant portion of Exxon's Rocky Mountain dry gas operations were impaired by no later than year-end 2015, thus requiring the Company to record an asset impairment charge in its financial statements.

### 1.   Defendants' 2014 Misstatements And Omissions

181.   On March 31, 2014, the Company issued the MTR Report, which was aimed at assuring investors that, through the use of a self-described "proxy cost" of carbon, the Company

was properly accounting for climate change-related risks to its assets.  Among other things, the

MTR Report stated:

> As detailed below, ExxonMobil makes long-term investment decisions based in part on our rigorous, comprehensive annual analysis of the global outlook for energy, an analysis that has repeatedly proven to be consistent with the International Energy Agency *World Energy Outlook*, the U. S. Energy Information Administration *Annual Energy Outlook*, and other reputable, independent sources. For several years, our *Outlook for Energy* has explicitly accounted for the prospect of policies regulating greenhouse gas emissions (GHG).  This factor, among many others, has informed investments decisions that have led ExxonMobil to become the leading producer of cleaner-burning natural gas in the United States, for example.
>
> Based on this analysis, we are confident that none of our hydrocarbon reserves are now or will become "stranded."

*      *      *

> Each year, ExxonMobil analyzes trends in energy and publishes our forecast of global energy requirements in our *Outlook for Energy*.  The Outlook provides the foundation for our business and investment planning, and is compiled from the breadth of the company's worldwide experience in and *understanding* of the energy industry.  It is based on rigorous analyses of supply and demand, technological development, economics, and government policies and regulations, and it is consistent with many independent, reputable third-party analyses.
>
> ExxonMobil's current *Outlook for Energy* extends through the year 2040, and contains several conclusions that are relevant to questions raised by stakeholder organizations.  Understanding this factual and analytical foundation is crucial to understanding ExxonMobil's investment decisions and approach to the prospect of further constraints on carbon.

*      *      *



We also address the potential for future climate-related controls, including the potential for restriction on emissions, through the use of a proxy cost of carbon. This proxy cost of carbon is embedded in our current *Outlook for Energy*, and has been a feature of the report for several years. The proxy cost seeks to reflect all types of actions and policies that governments may take over the Outlook period relating to the exploration, development, production, transportation or use of carbon-based fuels.

182.    On the same day, March 31, 2014, the Company also released a report entitled

"Energy and Climate." In this report, the Company stated, among other things:

Each year ExxonMobil develops and publishes its views on energy sources, requirements and trends. This Outlook provides the foundation for our business and investment planning and is compiled from the breadth of the company's worldwide experience in and understanding of the energy industry and is based on rigorous analyses of demands, technology, economics and policies. Our most recent Outlook spans the period through 2040. The Outlook is reviewed and discussed extensively with the company's Management Committee and Board prior to its release.

*        *        *

A key factor in assessing the world's energy outlook is the impact of public policies. One area of significant interest in recent years relates to policies enacted to reduce greenhouse gas (GHG) emissions.

Today there are policies in effect that are designed to limit GHG growth, and we anticipate additional policies developing over time. We expect OECD nations to

continue to lead the way in adopting these policies, with developing nations gradually following, led by countries like China and Mexico.

Future policies related to limiting GHG emissions remain uncertain and likely will vary over time and from country to country. However, for our Outlook we use a cost of carbon as a proxy to model a wide variety of potential policies that might be adopted by governments to help stem GHG emissions. For example, in the OECD nations [which include Canada and the United States], we apply a proxy cost that is about $80 per ton in 2040.

\*       \*       \*

This GHG proxy cost is integral to ExxonMobil's planning, and we believe the policies it reflects will increase the pace of efficiency gains and the adoption by society of lower-carbon technologies through the Outlook period, as well as accelerate the growth of lower carbon sources of energy like natural gas and renewables, while suppressing the global use of coal.

183.    The above statements were false and misleading when made because Defendants failed to disclose the truth about the Alleged Omitted Information described in the Alleged Omitted Information. Specifically, according to sworn testimony from the NYOAG and internal Exxon documents disclosed in the NYOAG Subpoena Action, at the time Exxon made the above statements, Exxon's internal policies actually prescribed the use of a separate, undisclosed set of proxy costs that were *significantly lower* than the proxy costs described in Exxon's statements above. By failing to disclose the Company's use of this separate, lower set of proxy costs, the above statements were materially misleading to investors. In addition, in direct contrast to the above statements, Exxon actually used *no proxy costs at all* for certain of its projects, including from at least "the fall of 2015" on the Canadian Bitumen Operations. Moreover, contrary to the above statement that Exxon's Outlook both incorporated a carbon proxy cost and served as "the foundation for [Exxon's] business and investment planning," the Company did not incorporate carbon proxy costs *into any of its asset* impairment determination processes until at least 2016. Based on the foregoing, the statements described on March 31, 2014 above provided investors with a materially misleading description of the Individual Defendants' efforts to evaluate and

account for the potential climate change-related risks associated with Exxon's reserve assets and long-term business prospects.

### 2.    Defendants' 2015 Misstatements And Omissions

184.    On February 23, 2015, Exxon announced that it had replaced 104% of its 2014 production by adding proved oil and gas reserves totaling 1.5 billion oil-equivalent barrels, including a 162% replacement ratio for crude oil and other liquids.  At year-end 2014, Exxon's proved reserves totaled 25.3 billion oil-equivalent barrels, which was made up of 54% liquids and 46% natural gas.  Natural gas additions totaled approximately 300 million oil-equivalent barrels for a 42% replacement ratio.  In Canada, reserve additions totaled almost 700 million barrels as a result of the Kearl resource.  At the time, Defendant Tillerson stated that "ExxonMobil's diverse global portfolio of attractive opportunities puts us in a unique position to execute our strategy to identify, evaluate and develop new energy supplies," and "[o]ur ability to achieve an industry-leading record of long-term reserves replacement is made possible by the size and diversity of ExxonMobil's resource base along with its project execution and technical capabilities."

185.    The preceding statements were false and misleading when made because Defendants failed to disclose the Alleged Omitted Information.  Specifically, Defendants failed to disclose that, until at least June 2014, the reserve assets at issue had been subject to internal policies that prescribed the use of a separate, undisclosed set of proxy costs that were *significantly lower* than those the Company had publicly represented that it used in connection with its investment and asset valuation processes.  The Individual Defendants also failed to disclose that, contrary to what investors had been led to believe, Exxon had failed to use *any proxy costs at all* for certain of its projects, or that Exxon had failed to incorporate carbon proxy costs into *any* of the Company's asset impairment determination processes for the reserve assets at issue above.  By failing to disclose the above information, the statements described above materially misled

investors with regard to the efforts that Defendants had undertaken to evaluate and account for the potential impact that climate change related risks may have on the value of the reserve assets at issue in the February 23, 2015 statement.

186.    On February 25, 2015, Exxon filed its 2014 Form 10-K, which was signed by Defendants Tillerson, Swiger, Rosenthal, Boskin, Brabeck-Letmathe, Burns, Faulkner, Fore, Frazier, George, Palmisano, Reinemund, and Weldon, Exxon stated in the Company's 2015 Form 10-K:

> ExxonMobil includes estimates of potential costs related to possible public policies covering energy-related greenhouse gas emissions in its long-term *Outlook for Energy*, which is used as a foundation for assessing the business environment and in its investment evaluations.
>
> The information provided in the Long-Term Business Outlook includes ExxonMobil's internal estimates and forecasts based upon internal data and analyses as well as publicly available information from external sources including the International Energy Agency.

187.    Defendants Tillerson, Swiger, Rosenthal, Boskin, Brabeck-Letmathe, Burns, Faulkner, Fore, Frazier, George, Palmisano, Reinemund, and Weldon's statements in the 2014 Form 10-K were false and misleading when made, because Defendants failed to disclose the truth about the omitted information described in the Alleged Omitted Information.   Specifically, according to sworn testimony from the NYOAG and internal Exxon documents disclosed in the NYOAG Subpoena Action, until at least June 2014, Exxon's internal policies actually prescribed the use of a separate, undisclosed set of proxy costs that were significantly lower than those the Company had publicly represented that it used in connection with its investment and asset valuation processes.   By failing to disclose the Company's use of this separate, lower set of proxy costs, the above statements were materially misleading to investors.   In addition, in direct contrast to the above statements, Exxon actually used no proxy costs at all for certain of its projects, including from at least "the fall of 2015" on the Canadian Bitumen Operations.   Moreover, contrary

to the above statement that Exxon's Outlook both incorporated a GHG proxy cost and served as "a foundation for assessing the business environment and in [Exxon's] investment evaluations," the Company failed to incorporate carbon proxy costs into any of its asset impairment determination processes until at least 2016.  Based on the foregoing, the statements described in the 2014 Form 10-K above provided investors with a materially misleading description of Defendants' efforts to evaluate and account for the potential climate change-related risks associated with Exxon's reserve assets and long-term business prospects.

188.   Defendants' 2014 Form 10-K filed on February 25, 2015 also contained certifications pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, as well as certifications pursuant to Securities Exchange Act Rule 13a-14(a) (the "SEC Certifications"), which were signed by Defendants Tillerson, Swiger, and Rosenthal.  The SEC Certifications stated that the filing "fully complies" with the applicable requirements of the Exchange Act, and that the information in the filing "fairly presents, in all material respects, the financial condition and results of operations of the Company."  In addition, the SEC Certifications represented that Defendants Tillerson, Swiger, and Rosenthal were "responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting," and that Defendants Tillerson, Swiger, and Rosenthal had designed such controls "to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to [Defendants Tillerson, Swiger and Rosenthal]."  The SEC Certifications also certified that Defendants Tillerson, Swiger, and Rosenthal had designed Exxon's controls and procedures "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with [GAAP]."  In addition,

the SEC Certifications stated, among other things, that Defendants Tillerson, Swiger, and Rosenthal had "[e]valuated the effectiveness of [Exxon's] disclosure controls and procedures."

189.    Virtually identical statements to those set forth in the certifications above were contained in all of Exxon's Form 10-K and Form 10-Q filings with the SEC throughout the wrongdoing complained of herein.  The SEC Certifications represented to investors, among other things, that Defendants Tillerson, Swiger, and Rosenthal had ensured that Exxon's internal controls were adequate to ensure accurate financial reporting.  As detailed herein, the SEC Certifications were materially false and misleading, as Exxon's SEC filings failed to disclose at least some of the Alleged Omitted Information and violated GAAP and SEC accounting and disclosure rules.

190.    On March 4, 2015, Exxon hosted a meeting with analysts to discuss Exxon's Outlook, business strategy, and investment plans.  The meeting was attended by, among others, Defendants Tillerson, Woodbury, and Swiger, all of whom spoke on Exxon's behalf at some point during the meeting.  During the call, Defendant Tillerson told analysts that Exxon's investment decisions were "[i]nformed by our energy outlook and tested across a broad range of economic parameters including a broad range of commodity prices," which "underpins and guides our company's business strategies and our investments" and "position[s] the Corporation for long-term performance across a broad range of business conditions."

191.    At the March 4, 2015 analyst meeting, Defendant Tillerson also addressed the addition of bitumen reserves in 2014, largely from the Kearl Operation.  Defendant Tillerson noted that these reserves helped Exxon achieve a "proved reserve replacement ratio [of] 104%, marking the 21st consecutive year [Exxon] added more oil and natural gas reserves than [Exxon] produced."

192.    Defendants Tillerson, Woodbury, and Swiger's statements on the March 4, 2015 meeting were false and misleading when made because Defendants failed to disclose the truth about the omitted information described in the Alleged Omitted Information.  Specifically, Defendants failed to disclose that, according to sworn testimony from the NYOAG and internal Exxon documents disclosed in the NYOAG Subpoena Action, until at least June 2014, Exxon's internal policies actually prescribed the use of a separate, undisclosed set of proxy costs that were *significantly lower* than those the Company had publicly represented that it used in connection with its investment and asset valuation processes.  By failing to disclose the Company's use of this separate, lower set of proxy costs, which would have affected at least some of the reserve assets at issue in above, the statements described on March 4, 2015, were materially misleading to investors. The statements on March 4, 2015 above also failed to disclose that, contrary to what investors had been led to believe, Exxon had failed to use *any proxy costs at all* for certain of its projects, or that Exxon had failed to incorporate carbon proxy costs into *any* of the Company's asset impairment determination processes for the reserve assets at issue.  By failing to disclose the above information, the statements at the analyst meeting above materially misled investors with regard to the efforts that Defendants had undertaken to evaluate and account for the potential impact that climate change-related risks may have on Exxon's reserve assets and long-term business prospects, including, specifically, the value of the reserve assets at issue.

193.    On April 30, 2015, Exxon held its first quarter 2015 earnings conference call. During the call, Defendant Woodbury stated, among other things, that Exxon was "fairly confident, given the range of variables that we test [in the Outlook for Energy], that we're looking at about a 35% growth in energy demand between 2010 and 2040.  Fundamentally, that is how Exxon-Mobil

sets its investment plans, and obviously, we continue to test that not only annually but periodically."

194.    The statements described above were false and misleading when made because they failed to disclose the truth about the Alleged Omitted Information described in ¶¶ 179-180. Specifically, according to sworn testimony from the NYOAG and internal Exxon documents disclosed in the NYOAG Subpoena Action, until at least June 2014, Exxon's internal policies actually prescribed the use of a separate, undisclosed set of proxy costs that were *significantly lower* than those the Company had publicly represented that it used in connection with its investment and asset valuation processes.  By failing to disclose the Company's use of this separate, lower set of proxy costs, the above statements were materially misleading to investors. In addition, the statements described above also failed to disclose that, contrary to what investors had been led to believe, Exxon had failed to use *any proxy costs at all* for certain of its projects, or that Exxon had failed to incorporate carbon proxy costs into *any* of the Company's asset impairment determination processes for the reserve assets at issue.  As such, the statements described above provided investors with a materially misleading description of Defendants' efforts to evaluate and account for the potential climate change-related risks associated with Exxon's reserve assets and long-term business prospects.

195.    On May 27, 2015, Exxon held its annual shareholders meeting.  The meeting was attended by, among others, Defendants Tillerson and Woodbury, both of whom spoke on Exxon's behalf at some point during the meeting.  During the meeting, Defendants highlighted Exxon's previously reported 2014 corporate earnings of $32.5 billion and the 104% reserves replacement ratio.  Defendant Tillerson also assured Exon's shareholders that the Company's "investment

decisions are based on a long-term view informed by our energy outlook, and they are tested across a broad range of economic parameters including a broad range of commodity prices."

196.    During the May 27, 2015 shareholders meeting, Defendant Tillerson stated that the Outlook that "underpins" Exxon's business strategies and investments also "anticipate[s] that government policies would impose rising cost[s] on carbon dioxide emissions." Tillerson stated that Exxon had always described climate change as a "risk management problem" and that "in risk management, you have to consider the range of possible consequences and be prepared for those."

197.    Defendants' statements on May 27, 2015 were false and misleading when made, because Defendants failed to disclose the truth about the omitted information described in the Alleged Omitted Information. Specifically, Defendants failed to disclose that, according to sworn testimony from the NYOAG and internal Exxon documents disclosed in the NYOAG Subpoena Action, until at least June 2014, Exxon's internal policies actually prescribed the use of a separate, undisclosed set of proxy costs that were *significantly lower* than those the Company had publicly represented that it used in connection with its investment and asset valuation processes. By failing to disclose the Company's use of this separate, lower set of proxy costs, which would have likely affected at least some of the earnings and reserve assets at issue above, the statements on May 27, 2015 were materially misleading to investors. The statements described above also failed to disclose that, contrary to what investors had been led to believe, Exxon had failed to use *any proxy costs at all* for certain of its projects, or that Exxon had failed to incorporate carbon proxy costs into *any* of the Company's asset impairment determination processes for the reserve assets at issue. By failing to disclose the above information, the statements described on May 27, 2015 above materially misled investors with regard to the efforts that Defendants had undertaken, and were undertaking, to evaluate and account for the potential impact that climate change-related risks may

have on Exxon's reserve assets and long-term business prospects, including, specifically, the value of the reserve assets at issue.

198.    On July 31, 2015, Exxon held its second quarter earnings call, during which the following exchange took place:

> [**Paul Sankey - Wolfe Research - Analyst**:] One thing I'm worried about Jeff, is reserves replacement.  Just insofar as I don't think you've had any FIDs this year.  And I also noticed that your reserves booking last year were heavily dominated by the US.  Could you update us on where we stand as regard to reserves replacement?

> [**Jeff Woodbury - ExxonMobil Corporation - VP of IR and Secretary**:] Yes, well, obviously that's an annual process. And we're – we've fully replaced our production for 21 straight years.  We've got a very good inventory that we're working on, to convert to an FID decision in proved reserves, as well as a very active exploration program. So we've been very successful, as the history shows, and I'd say that the prognosis in the future will remain the same.

199.    On the same call, the following exchange also took place:

> [**John Herrlin - Societe Generale - Analyst**:] Most things have been asked, Jeff, but you have seen a lot of your IOC peers, as well as some large cap E&Ps take significant impairments.  You have a very robust resource base, as you've stated.  Are there any issues for, say, intermediate term projects coming off the books on a long-term basis for Exxon?

> [**Jeff Woodbury - ExxonMobil Corporation - VP of IR and Secretary**:] Well, there's two parts to your question.  One is, if we've got resources that are in a resource base that ultimately we don't see the long-term value, as I indicated earlier, John, we will look for ways to monetize them, which may include some level of divestment. In terms specifically of impairments, as you know, we live in a commodity price environment that has great volatility.  But as I've said several times in our annual outlook, the longer-term market fundamentals remain unchanged, and the lifespan of our assets really are measured in decades.  Therefore, long-term price views are more stable, and quite frankly, more meaningful for future cash flows and market value.  So we expect the business to more than recover the carrying value of the assets on the books.  Obviously in the course of our ongoing asset management efforts, we do confirm that asset values fully cover carrying costs.

> [**John Herrlin - Societe Generale - Analyst**:] Great, that's what I wanted to hear.

200.    Defendant Woodbury's statements on July 31, 2015 were false and misleading when made because they failed to disclose the truth about the omitted information described in the

Alleged Omitted Information.  Specifically, Defendants failed to disclose that, until at least June 2014, Exxon's internal policies actually prescribed the use of a separate, undisclosed set of proxy costs that were *significantly lower* than those the Company had publicly represented that it used in connection with its investment and asset valuation processes.  By failing to disclose the Company's use of this separate, lower set of proxy costs, which would have affected at least some of the reserve assets at issue above, the statements were materially misleading to investors.  The statements also failed to disclose that, contrary to what investors had been led to believe, Exxon had failed to use *any proxy costs at all* for certain of its projects, or that Exxon had failed to incorporate carbon proxy costs into *any* of the Company's asset impairment determination processes for the reserve assets at issue.  By failing to disclose the above information, the statements materially misled investors with regard to the efforts that the Individual Defendants had undertaken, and were undertaking, to evaluate and account for the potential impact that climate change-related risks may have on Exxon's reserve assets and long-term business prospects, including, specifically, the value of the reserve assets at issue in such statements.

201.    On October 30, 2015, Exxon held its third quarter earnings call.  Among other things, Defendant Woodbury highlighted major new project developments, such as the Kearl Operation, that were contributing to production rates.  Specifically, Defendant Woodbury stated that such projects provide "a very strong foundation to our production, but importantly a valuable foundation that contributes significant cash flow."

202.    Defendant Woodbury's statements on October 30, 2015 were false and misleading when made because they failed to disclose the truth about the omitted information described in the Alleged Omitted Information.  Specifically, Defendant Woodbury failed to disclose that, until at least June 2014, the reserve assets at issue had been subject to internal policies that prescribed the

use of a separate, undisclosed set of proxy costs that were *significantly lower* than those the Company had publicly represented that it used in connection with its investment and asset valuation processes.  By failing to disclose the Company's use of this separate, lower set of proxy costs, which would have affected at least some of the reserve assets at issue above, the statements were materially misleading to investors.  The statements also failed to disclose that, contrary to what investors had been led to believe, Exxon had failed to use *any proxy costs at all* for certain of its projects, or that Exxon had failed to incorporate carbon proxy costs into *any* of the Company's asset impairment determination processes for the reserve assets at issue on October 30, 2015.  By failing to disclose the above information, the statements materially misled investors with regard to the efforts that the individual Defendants had undertaken, and were undertaking, to evaluate and account for the potential impact that climate change-related risks may have on Exxon's reserve assets and long-term business prospects, including, specifically, the value of the reserve assets at issue in such statements.

### 3.   Defendants' 2016 Misstatements And Omissions

203.   On February 2, 2016, Exxon issued its fourth quarter and year-end 2015 earnings press release.  Included in that release was the following "Estimated Key Financial and Operating Data":

**Exxon Mobil Corporation**
**Fourth Quarter 2015**
(millions of dollars, unless noted)

| | Fourth Quarter | | Twelve Months | |
|---|---|---|---|---|
| | 2015 | 2014 | 2015 | 2014 |
| **Earnings / Earnings Per Share+** | | | | |
| Total revenues and other income | 59,807 | 87,276 | 268,882 | 411,939 |
| Total costs and other deductions | 57,179 | 78,434 | 246,916 | 360,309 |
| Income before income taxes | 2,628 | 8,842 | 21,966 | 51,630 |
| Income taxes 1 | (202) | 2,060 | 5,415 | 18,015 |
| Net income including noncontrolling interests | 2,830 | 6,782 | 16,551 | 33,615 |
| Net income attributable to noncontrolling interests | 50 | 212 | 401 | 1,095 |
| Net income attributable to ExxonMobil (U.S. GAAP) | 2,780 | 6,570 | 16,150 | 32,520 |
| Earnings per common share (dollars) | 0.67 | 1.56 | 3.85 | 7.60 |

204.     Defendants' statements regarding the earnings press release were false and misleading when made because Defendants failed to properly record the significant asset impairment charge concerning Exxon's Rocky Mountain dry gas operations, which the Company was required to record pursuant to ASC 360-10.

205.     On February 2, 2016, Exxon held its fourth quarter 2015 earnings conference call. On that call, Defendant Woodbury told analysts that the Company "feel[s] very good about the resource potential" of the Kearl Operation, and that Exxon "[has] built [its] business to ensure that it is durable in a low-price environment."  Defendant Woodbury also stated: "we still feel very good about the long-term financial performance of these assets.  Because remember, when we make the final investment decision, we're testing those investments across a wide range of economic parameters, including price.  And as I said earlier, our fundamental focus has been making sure that our Business is viable and durable in a low-price environment."

206.     During the same February 2, 2016 call, Defendant Woodbury also stated:

The way we have prudently managed our cash, our disciplined investment and our leading financial and operating results, all of which has allowed us the financial flexibility to invest through the cycle as we've been discussing.

I tell you that the current environment is clearly tough, but we've managed the business to be durable on the low end of commodity prices. We're very well positioned to continue the same level of superior performance in the future, and we think that all underpins the strong credit rating that we have.

207.     During the February 2, 2016 earnings call, Defendant Woodbury also told one analyst that, despite the plunge in prices over approximately 18 months, Exxon had not revised the range of prices it uses to evaluate investment decisions, stating that "we continue to see that the [existing] range is applicable."

208.     On February 19, 2016, Defendants issued a release entitled "ExxonMobil Announces 2015 Reserves Additions."  The release stated in pertinent part that Exxon had "added

1 billion oil-equivalent barrels of proved oil and gas reserves in 2015, replacing 67 percent of production, including a 219 percent replacement ratio for crude oil and other liquids," such that "[a]t year-end 2015, ExxonMobil's proved reserves totaled 24.8 billion oil-equivalent barrels." The release quoted Defendant Tillerson as stating that "'ExxonMobil has a successful track record of proved reserves replacement over the long term, demonstrating the strength of our global strategy to identify, evaluate, capture and advance high-quality opportunities,'" and that the Company's "'proved reserves represent a diverse portfolio that positions [it] to create shareholder value as [it] suppl[ies] long-term energy demand growth.'" The release further quoted Defendant Tillerson as emphasizing that Exxon would "'continue to apply [its] disciplined, paced investing approach as [it] develop[s] [its] industry-leading resource base.'"

209.    Defendants' statements on February 2 and 19, 2016 were false and misleading when made because they failed to disclose the truth about the omitted information described in the Alleged Omitted Information.  Specifically, for the same reasons as detailed above, by failing to disclose the omitted information they materially misled investors with regard to the efforts that Defendants had undertaken, and were undertaking, to evaluate and account for the potential impact that climate change-related risks might have on Exxon's reserve assets and long-term business prospects, including, specifically, the value of the reserve assets.  In addition, the statements on February 2 and 19, 2016 regarding, among other things, Exxon's reserve levels and reserve replacement ratios, the Company's "'industry-leading resource bases,'" its "resource potential," the "long-term financial performance of [its reserve] assets," that the Company is "well positioned to continue the same level of superior performance in the future," were materially misleading to investors in light of the failure to disclose that, *at the time*, the Canadian Bitumen Operations were operating at a loss, the Kearl Operation was unlikely to satisfy the SEC definition for proved

reserves at year-end 2016, and a significant portion of Exxon's Rocky Mountain dry gas operations were impaired.

210.    On February 24, 2016, Exxon filed with the SEC its 2015 Form 10-K.  The 2015 Form 10-K was signed by Defendants Tillerson, Swiger, Rosenthal, Boskin, Brabeck-Letmathe, Burns, Faulkner, Fore, Frazier, Palmisano, Reinemund, Oberhelman, Woods, and Weldon. Concerning Exxon's "Disclosure of Reserves," and specifically its "Summary of Oil and Gas Reserves at Year-End 2015," the 2015 Form 10-K stated, in pertinent part, as follows:

| | Crude Oil | Natural Gas Liquids | Bitumen | Synthetic Oil | Natural Gas | Oil-Equivalent Basis |
|---|---|---|---|---|---|---|
| | (million bbls | million bbls) | (million bbls) | (million bbls) | (billion cubic ft | (million bbls) |
| **Proved Reserves** | | | | | | |
| **Developed** | | | | | | |
| **Consolidated Subsidiaries** | | | | | | |
| United States | 1,155 | 272 | - | - | 13,353 | 3,652 |
| Canada/South America | 92 | 9 | 4,108 | 581 | 552 | 4,882 |
| Europe | 158 | 34 | - | - | 1,593 | 458 |
| Africa | 738 | 162 | - | - | 750 | 1,025 |
| Asia | 1,586 | 121 | - | - | 4,917 | 2,526 |
| Australia/Oceania | 73 | 34 | - | - | 1,962 | 434 |
| Total Consolidated | 3,802 | 632 | 4,108 | 581 | 23,127 | 12,977 |
| | | | | | | |
| **Equity Companies** | | | | | | |
| United States | 221 | 7 | - | - | 156 | 254 |
| Europe | 25 | - | - | - | 6,146 | 1,049 |
| Asia | 802 | 349 | - | - | 15,233 | 3,690 |
| Total Equity Company | 1,048 | 356 | - | - | 21,535 | 4,993 |
| Total Developed | 4,850 | 988 | 4,108 | 581 | 44,662 | 17,970 |
| | | | | | | |
| **Undeveloped** | | | | | | |
| **Consolidated Subsidiaries** | | | | | | |
| United States | 1,223 | 396 | - | - | 6,027 | 2,624 |
| Canada/South America | 168 | 6 | 452 | - | 575 | 722 |
| Europe | 26 | 8 | - | - | 363 | 95 |
| Africa | 225 | 5 | - | - | 43 | 237 |
| Asia | 1,239 | - | - | - | 412 | 1,308 |
| Australia/Oceania | 52 | 31 | - | - | 5,079 | 929 |
| Total Consolidated | 2,933 | 446 | 452 | - | 12,499 | 5,915 |

**Equity Companies**

| | | | | | | |
|---|---|---|---|---|---|---|
| United States | 33 | 6 | - | - | 64 | 50 |
| Europe | - | - | - | - | 1,757 | 293 |
| Asia | 275 | 52 | - | - | 1,228 | 531 |
| Total Equity Company | 308 | 58 | - | - | 3,049 | 874 |
| Total Undeveloped | 3,241 | 504 | 452 | - | 15,548 | 6,789 |
| **Total Proved Reserves** | 8,091 | 1,492 | 4,560 | 581 | 60,210 | 24,759 |

211.    The 2015 Form 10-K also announced Exxon's transfer of approximately 2.7 GOEB of reserve assets from proved undeveloped to proved developed reserves, mostly attributable to transfers relating to the Kearl Operation.

212.    In addition, the 2015 Form 10-K stated that "Management views the Corporation's financial strength as a competitive advantage," and further stated:

> The Corporation has an active asset management program in which underperforming assets are either improved to acceptable levels or considered for divestment.  The asset management program includes a disciplined, regular review to ensure that all assets are contributing to the Corporation's strategic objectives.  The result is an efficient capital base, and the Corporation has seldom had to write down the carrying value of assets, even during periods of low commodity prices.

213.    The Individual Defendants' statements in the 2015 Form 10-K were false and misleading when made because Defendants failed to disclose the truth about the omitted information described in the Alleged Omitted Information.  Specifically, for the same reasons as detailed above, by failing to disclose the omitted information, the Individual Defendants materially misled investors with regard to the efforts that they had undertaken, and were undertaking, to evaluate and account for the potential impact that climate change-related risks might have on Exxon's reserve assets and long-term business prospects, including, specifically, the value of the reserve assets at issue in the 2015 Form 10-K.  In addition, the statements described in the 2015 Form 10-K above were materially misleading to investors in light of the Individual Defendants' failure to disclose that, *at the time*, the Canadian Bitumen Operations were operating at a loss, the

Kearl Operation was unlikely to satisfy the SEC definition for proved reserves at year-end 2016,

and a significant portion of Exxon's Rocky Mountain dry gas operations were impaired.

214.    The 2015 Form 10-K also stated:

In general, the Corporation does not view temporarily low prices or margins as a trigger event for conducting impairment tests.  The markets for crude oil, natural gas and petroleum products have a history of significant price volatility.  Although prices will occasionally drop significantly, industry prices over the long term will continue to be driven by market supply and demand.  On the supply side, industry production from mature fields is declining, but this is being offset by production from new discoveries and field developments.  OPEC production policies also have an impact on world oil supplies. The demand side is largely a function of global economic growth.  The relative growth/decline in supply versus demand will determine industry prices over the long term, and these cannot be accurately predicted.

If there were a trigger event, the Corporation estimates the future undiscounted cash flows of the affected properties to judge the recoverability of carrying amounts. Cash flows used in impairment evaluations are developed using estimates for future crude oil and natural gas commodity prices, refining and chemical margins, and foreign currency exchange rates. Volumes are based on projected field and facility production profiles, throughput, or sales.  These evaluations make use of the Corporation's price, margin, volume, and cost assumptions developed in the annual planning and budgeting process, and are consistent with the criteria management uses to evaluate investment opportunities.  Where unproved reserves exist, an appropriately risk-adjusted amount of these reserves may be included in the evaluation.

An asset group would be impaired if its undiscounted cash flows were less than the asset's carrying value.  Impairments are measured by the amount by which the carrying value exceeds fair value.  Cash flow estimates for impairment testing exclude the effects of derivative instruments.

In light of continued weakness in the upstream industry environment in late 2015, the Corporation undertook an effort to assess its major long-lived assets most at risk for potential impairment.  The results of this assessment confirm the absence of a trigger event and indicate that the future undiscounted cash flows associated with these assets substantially exceed the carrying value of the assets.  The assessment reflects crude and natural gas prices that are generally consistent with the long-term price forecasts published by third-party industry experts.  Critical to the long-term recoverability of certain assets is the assumption that either by supply and demand changes, or due to general inflation, prices will rise in the future. Should increases in long-term prices not materialize, certain of the Corporation's assets will be at risk for impairment.  Due to the inherent difficulty in predicting future commodity prices, and the relationship between industry prices and costs, it

is not practicable to reasonably estimate a range of potential future impairments related to the Corporation's long-lived assets.

215.    The Individual Defendants' statements above were false and misleading when made because Defendants failed to disclose the truth about the omitted information described in the Alleged Omitted Information.  Specifically, contrary to the statement that Exxon's asset impairment calculations "make use of the Corporation's price, margin, volume, and cost assumptions developed in the annual planning and budgeting process, and are consistent with the criteria management uses to evaluate investment opportunities," Exxon *did not incorporate carbon proxy costs into any of its asset impairment determination processes* for 2015.  In addition, the statements described above were materially misleading to investors because they failed to disclose that a significant portion of Exxon's Rocky Mountain dry gas operations were impaired at year-end 2015.  Wright Decl., ¶¶ 87-107.

216.    The 2015 Form 10-K also stated:

For many years, the Corporation has taken into account policies established to reduce energy-related greenhouse gas emissions in its long-term *Outlook for Energy*, which is used as a foundation for assessing the business environment and business strategies and investments.  The climate accord reached at the recent Conference of the Parties (COP 21) in Paris set many new goals, and while many related policies are still emerging, the *Outlook for Energy* continues to anticipate that such policies will increase the cost of carbon dioxide emissions over time.  For purposes of the *Outlook for Energy*, we continue to assume that governments will enact policies that impose rising costs on energy-related $CO_2$ emissions, which we assume will reach an implied cost in OECD nations of about $80 per tonne in 2040.  China and other leading non-OECD nations are expected to trail OECD policy initiatives.  Nevertheless, as people and nations look for ways to reduce risks of global climate change, they will continue to need practical solutions that do not jeopardize the affordability or reliability of the energy they need.  Thus, all practical and economically viable energy sources, both conventional and unconventional, will be needed to continue meeting global energy needs – because of the scale of worldwide energy demand.

The information provided in the Long-Term Business Outlook includes ExxonMobil's internal estimates and forecasts based upon internal data and analyses as well as publicly available information from external sources including the International Energy Agency.

217.   The Individual Defendants' statements above were false and misleading when made because they failed to disclose the truth about the omitted information described in the Alleged Omitted Information.  Specifically, according to sworn testimony from the NYOAG and internal Exxon documents disclosed in the NYOAG Subpoena Action, until at least June 2014, Exxon's internal policies actually prescribed the use of a separate, undisclosed set of proxy costs that were *significantly lower* than those the Company had publicly represented that it used in connection with its investment and asset valuation processes.  By failing to disclose the Company's use of this separate, lower set of proxy costs, the above statements were materially misleading to investors.  In addition, in direct contrast to the above statements, Exxon actually used *no proxy costs at all* for certain of its projects, including, from at least "the fall of 2015" on, the Canadian Bitumen Operations, and the Company failed to incorporate carbon proxy costs into *any* of its asset impairment determination processes for 2015.  Based on the foregoing, the statements above provided investors with a materially misleading description of the Individual Defendants' efforts to evaluate and account for the potential climate change-related risks associated with Exxon's reserve assets and long-term business prospects.

218.   Lastly, the 2015 Form 10-K stated:

When crude oil and natural gas prices are in the range seen in late 2015 and early 2016 for an extended period of time, under the SEC definition of proved reserves, certain quantities of oil and natural gas, such as oil sands operations in Canada and natural gas operations in North America could temporarily not qualify as proved reserves.  Amounts that could be required to be de-booked as proved reserves on an SEC basis are subject to being re-booked as proved reserves at some point in the future when price levels recover, costs decline, or operating efficiencies occur.  Under the terms of certain contractual arrangements or government royalty regimes, lower prices can also increase proved reserves attributable to ExxonMobil.  We do not expect any temporary changes in reported proved reserves under SEC definitions to affect the operation of the underlying projects or to alter our outlook for future production volumes.

219.    Defendants' statements above were false and misleading when made because Defendants failed to disclose the truth about the omitted information described in the Alleged Omitted Information.  Specifically, as detailed *supra*, at the time the Individual Defendants made the statement described above, they knew or were grossly negligent in not knowing that the Kearl Operation would not satisfy the SEC definition for proved reserves at year-end 2016, absent an extraordinary and, by Exxon's own subsidiary's internal estimates, unexpected rise in the price of oil.  In fact, at the time, the year-to-date average WCS price was just $19.83 (USD/bbl), and the Individual Defendants knew that the Kearl Operation would only satisfy the SEC definition for proved reserves at year-end 2016 if the average WCS price over the remainder of the year was $38.77 (USD/bbl) or nearly *double* the year-to-date average.  In addition, the Individual Defendants also failed to disclose that, *at the time*, they were not applying *any carbon proxy costs at all* to the Canadian Bitumen Operations, or that the Canadian Bitumen Operations had been operating at a loss for several months.  As such, Defendants' disclosure regarding the possibility that the Kearl Operation might need to be de-booked at year-end was materially misleading to investors.

220.    In addition to being materially misleading, Exxon's 2015 Form 10-K also violated GAAP and SEC accounting and disclosure rules.

221.    On March 2, 2016, Defendants filed a final prospectus with the SEC in connection with the March 2016 Debt Offering.  The registration statement and prospectus used to complete the March 2016 Debt Offering expressly incorporated by reference Exxon's 2015 Form 10-K.  As such, these documents were materially false and misleading for the same reason set forth above.

222.    On March 2, 2016, Exxon also conducted its 2016 analyst meeting at the New York Stock Exchange building in New York City.  Defendant Tillerson displayed the following slide

during his opening remarks, which he said demonstrated that, despite the fact that "the business environment ha[d] changed dramatically, even since . . . last year, with a sharp decrease in crude oil and natural gas prices," due to its "[o]perational integrity" and "reliability," Exxon was "uniquely suited to endure these conditions and outperform competition, leaving [Exxon] best-positioned to capture value in the upturn."



223.    Defendant Tillerson also used the following slides at the March 2, 2016 analyst meeting to, among other things, highlight the quality of Exxon's reserves and assert that, regardless of the impairment charges Exxon's competitors were taking on their oil reserves, the value of Exxon's reserves were not impaired because of the Company's "disciplined investment approach, effective project management and innovative technologies," stating in pertinent part as follows:



The quality of ExxonMobil's portfolio is also evident relative to significant recent asset impairments by our competitor group. Not shown [on the graph] are the North American pure play E&P companies, which, if you look at the last couple of years, took impairments of over $120 billion; and if you look at the last eight years, took impairments of over $200 billion.

Now, while these impairments will improve competitor return on capital employed performance in the future years, they represent a significant destruction of shareholder assets. Our investment discipline delivers industry-leading returns and a portfolio that is durable across a wide range of commodity prices. Effective project execution provides the lowest installed capital cost, which, along with optimized operations, creates a long-term value that simply outpaces our competitors.



This chart provides perspective on the quality of our upstream assets. Upstream capital efficiency underpins long-term financial performance. The plot illustrates ExxonMobil's structural advantage in capital employed per barrel of crude reserves, which leads competition at $6.50 a barrel. Our high-quality, efficient capital base is an outcome of our investment approach, consistently applied for decades. Importantly, 73% of our proved reserves are developed and are in production, contributing to the bottom line.

Next I will discuss reserve replacement, which is an outcome of our disciplined investment approach. ExxonMobil has a successful track record of long-term proved reserve additions, demonstrating the strength of our global strategy to identify, evaluate, capture and advance high-quality opportunities. The Corporation has a diverse resource base of 91 billion oil equivalent barrels, all in various stages of evaluation, design and development. As you can see in the graphic, we consistently convert sizable portions of the resource base along with

newly acquired resources into proved reserves, which currently total 25 billion oil-equivalent barrels.



We have consistently added about 1.5 billion to 2 billion oil equivalent barrels of resource to proved reserves each year, replacing over 100% of production for over two decades.  We have a long reserve life of 16 years at current production rates, which does lead to competition. Last year, we replaced 67% of production, adding 1 billion oil-equivalent barrels of proved reserves in both oil and gas, but that reflects also a 219% replacement of crude oil and other liquids.

The level of reserve replacement in any given year is an outcome of our investment choices, and it is not an objective.  We are value-focused, making the best long-term decisions for our shareholders, progressing opportunities at the right time and deploying capital efficiently to create that long-term shareholder value, even if it means interrupting a 21-year trend.

The quality of our resource opportunities remains strong into the future.  They have not diminished in the current business climate.  ExxonMobil maintains a rigorous reserves evaluation process.  And as with all aspects of our business, we approach the reporting of reserve balances with the highest integrity.

224.    During the March 2, 2016 analyst meeting, Defendant Tillerson also showed the following slide, and stated the following:



Now let's take a look at our approach to environmental protection.  We recognize that meeting the world's growing energy needs while protecting the environment is one of today's grand challenges.  We are committed to lowering emissions, reducing spills, and minimizing waste to mitigate the environmental impact of our operations.  We have developed and deployed advanced technologies and enhanced products that have lowered greenhouse gas emissions across the value chain.

Sustainable improvements in our operations have reduced cumulative greenhouse gases by more than 20 million metric tons over the past decade.  For example, we have increased our energy efficiency significantly over time by installing additional cogeneration facilities in our operations, making us an industry leader with current gross capacity of 5.5 gigawatts.  And products we produce, like cleaner-burning natural gas, also help to reduce global emissions.

At ExxonMobil, we do take the risk of climate change seriously.  We have studied climate change for almost 40 years, and we consistently collaborate and share our research with leading scientific institutions, top universities, the United Nations and other public stakeholders.  We also engage in constructive dialogue on climate change policy options with NGOs, industry and policymakers.

225.    Defendant Tillerson's statements described above on March 2, 2016 were false and misleading when made because they failed to disclose the truth about the Alleged Omitted Information.  Specifically, for the same reasons as detailed above, by failing to disclose the Alleged Omitted Information, the Individual Defendants materially misled investors with regard to the efforts that they had undertaken, and were undertaking, to evaluate and account for the potential

impact that climate change-related risks might have on Exxon's reserve assets and long-term business prospects, including, specifically, the value of the reserve assets. In addition, the March 2, 2016 statements above were materially misleading to investors because they failed to disclose that, *at the time*, the Canadian Bitumen Operations were operating at a loss, the Kearl Operation was unlikely to satisfy the SEC definition for proved reserves at year-end 2016, and a significant portion of Exxon's Rocky Mountain dry gas operations were impaired.

226.   On March 30, 2016, Exxon published its 2015 Corporate Citizenship Report, which purported to describe Exxon's efforts to lower climate change risks. In the report, Exxon represented that since the transition to lower emissions sources would take "many decades," none of Exxon's proven hydrocarbon reserves were or would become "stranded." The report also stated, in relevant part, as follows:

> By 2040, the world's population is projected to reach 9 billion — up from about 7.2 billion today — and global GDP will have more than doubled. As a result, we see global energy demand rising by about 25 percent from 2014 to 2040. In order to meet this demand, we believe all economic energy sources, including our existing hydrocarbon reserves, will be needed. We also believe that the transition of the global energy system to lower-emissions sources will take many decades due to its enormous scale, capital intensity and complexity. As such, we believe that none of our proven hydrocarbon reserves are, or will become, stranded.

> ExxonMobil's long-range annual forecast, *The Outlook for Energy*, examines energy supply and demand trends for approximately 100 countries, 15 demand sectors and 20 different energy types. The *Outlook* forms the foundation for the company's business strategies and helps guide our investment decisions. In response to projected increases in global fuel and electricity demand, our 2016 *Outlook* estimates that global energy-related $CO_2$ emissions will peak around 2030 and then begin to decline. A host of trends contribute to this downturn — including slowing population growth, maturing economies and a shift to cleaner fuels like natural gas and renewables — some voluntary and some the result of policy.

> ExxonMobil addresses the potential for future climate change policy, including the potential for restrictions on emissions, by estimating a proxy cost of carbon. This cost, which in some geographies may approach $80 per ton by 2040, has been included in our Outlook for several years. This approach seeks to reflect potential policies governments may employ related to the exploration, development, production, transportation or use of carbon-based fuels. We believe our view on

the potential for future policy action is realistic and by no means represents a "business-as-usual" case.  We require all of our business lines to include, where appropriate, an estimate of greenhouse gas-related emissions costs in their economics when seeking funding for capital investments.

We evaluate potential investments and projects using a wide range of economic conditions and commodity prices.  We apply prudent and substantial margins in our planning assumptions to help ensure competitive returns over a wide range of market conditions.  We also financially stress test our investment opportunities, which provides an added margin against uncertainties, such as those related to technology development, costs, geopolitics, availability of required materials, services and labor.  Stress testing further enables us to consider a wide range of market environments in our planning and investment process.

227.    The March 30, 2016 statements were false and misleading when made because they failed to disclose the truth about the Alleged Omitted Information.  Specifically, as detailed above, until at least June 2014, Exxon's internal policies actually prescribed the use of a separate, undisclosed set of proxy costs that were *significantly lower* than those the Company had publicly represented that it used in connection with its investment and asset valuation processes.  By failing to disclose the Company's use of this separate, lower set of proxy costs, the above statements were materially misleading to investors.  In addition, in direct contrast to the above statements, Exxon actually used *no proxy costs at all* for certain of its projects, including from at least "the fall of 2015" on, the Canadian Bitumen Operations, and the Company failed to incorporate carbon proxy costs into *any* of its asset impairment determination processes for 2015.  Based on the foregoing, the statements described above provided investors with a materially misleading description of Defendants' efforts to evaluate and account for the potential climate change-related risks associated with Exxon's reserve assets and long-term business prospects.

228.    On April 13, 2016, Exxon filed a notice of its annual shareholder meeting and proxy statement with the SEC.  The notice recommended that shareholders vote against a number of climate change-related proposals, stating, among other things:

ExxonMobil published the report, *Energy and Carbon – Managing the Risks*, to address questions raised on the topic of global energy demand and supply, climate change policy and carbon asset risks. This report further described how the Company integrates consideration of climate change risks into planning processes and investment evaluation. The Board is confident that the Company's robust planning and investment processes adequately contemplate and address climate change related risks.

Each year, we update our long-term energy demand projection in our *Outlook for Energy* – taking into account the most up-to-date demographic, economic, technological, and climate policy information available. This analysis serves as a foundation for our long-term business strategies and investments, and is generally consistent with other forecasting organizations such as the International Energy Agency. Our *Outlook* by no means represents a "business as usual" case and it includes a significant reduction in projected energy use and greenhouse gas (GHG) emissions due to energy efficiency initiatives. Because we assume policy action will become increasingly more stringent over time, our *Outlook* projects lower future energy-related $CO_2$ emissions through 2040 than would be implied by a "no policy scenario" where limited GHG reduction policies and regulations are implemented.

\*        \*        \*

Projects are evaluated under a wide range of possible economic conditions and commodity prices that are reasonably likely to occur. The Company does not publish the economic bases upon which we evaluate investments due to competitive considerations; however, it applies prudent and substantial safety margins in our planning assumptions to help ensure robust returns.

\*        \*        \*

The Company addresses the potential for future climate-related policy, including the potential for restriction on emissions, through the use of a proxy cost of carbon. The proxy cost seeks to reasonably reflect the types of actions and policies that governments may take over the outlook period relating to the exploration, development, production, transportation or use of carbon-based fuels. This proxy cost of carbon is embedded in our Outlook for Energy, and has been a feature of the report since 2007. All business segments are required to include, where appropriate, an estimate of the costs associated with greenhouse gas emissions in their economics when seeking funding for capital investments.

229.    In addition, the notice described above also stated that the Board of Directors was

"confident that the Company's robust planning and investment processes adequately contemplate

and address climate change related risks, ensuring the viability of its assets," and believed that "none of our proven hydrocarbon reserves are, or will become, stranded."

230.    The Individual Defendants' statements above were false and misleading when made for the same reasons as those set forth in ¶ 227.

231.    On April 29, 2016, the Individual Defendants issued Exxon's first quarter 2016 earnings press release.  Included in that release was the following "Estimated Key Financial and Operating Data":

**Exxon Mobil Corporation**
**First Quarter 2016**
(millions of dollars, unless noted)

|  | First Quarter | |
|---|---|---|
|  | **2016** | 2015 |
| **Earnings / Earnings Per Share** | | |
| Total revenues and other income | **48,707** | 67,618 |
| Total costs and other deductions | **46,977** | 60,983 |
| Income before income taxes | **1,730** | 6,635 |
|     Income taxes | **(51)** | 1,560 |
| Net income including noncontrolling interests | **1,781** | 5,075 |
|     Net income attributable to noncontrolling interests | **(29)** | 135 |
| Net income attributable to ExxonMobil (U.S. GAAP) | **1,810** | 4,940 |
| | | |
| Earnings per common share (dollars) | **0.43** | 1.17 |

232.    The Individual Defendants' statements above were false and misleading when made because they failed to properly record the significant asset impairment charge concerning Exxon's Rocky Mountain dry gas operations, which the Company was required to record pursuant to ASC 360-10.

233.    On April 29, 2016, Exxon held a conference call with investors and analysts to discuss the Company's earnings and operations.  During the conference call, Defendant Woodbury engaged in the following exchange with a stock analyst:

> [*Paul Sankey - Wolfe Research - Analyst*:] Okay, Jeff, because of time constraints, I'll just jump into another one.  You again, mentioned return on capital employed.

I really struggle with you losing money in the upstream on an earnings basis, particularly in the U.S., and how you reconcile that with the measure of the return on capital employed.  Typically, we don't look at that, we look at the cash flow measure.  Can you help us with the DD&A upstream particularly in the U.S., so we can get to the cash returns that you're making as opposed to these losses upstream?

[*Jeff Woodbury - ExxonMobil Corporation - VP of IR and Secretary*:] We've got a very strong portfolio in the upstream and remember that we invest with a long-term view that's informed by our long-term energy demand outlook.  All of our assets were managed to maximize returns through the life cycle with the objective of maintaining positive cash flow in low price environments.  We'll continue to focus on those things that we control, cost, reliability, operational integrity.

Importantly, we'll invest in attractive opportunities throughout the cycle that further enhance the asset profitability, and we see significant value in our assets, so, yes, there is a low price.  We're in a low-price period like we've been in the past.  As I've said, we've really designed these assets to be very durable during a low price environment.

They continue to generate—our producing assets continue to generate cash flow, and over the long-term we will continue to demonstrate, industry leading returns on capital employed.

234.    Defendant Woodbury's statements described above were false and misleading when made because they failed to disclose the truth about the Alleged Omitted Information. Specifically, for the same reasons as detailed above, by failing to disclose Alleged Omitted Information, Defendant Woodbury materially misled investors with regard to the efforts that Defendants had undertaken, and were undertaking, to evaluate and account for the potential impact that climate change-related risks might have on Exxon's reserve assets and long-term business prospects.  In addition, the statements described above were materially misleading to investors because they failed to disclose that the Canadian Bitumen Operations were operating at a loss from at least mid-November 2015 through mid-April 2016, that the Kearl Operation was unlikely to satisfy the SEC definition for proved reserves at year-end 2016, and that a significant portion of Exxon's Rocky Mountain dry gas operations were impaired.

235.     On May 12, 2016, Exxon held its annual executive compensation conference call where several climate-related shareholder proposals were addressed.   The Board of Directors recommended voting against these proposals.   During the call, Defendant Woodbury stated, in part, as follows:

> To address questions raised on the topics of global energy demand and supply, climate change policy and carbon asset risk, the Company previously published a comprehensive report entitled, Energy and Carbon—Managing the Risks.  I'll also highlight that our outlook for energy which details our forward assessment of energy demand and supply, is updated annually and considers many key demand-based variables, including the most up-to-date climate policy information available.
>
> Both of these documents, which are available on our website, provide to the shareholders an important insight into the merits of our business model and the rigor that underpins our investment plans to create shareholder value.
>
> *          *          *
>
> So in this regard we address the potential for future climate-related policy, including the expectation that future government policies to reduce greenhouse gas emissions will become more restrictive by using a proxy cost of carbon which has been embedded in our outlook since 2007.  These factors have positioned Exxon Mobil consistently as an industry leader in return on capital employed, being unrelenting in our commitment to shareholder value.
>
> *          *          *
>
> Finally, I'll note that our annual outlook for energy includes a significant reduction in projected energy use and greenhouse gas emissions, due to the efficiency initiatives and continuing policy action.  In short, our outlook by no means represents a business as usual case and is generally consistent with other forecasting organizations such as the International Energy Agency.
>
> *          *          *
>
> I mentioned earlier that the Company previously published the report, Energy and Carbon – Managing the Risks. This report demonstrates the Board's focus on the importance of assessing the resiliency of the Company's resource portfolio.
>
> *          *          *
>
> The Board believes that The Company's current processes sufficiently test its portfolio to ensure long-term shareholder value.  Framed by the report I just mentioned, and assessed annually through stress testing and our outlook for energy and in investment planning, we remain confident in the commercial viability of our

portfolio.  It should also be noted that all of our proved reserves fully comply with SEC definitions and requirements, as detailed in our annual 10-K filing.

It is also important to note that our outlook is consistent with other forecasting organizations, such as the International Energy Agency, as well as the commitments made under the Paris agreement.  In other words, the aggregation of intended nationally determined contributions, which were submitted by governments as part of the Paris agreement, indicates a greenhouse gas trajectory similar to that anticipated in our outlook.

Further, the outlook includes an expectation that future government policies to reduce greenhouse gas emissions will become increasingly stringent over time and has used a proxy cost of carbon to assess investments since 2007.

236.    Defendant Woodbury's statements on the May 12, 2016 conference call were false and misleading when made for the same reasons as those set forth in the Alleged Omitted Information.

237.    At the Annual Shareholders' Meeting held on May 25, 2016, Defendant Tillerson stated, among other things, that:

[E]very year, Exxon Mobil shares its long-term view of global energy demand and supply, which guides our company's business strategies and our investments, and we publish that as our outlook for energy.  This document confirms the wisdom of these investments and help provide the world with reliable and affordable energy necessary to advance economic prosperity and improve living standards well into the future.

238.    In addition, Defendant Tillerson also stated, in part, at the May 25, 2016 Annual Shareholders' Meeting:

We have, unlike many of our competitors, we have for many years included a price of carbon in our outlook.  And that price of carbon gets put into all of our economic models when we make investment decisions as well.

It's a proxy.  We don't know how else to model what future policy impacts might be.  But whatever policies are, ultimately they come back to either your revenues or your cost. So we choose to put it in as a cost.

So we have accommodated that uncertainty in the future, and everything gets tested against it.

239.    Defendant Tillerson's statements at the May 25, 2016, Shareholders' Meeting were false and misleading when made because they failed to disclose the truth about the Alleged Omitted Information.  Specifically, as detailed above, until at least June 2014, Exxon's internal policies actually prescribed the use of a separate, undisclosed set of proxy costs that were *significantly lower* than those the Company had publicly represented that it used in connection with its investment and asset valuation processes.  By failing to disclose the Company's use of this separate, lower set of proxy costs, the above statements were materially misleading to investors.  In addition, in direct contrast to Defendant Tillerson's statements, Exxon actually used *no proxy costs at all* for certain of its projects, including, from at least "the fall of 2015" on, the Canadian Bitumen Operations, and the Company failed to incorporate carbon proxy costs into *any* of its asset impairment determination processes for 2015.  Based on the foregoing, the statements described on May 25, 2016, above provided investors with a materially misleading description of the Individual Defendants' efforts to evaluate and account for the potential climate change-related risks associated with Exxon's reserve assets and long-term business prospects.

240.    On July 29, 2016, Exxon issued its second quarter 2016 earnings press release.  Included in that release was the following "Estimated Key Financial and Operating Data":

**Exxon Mobil**
**Second Quarter**
(millions of dollars, unless noted)

| | Second Quarter | | First Half | |
|---|---|---|---|---|
| **Earnings / Earnings Per Share** | **2016** | 2015 | **2016** | 2015 |
| Total revenues and other income | **57,694** | 74,113 | **106,401** | 141,731 |
| Total costs and other deductions | **55,298** | 67,159 | **102,275** | 128,142 |
| Income before income taxes | **2,396** | 6,954 | **4,126** | 13,589 |
| Income taxes | **715** | 2,692 | **664** | 4,252 |
| Net income including noncontrolling interests | **1,681** | 4,262 | **3,462** | 9,337 |
| Net income attributable to noncontrolling interests | **(19)** | 72 | **(48)** | 207 |
| Net income attributable to ExxonMobil (U.S. GAAP) | **1,700** | 4,190 | **3,510** | 9,130 |
| Earnings per common share (dollars) | **0.41** | 1.00 | **0.84** | 2.17 |

241.     Defendants' statements in July 29, 2016 second quarter 2016 earnings press release above were false and misleading when made because Defendants failed to properly record the significant asset impairment charge concerning Exxon's Rocky Mountain dry gas operations, which the Company was required to record pursuant to ASC 360-10.

242.     On October 28, 2016, Exxon issued a news release announcing Exxon's financial results for the quarter ended September 30, 2016.  Among other things, the release stated in part:

> If the average prices seen during the first nine months of 2016 persist for the remainder of the year, under the SEC definition of proved reserves, certain quantities of oil, such as those associated with the Kearl oil sands operations in Canada, will not qualify as proved reserves at year-end 2016.  In addition, if these average prices persist, the projected end-of-field-life for estimating reserves will accelerate for certain liquids and natural gas operations in North America, resulting in a reduction of proved reserves at year-end 2016.  Quantities that could be required to be de-booked as proved reserves on an SEC basis amount to approximately 3.6 billion barrels of bitumen at Kearl, and about 1 billion oil-equivalent barrels in other North America operations.  Among the factors that would result in these reserves being re-booked as proved reserves at some point in the future are a recovery in average price levels, a further decline in costs, and / or operating efficiencies.  Under the terms of certain contractual arrangements or government royalty regimes, lower prices can also increase proved reserves attributable to ExxonMobil.  We do not expect the de-booking of reported proved reserves under SEC definitions to affect the operation of the underlying projects or to alter our outlook for future production volumes.

243.     Defendants' October 28, 2016 statements were false and misleading when made because Defendants failed to disclose the truth about the Alleged Omitted Information. Specifically, as detailed *supra*, at the time the Individual Defendants caused the statement described above to be made, they knew it was a *virtual certainty* that the Kearl Operation would not satisfy the SEC definition for proved reserves at year-end 2016, *even if prices increased significantly*.   In fact, at the time, the year-to-date average WCS price was just $27.88, and Defendants knew that the Kearl Operation would only satisfy the SEC definition for proved reserves at year-end 2016 if the average WCS price over the final two months of the year was *$74.27* or nearly *triple* the year-to-date average.  In addition, Defendants also failed to disclose that, since at least "the fall of 2015," Exxon had not been not applying *any carbon proxy costs at all* to the Canadian Bitumen Operations.  As such, the Individual Defendants' belated disclosure regarding the possibility that the Kearl Operation might need to be de-booked at year-end was materially misleading to investors.

244.     Also included in the October 28, 2016 news release was the following "Estimated Key Financial and Operating Data":

**Exxon Mobil Corporation**
**Third Quarter 2016**
**(millions of dollars, unless noted)**

|  | Third Quarter | | Nine Months | |
| --- | --- | --- | --- | --- |
|  | **2016** | 2015 | **2016** | 2015 |
| **Earnings / Earnings Per Share** | | | | |
| Total revenues and other income | **58,677** | 67,344 | **165,078** | 209,075 |
| Total costs and other deductions | **55,451** | 61,595 | **157,726** | 189,737 |
| Income before income taxes | **3,226** | 5,749 | **7,352** | 19,338 |
| Income taxes | **337** | 1,365 | **1,001** | 5,617 |
| Net income including noncontrolling interests | **2,889** | 4,384 | **6,351** | 13,721 |
| Net income attributable to noncontrolling interests | **239** | 144 | **191** | 351 |
| Net income attributable to ExxonMobil (U.S. GAAP) | **2,650** | 4,240 | **6,160** | 13,370 |
| Earnings per common share (dollars) | **0.63** | 1.01 | **1.47** | 3.18 |

245.    Exxon's statements in the October 28, 2016 release were false and misleading when made because Defendants failed to properly record the significant asset impairment charge concerning Exxon's Rocky Mountain dry gas operations, which the Company was required to record pursuant to ASC 360-10.

246.    Also, on October 28, 2016, Exxon held its third quarter earnings call, during which Defendant Woodbury stated, in part:

> Our results are in accordance with the rules and standards of SEC and the Financial Accounting Standards Board.  Starting with our oil and gas crude reserves.
>
> As I indicated, our reporting is consistent with SEC rules, which prescribe technical standards as well as a pricing basis for calculation of reported reserves.  This pricing basis is a historical 12-month average of first day of the month prices in a given year.
>
> As such, the low price environment impacted our 2015 reserves replacement, resulting in its 67% replacement ratio.  This was the net result of natural gas reserves being reduced by 834 million oil crude and barrel, primarily in the US, reflecting the change in natural gas prices, offset by liquid additions of 1.9 billion barrels.  Given that year-to-date crude prices are down further from 2015 by almost 25% on the SEC pricing basis, we anticipate that certain quantities of currently booked reserves, such as those associated with our Canadian oil sands, will not qualify as crude reserves at year-end 2016.
>
> In addition, if these price levels persist, reserves associated with end-of-field life production for certain other liquids and natural gas operations in North America also may not qualify.  However, as you know, amounts required to be de-booked on an SEC basis are subject to being rebooked in the future when price levels recover, or when future operating or cost efficiencies are implemented.  We do not expect the de-booking of reported reserves under the SEC definitions to affect operations of these assets, or to alter our outlook for future production volumes.  And you can find further details of our reserves reporting in our 2015 10-K.
>
> Now regarding asset impairments.  We follow US GAAP successful efforts, and under this standard assessments are made using crude and natural gas price outlooks consistent with those that Management uses to evaluate investment opportunities.  This is different than the SEC price basis for reserves that I just described.
>
> As detailed in our 2015 10-K, last year, we undertook an effort to assess our major long-life assets most at risk for potential impact.  The price basis used in this assessment was generally consistent with long-term price forecasts published by third-party industry and government experts.  The results of this analysis indicated

that the future undiscounted cash flows associated with these assets exceeded their carrying value.  Again, this is detailed in our 2015 10-K.

In light of continued weakness in the upstream industry environment and in connection with our annual planning and budgeting process, we will again perform an assessment of our major long-life assets.  Similar to the exercise undertaken in 2015.  We will complete this assessment in the fourth quarter, and report any impacts in our year-end financial statements.

247.    Defendant Woodbury's statements above were false and misleading when made because they failed to disclose the truth about the omitted information described in the Alleged Omitted Information.  Specifically, Defendant Woodbury's statements concerning Exxon's proved reserves were false and misleading for the same reasons described above in ¶ 243.  In addition, Defendant Woodbury's statements concerning "asset impairments" were false and misleading because they failed to disclose that Exxon did not incorporate carbon proxy costs into any of its asset impairment determination processes for 2015, and also because they failed to disclose that a significant portion of Exxon's Rocky Mountain dry gas operations were impaired by at least year-end 2015.  Wright Decl., ¶¶ 87-107.

248.    On November 3, 2016, Defendants filed with the SEC Exxon's Form 10-Q for the third quarter of 2016.  The Form 10-Q was signed by Defendant Rosenthal.  The Form 10-Q also included SEC Certifications signed by Defendants Tillerson, Swiger, and Rosenthal.  In addition, the Form 10-Q also repeated the statements from the Company's October 28, 2016 news release set forth above.

249.    In addition, the Form 10-Q stated, in part:

In light of continued weakness in the upstream industry environment during 2016, and as part of its annual planning and budgeting process which is currently in progress, the Corporation will perform an assessment of its major long-lived assets, similar to the exercise undertaken in late 2015, including North America natural gas assets and certain other assets across the remainder of its operations.  The assessment will reflect crude and natural gas price outlooks consistent with those that management uses to evaluate investment opportunities and generally consistent with the long-term price forecasts published by third-party industry and

government experts. Development of future undiscounted cash flow estimates requires significant management judgment, particularly in cases where an asset's life is expected to extend decades into the future. An asset group would be impaired if its estimated undiscounted cash flows were less than the asset's carrying value, and impairment would be measured by the amount by which the carrying value exceeds fair value. The Corporation will complete its asset recoverability assessment and analyze the conclusions of that assessment in connection with the preparation and review of the Corporation's year-end financial statements for inclusion in its 2016 Form 10-K. Until these activities are complete, it is not practicable to reasonably estimate the existence or range of potential future impairments related to the Corporation's long-lived assets.

250. Defendants' statements above were false and misleading when made because they failed to disclose that Exxon did not incorporate carbon proxy costs into any of its asset impairment determination processes for 2015, and also because they failed to disclose that a significant portion of Exxon's Rocky Mountain dry gas operations were impaired by at least year-end 2015. Wright Decl., ¶¶ 87-107.

### B. Defendants' Violations Of GAAP And SEC Accounting And Disclosure Rules

251. The SEC requires that publicly traded companies file quarterly and annual financial statements prepared in accordance with GAAP.[10] Exxon, in violation of GAAP and SEC rules, materially misstated its publicly issued financial statements by:

> (i) Failing to disclose that its Canadian Bitumen Operations were operating at a loss, in violation of ASC 275 and SEC Regulation S-K Item 303;

---

[10] GAAP comprises the standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices. The SEC has the statutory authority for the promulgation of GAAP for public companies and has generally delegated that authority to the Financial Accounting Standards Board (FASB). The FASB's promulgated standards are generally contained within the FASB Accounting Standards Codification ("ASC"), which are considered to be the highest standards of GAAP. SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

(ii)      Failing to disclose that its Kearl Operation would not satisfy the SEC definition for proved reserves at year-end 2016, absent an extraordinary and, by Exxon's own subsidiary's estimates, unexpected rise in the price of oil, in violation of ASC 275, ASC 932, and SEC Regulation S-K Item 303;

(iii)     Failing to disclose that, contrary to public representations, carbon or GHG proxy costs were not incorporated into Exxon's investment and asset valuation processes in violation of ASC 275, and Statement of Financial Accounting Concepts ("SFAC") No. 8;

(iv)     Failing to incorporate GHG or carbon proxy costs into its asset impairment and proved reserves testing and evaluation processes, in violation of ASC 360, ASC 932, and SEC Regulation S-X Rule 4-10; and

(v)      Failing to record an asset impairment charge for its Rocky Mountain dry gas assets no later than the accounting period ending December 31, 2015, in violation of ASC 360-10-35.

252.    The allegations in this section are supported by the facts alleged throughout this complaint, as well as the analysis set forth in the Wright Declaration.[11]

### 1.      Relevant GAAP And SEC Provisions

#### a.      Materiality Of Misstatements And Omissions: SEC Staff Accounting Bulletin No. 99 – Materiality

253.    SEC Staff Accounting Bulletin No. 99 – Materiality ("SAB 99") sets forth the generally accepted methods to evaluate materiality in relation to the financial statements of SEC

---

[11] Per Dr. Wright's curriculum vitae, a copy of which is attached as Ex. 1 to the Wright Declaration, Dr. Wright is an accomplished oil and gas accounting expert with 35 years of experience in the areas of oil and gas accounting and economic analysis.  Wright Decl., Ex. 1.

registrants.  Among other things, SAB 99 states that: "*The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item*."

254.    SAB 99 also states that both "quantitative" and "qualitative" factors must be considered in assessing materiality:

> Evaluation of materiality requires a registrant and its auditor to consider all the relevant circumstances, and *the staff believes that there are numerous circumstances in which misstatements below 5% could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material*; as stated in the auditing literature.

255.    SAB 99 considerations that may well render material a quantitatively small misstatement of a financial statement item include, but are not limited to:

- Whether the misstatement masks a change in earnings or other trends.

- Whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise.

- Whether the misstatement changes a loss into income or vice versa.

- Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

256.    The SEC staff also believes that even a small misstatement, *if intentional*, supports the inference that the misstatement is material:

> For the reasons noted above, the staff believes that a registrant and the auditors of its financial statements should not assume that even small intentional misstatements in financial statements, for example those pursuant to actions to "manage" earnings, are immaterial.  ***While the intent of management does not render a misstatement material, it may provide significant evidence of materiality.  The evidence may be particularly compelling where management has intentionally misstated items in the financial statements to "manage" reported earnings.  In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements.  The staff believes that investors generally would regard as significant a management practice to***

*over- or under-state earnings up to an amount just short of a percentage threshold in order to "manage" earnings.  Investors presumably also would regard as significant an accounting practice that, in essence, rendered all earnings figures subject to a management-directed margin of misstatement*.

SAB 99 (footnotes omitted).

257.    Finally, SAB 99 states that materiality may turn on whether a misstatement of even a relatively small business segment is likely to be material if management represents that the particular segment is important to future profitability:

> The materiality of a misstatement may turn on where it appears in the financial statements.  For example, a misstatement may involve a segment of the registrant's operations.  In that instance, in assessing materiality of a misstatement to the financial statements taken as a whole, registrants and their auditors should consider not only the size of the misstatement but also the significance of the segment information to the financial statements taken as a whole. "*A misstatement of the revenue and operating profit of a relatively small segment that is represented by management to be important to the future profitability of the entity" is more likely to be material to investors* than a misstatement in a segment that management has not identified as especially important.

(Footnotes omitted.)

### b.    ASC 360-10-35, Impairment Or Disposal Of Long-Lived Assets

258.    ASC 360-10-20 explains that "[i]mpairment is the condition that exists when the carrying amount of a long-lived asset or asset group exceeds its fair value."  The "carrying amount" is the original cost of an asset, less the accumulated amount of any depreciation or amortization.  ASC 360-10-35, *Impairment or Disposal of Long-Lived Assets*, provides the accounting guidance regarding asset impairments for companies like Exxon following the successful efforts method of accounting, and requires that the carrying amount of long-lived assets, such as the capitalized costs of acquiring, successful exploration, and development of oil and gas, "**shall** be tested for recoverability whenever events or changes in circumstances indicate that its carrying amount **may** not be recoverable."  Events and circumstances that are considered potential impairment indicators

are frequently referred to as "trigger events," as they indicate the necessity that an accounting impairment test be performed.

(1)      <strong>Trigger Events</strong>

259.    ASC 360-10-35-21 provides examples of possible impairment indicators (triggers). These examples of such events or changes in circumstances include, but are not limited to:

(i)        A significant decrease in the market price of a long-lived asset (asset group);

(ii)       A significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition; and

(iii)      A significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action or assessment by a regulator.

260.    In addition, pages 322 to 323 of Petroleum Accounting 7th ed.—an accounting text authored by current and former audit partners from Exxon's outside audit firm, PwC—identifies oil and gas industry-specific impairment triggers, including:

(i)        Lower expected future oil and gas prices (such as the prices used by management in evaluating whether to develop or acquire properties);

(ii)       Actual or expected future development or operating costs are significantly more than previously anticipated for a group of properties, significant AFE overruns or higher oil field or other service costs with no significant upward revisions in reserve estimates); and

(iii)      Significant adverse change in legislative or regulatory climate.

(2)      <strong>Impairment Testing And Loss Recognition</strong>

261.    If trigger events are present, a company must then perform the second step, a "recoverability test," which requires the company to determine if the carrying value is recoverable

- 104 -

by estimating whether the undiscounted net cash flows of each property being examined (*e.g.*, the specific oil and gas fields and related support facilities) exceed the carrying value of those assets. If the sum of these future undiscounted net cash flows from the expected use and eventual disposition of the asset fail to exceed the carrying value of the asset on the company's books, the asset is considered to be impaired and an impairment loss must be recorded.

262.    According to ASC 360-10-35-17, impairment losses are measured as the amount by which the carrying amount of a long-lived asset or asset group exceeds its fair value. Impairment is recorded as an impairment loss that results in a reduction to the capitalized cost of the asset or asset group and a reduction in net income for the period in which the impairment was determined.

263.    In applying the recoverability test, the cash flow estimates are to include all available evidence including the entity's own assumptions about the use of the asset:

> Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) shall incorporate the entity's own assumptions about its use of the asset (asset group) and shall consider all available evidence.  The assumptions used in developing those estimates shall be reasonable in relation to the assumptions used in developing other information used by the entity for comparable periods, such as internal budgets and projections, accruals related to incentive compensation plans, or information communicated to others.

**c.    Proved Reserve Accounting Overview:
ASC 932, Extractive Industries: Oil And
Gas And SEC Regulation S-X Rule 4-10**

264.    ASC 932 *Extractive Industries: Oil and Gas* is a codification of all FASB accounting and disclosure requirements specifically addressing accounting and disclosures mandated for companies engaged in oil and gas producing activities.  ASC 932 is aligned with the SEC's rules for accounting using the successful efforts method and for disclosure of information relating to oil and gas producing activities as set forth in SEC Regulation S-X Rule 4-10.  The SEC defines proved oil and gas reserves in Regulation S-X Rule 4-10(a)(22):

- 105 -

Proved oil and gas reserves.  Proved oil and gas reserves are those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible-from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations-prior to the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether deterministic or probabilistic methods are used for the estimation.

265.    One of the most critical aspects in the above definition of proved reserves is, in order to qualify as such, the quantities of oil and gas reserves must be economically producible under current economic conditions, *i.e.*, conditions existing as of the financial statement date. ASC 932-10-20 defines "economically producible" as meaning that production of a resource is expected to generate revenue that exceeds, or is reasonably expected to exceed, the costs of the operation.

266.    In order to determine whether specific reserves meet the SEC's test for economic producibility under existing economic conditions (and thus meet the definition of proved reserves), registrants are required to consider both historical prices and current costs.  SEC Regulation S-X Rule 4-10(a)(22)(v) indicates that sales prices to be used in assessing existing economic conditions is the arithmetic average of the first-day-of-the-month prices achieved for the prior 12 months, unless future sales price commitments are defined by contractual arrangements.  The first-day-of-the-month prices should be adjusted to reflect the conditions and situations specifically affecting all reserves and resources.

267.    In order to continue to be classified as proved reserves, such reserves must continue to meet the definition of proved reserves.  If subsequent evaluations result in the determination that previously classified proved reserves no longer qualify as being economically producible, those reserves are no longer proved reserves and must be "de-booked" (*i.e.*, reclassified from proved to unproved).  The SEC rules require disclosure of revisions of previously estimated

quantities of proved reserves.  De-booking of proved reserves appears as a downward or negative revision to the beginning of the year proved reserves quantities reported in the SEC Regulation S-X Rule 4-10 mandated proved reserves disclosures that appear in the financial statements.

268.    While formal reserve reports are not a mandated component of interim reports (such as Form 10-Q reports), when adverse events that significantly affect proved reserve quantities occur, disclosure regarding such revisions must be included in interim reports.  According to ASC 932-270-50-1:

> The disclosures set forth in Subtopic 932-235 are not required in interim financial reports.  However, interim financial reports shall include information about a major discovery or other favorable or adverse event that causes a significant change from the information presented in the most recent annual financial report concerning oil and gas reserve quantities.

### d.     ASC 275 – Risks And Uncertainties

269.    Estimates are inherent in financial statement preparation.  Accordingly, ASC 275 requires that management provide discussion about the risks and uncertainties inherent in significant estimates when it is "reasonably possible" that the estimate will change materially in the next year.  If management knows by the time the financial statements are issued, that a reasonable possibility exists that a significant estimate or estimates underpinning the recognition or measurement of element(s) of the financial statements is likely to change in the next 12 months and the effect of such change will be material, management is required to make a complete and fulsome disclosure of all the relevant facts.

270.    Furthermore, ASC 275 requires that this disclosure be more than just a general statement, but rather indicates that it must include an estimate of the effect of a change in a condition, situation, or set of circumstances that existed at the date of the financial statements and an indication that it is at least reasonably possible that a change in the estimate will occur in the

near term.  The disclosures required as a consequence of changes in certain significant estimates are described in ASC 275-10-50-6:

> **Certain Significant Estimates:**
>
> This Subtopic requires discussion of estimates when, based on known information available before the financial statements are issued or are available to be issued (as discussed in Section 855-10-25), it is reasonably possible that the estimate will change in the near term and the effect of the change will be material.  The estimate of the effect of a change in a condition, situation, or set of circumstances that existed at the date of the financial statements shall be disclosed and the evaluation shall be based on known information available before the financial statements are issued or are available to be issued (as discussed in Section 855-10-25).

271.    Notably, the "reasonably possible" threshold for such required disclosure is relatively low.  ASC 275-10-20 defines "reasonably possible" as merely "[t]he chance of the future event or events occurring is more than remote but less than likely."

272.    In addition, the American Institute of CPAs ("AICPA") published *Audit & Accounting Guide: Entities With Oil and* Gas *Producing Activities* (AICPA 2014) for the express purpose of assisting management in preparing financial statements in conformity with GAAP and to assisting practitioners in performing and reporting their audit engagements.  In ¶ 8.162, the AICPA identifies risks and uncertainties of special significance to accurate reporting of oil and gas reserves and their effect of estimates of future cash flows:

> FASB ASC 275, Risks and Uncertainties, and paragraphs 50-54 of FASB ASC 360-10-55 require disclosure of significant estimates and concentrations.  The auditor should evaluate the appropriateness of the entity's disclosures related to significant concentrations and estimates.  Significant estimates prevalent in the oil and gas industry include, but are not limited to, the following:
>
> - Proved oil and gas reserve and cash flow estimates, including DD&A, impairments and purchase price allocations, which are all affected by oil and gas reserve estimates.

e.      **SEC Regulation S-K Item 303 –**
        **Management's Discussion And Analysis**

273.    SEC Regulation S-K Item 303 ("Item 303") requires a discussion of results of operations and other information necessary to an understanding of a registrant's financial condition, changes in financial condition and results of operations.  According to the SEC, "[t]his includes unusual or infrequent transactions, known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue."

274.    The SEC describes the purpose of the MD&A requirements as "not complicated," stating that it is to "provide readers information 'necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations.'"  Moreover, the SEC has stated that the MD&A requirements are intended to satisfy the following three principal objectives:

- provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;

- enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and

- provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

**2.      Failure To Disclose The Canadian**
**Bitumen Operations Were Operating At A Loss**

275.    As detailed *supra*, the Canadian Bitumen Operations were operating at a loss from at least mid-November 2015 through mid-April 2016.

276.    Exxon, however, failed to disclose this fact in its 2015 Form 10-K, which was filed with the SEC on February 24, 2016.  Instead, Exxon disclosed only that, during 2015, the average price received per barrel of bitumen produced from the Canadian Bitumen Operations was $25.07,

and the average production cost per barrel of bitumen produced from the Canadian Bitumen Operations was $19.20, *implying a per barrel profit of $5.87*.  Because the Canadian Bitumen Operations had, in fact, been operating at a loss for more than three months at the time Exxon filed its 2015 Form 10-K, the Company's disclosure implying a $5.87/bbl profit was materially misleading and served to mask the start of a materially unfavorable trend concerning the Canadian Bitumen Operations.

277.    Given the significant losses incurred by the Canadian Bitumen Operations beginning no later than mid-November 2015, it was at least "reasonably possible," as that phrase is defined by ASC 275, at the time Exxon filed its 2015 Form 10-K, that the Company's estimates of future profitability, price, and cost levels would change within the next 12 months and would have a materially negative impact on, among other things, Exxon's net profits and proved bitumen reserve levels, both of which are highly material metrics to investors and other market participants. *See* Wright Decl., ¶ 57(a)-(b).  Moreover, the significant losses incurred by the Canadian Bitumen Operations beginning no later than mid-November 2015 clearly represented a known trend or uncertainty that could reasonably be expected to have a material unfavorable impact on revenues or income from continuing operations and was thus required to be disclosed pursuant to Item 303. *See* Wright Decl., ¶ 57(c)-(d).

278.    As such, Exxon's failure to disclose in its 2015 Form 10-K that the Canadian Bitumen Operations were at that time losing money constituted a violation of both ASC 275 and Item 303.  Wright Decl., ¶ 57.

279.    Moreover, such violations were clearly material.  First, the Canadian Bitumen Operations were an extremely important segment or portion of Exxon's business going forward and represented approximately 31% of Exxon's total liquids proved reserves and 18% of the

Company's combined worldwide proved reserves.  Accordingly, the fact that the Canadian Bitumen Operations had been operating a loss for at least three months would have been highly material to existing and potential investors, lenders, and other creditors in assessing the timing, amount, and uncertainty of future net cash inflows to Exxon.  Second, as noted above, Exxon's failure to disclose the Canadian Bitumen Operations' then-current operating loss masked the start of a materially unfavorable trend concerning Exxon's earnings.  Third, the Canadian Bitumen Operations were also an important segment of Exxon's operations due to their outsized contributions to the Company's reported reserve replacement ratio in 2014 and 2015, and as further evidenced by Defendant Woodbury's statements concerning Exxon's dependence on such operations for long-term production and cash flow stability.  As noted *supra*, SAB 99 considers all of the factors described above to be significant considerations in the materiality analysis.  *See* Wright Decl., ¶ 56.

### 3. Failure To Disclose Likelihood That The Kearl Operation Would Not Qualify As Proved Reserves At Year-End 2016

280.    As detailed *supra*, throughout 2016, Exxon knew that its Kearl Operation would not satisfy the SEC definition for proved reserves at yearend 2016, absent an extraordinary and, by Exxon's own subsidiary's estimates, unexpected rise in the price of oil.

281.    Exxon, however, failed to adequately disclose its awareness of this fact in the Company's 2015 Form 10-K and 2016 Form 10-Q reports, which were filed on February 24, 2016, May 4, 2016, August 3, 2016, and November 3, 2016, respectively.  Instead, Exxon merely issued tepid warnings mentioning the possibility of de-bookings, while failing to inform investors of the true state of affairs—namely, that the de-booking of the Kearl Operation's proved reserves was all but guaranteed absent an extraordinary and unexpected change in circumstances.  *See* Wright

Decl., ¶¶ 69-72.  As such, Exxon's purported disclosures and other representations to investors were materially misleading.

282.    As detailed *supra*, ASC 932 requires that, when adverse events cause significant downward estimates in proved reserves, the information must be conveyed to financial statement users at the earliest possible time.   Accordingly, by failing to adequately disclose Exxon's awareness about the virtually certain need to de-book the Kearl Operation's proved reserves by year-end 2016, Exxon's 2015 Form 10-K, and 2016 Form 10-Q reports violated ASC 932.  *See* Wright Decl., ¶ 72(a)-(c).

283.    In addition, based on the above information, Exxon clearly would have known at the time it filed its 2015 Form 10-K and 2016 Form 10-Q reports that the Company's estimates of proved reserves were likely to change within the next 12 months, and would have a materially negative impact on Exxon's worldwide proved reserve levels.  As such, Exxon's failure to disclose such information in its 2015 Form 10-K and 2016 Form 10-Q reports constituted a violation of ASC 275.  *See* Wright Decl., ¶ 72(d).

284.    Moreover, as detailed *supra*, Item 303 requires comprehensive MD&A discussion and analyses of known trends or uncertainties that might reasonably be expected to have a material unfavorable effect on net income.  Given the facts detailed *supra*, Exxon clearly would have known at the time it filed its 2015 Form 10-K and 2016 Form 10-Q reports that the Company's estimates of the Kearl Operation's proved reserves were likely to negatively change within the next 12 months and that the change would have a materially negative impact on Exxon's future earnings and assets.  Thus, Exxon also violated Item 303 by failing to make more truthful and accurate disclosures concerning the likelihood that the Kearl project would not satisfy the SEC definition for "proved reserves" at year-end 2016.  *See* Wright Decl., ¶ 72(f).

285.     Accordingly, Exxon's 2015 Form 10-K and 2016 Form 10-Q reports violated ASC 275, ASC 932, and Item 303, by failing to provide more detailed and truthful disclosures concerning the likelihood that the Kearl project would not satisfy the SEC definition for "proved reserve." Exxon's failure to disclose in its 2015 Form 10-K that the Canadian Bitumen Operations were at that time losing money constituted a violation of both ASC 275 and Item 303. Wright Decl., ¶ 57.

286.     Moreover, as established *supra*, the Canadian Bitumen Operations proved reserve levels were material from both a quantitative and qualitative standpoint because the reserves accounted for 31% of Exxon's total liquid proved reserves, accounted for an outsized contribution to Exxon's reserve replacement ratios in 2014 and 2015, and were expected to have a long-term stabilizing effect on Exxon's future petroleum production and cash flows. Such facts also made the Canadian Bitumen Operations an important segment or portion of Exxon's business, as contemplated by SAB 99.

### 4.     Failure To Disclose That Carbon "Proxy Cost" Was Not Used In Processes For The Canadian Bitumen Operations

287.     As detailed *supra*, from at least "the fall of 2015" on, Exxon's investment and asset valuation processes for the Canadian Bitumen Operations were not consistent with the Company's public representations regarding its supposed use of a GHG "proxy cost" in connection with such processes. *See* Wright Decl., ¶¶ 73-78.

288.     As also detailed *supra*, one of the most basic tenants of financial reporting and disclosure is that the information presented must be truthful. Indeed, SFAC No. 8 instructs that: "To be useful, financial information not only must represent relevant phenomena, but it also must faithfully represent the phenomena that it purports to represent. To be a perfectly faithful representation, a depiction would have three characteristics. It would be complete, neutral, and

free from error."   SFAC No. 8 further states: "Free from error means there are no errors or omissions in the description of the phenomenon, and the process used to produce the reported information has been selected and applied with no errors in the process."   By publicly indicating that a GHG "proxy cost" was incorporated into Exxon's estimate of current and future costs, when in fact the Company did not do so with regard to the Canadian Bitumen Operations, Exxon's 2015 Form 10-K and 2016 Form 10-Q reports were not representationally faithful, and therefore, violated fundamental FASB guidance from SFAC No. 8.  *See* Wright Decl., ¶ 81(a)-(c).

289.   In addition, Exxon's failure to truthfully disclose that the Company did not incorporate a GHG "proxy cost" into Exxon's calculations concerning its investment and asset valuation processes for the Canadian Bitumen Operations violated ASC 275, as the Company's failure to include such costs in its calculation concerning the Canadian Bitumen Operations unquestionably had a material impact on the estimates used in connection with the evaluation of proved reserves and potential asset impairments concerning such assets.  *See* Wright Decl., ¶ 81(d).

290.   Based on the foregoing, Exxon's 2015 Form 10-K and 2016 Form 10-Q reports violated ASC 275 and fundamental FASB guidance from SFAC No. 8 by failing to disclose that, contrary to the Company's statements to investors, Exxon did not incorporate a GHG "proxy cost" into the Company's calculations concerning its investment and asset valuation processes for the Canadian Bitumen Operations.

291.   Moreover, as established *supra*, the Canadian Bitumen Operations constituted a material segment or portion of Exxon's business.  Accordingly, the Company's failure to alert investors that asset valuations concerning the Canadian Bitumen Operations did not take into account all the costs the Company had assured investors were included was also material.

**5.    Failure To Incorporate A Carbon "Proxy Cost" Into
Proved Reserves And Asset Impairment Calculations**

292.    As detailed *supra*, contrary to numerous representations Exxon made to investors, from at least "the fall of 2015" on, the Company did not apply its publicly stated GHG "proxy cost" to Exxon's investment and asset valuation processes concerning the Canadian Bitumen Operations. *See* Wright Decl., ¶¶ 73-78.  In addition, at least prior to 2016, Exxon made no attempt to incorporate a GHG proxy cost into any of its asset impairment-related calculations.  *Id.*

293.    Moreover, the costs associated with actual application of Exxon's publicly stated GHG "proxy cost" to its Canadian Bitumen Operations would have been significant, given that a $80/ton GHG "proxy cost" would have equated to an additional cost of approximately $5.70 (USD/bbl), and even just a $20/ton GHG "proxy cost" would have equated to an additional cost of approximately $1.43 (USD/bbl).  *See* Wright Decl., ¶ 84.  These numbers are particularly significant in light of the fact that the Kearl Operation was no more than $1.52 (USD/bbl) away from no longer qualifying as a proved reserve at year-end 2015, ***without*** the application of any GHG "proxy cost."  *See* Wright Decl., ¶ 84.

294.    In addition, the material impact of Exxon's failure to incorporate its publicly stated GHG "proxy cost" into applicable accounting calculations concerning the Canadian Bitumen Operations is further confirmed by the sworn testimony of the Oleske Affirmation, which states that "according to evidence reviewed by [NYOAG], [actual application of Exxon's publicly stated GHG proxy cost] may have rendered at least one of its major [Canadian] oil sands projects unprofitable over the life of the project."  Oleske Affirmation, ¶ 29; *see also* Wright Decl., ¶ 85.

295.    As noted above, in order to qualify as proved reserves, ASC 932-10-S99 and SEC in Regulation S-X Rule 4-10 require that the quantities of oil and gas reserves must be economically producible under current economic conditions.  Moreover, the proper determination

of costs is integral to the determination of economic producibility.  GHG "proxy costs" represent a current and future cost of exploring, developing, and producing proved reserves.  By failing to include GHG "proxy costs" in the future net cash flows for Exxon's Canadian Bitumen Operations, Defendants' analysis, at a minimum, understated the costs of producing proved reserves, overstated the future net cash inflows from producing proved oil and gas reserves, and thus failed to properly account for the Company's proved reserve quantities in connection with the Canadian Bitumen Operations.  Wright Decl., ¶ 86(a).

296.    In addition, Exxon's failure to include the clearly material GHG "proxy costs" in the Company's investment and asset valuation processes affected numerous accounts and estimates in Exxon's financial statements, including, *inter alia*, operating costs, depreciation, depletion, and amortization (DD&A), liabilities, impairment, asset retirement obligations and earnings.  Wright Decl., ¶ 86(b).

297.    As also noted *supra*, pursuant to ASC 360-10-35-30, Exxon was required to use all available evidence, including assumptions used in long-range budgeting and planning processes, when developing future cash flow estimates for impairment analysis.  *See* Wright Decl., ¶ 86(c)-(e).  Moreover, Exxon affirmatively represented to investors that it used GHG "proxy costs" in all of its "own assumptions about its use of the asset."  ASC 360-10-35-30; *see also* Wright Decl., ¶86 (f).

298.    Based on the foregoing, each of Exxon's Form 10-K and Form 10-Q reports filed violated ASC 360, ASC 932, and SEC Regulation S-X Rule 4-10 requirements.

### 6.    Failure To Record An Asset Impairment Charge For Rocky Mountain Dry Gas Operations

299.    As detailed *supra*, by no later than year-end 2015, a significant portion of Exxon's Rocky Mountain dry gas operations no longer justified their applicable "carrying value" on

Exxon's financial *statements*, thus warranting the recording of an asset impairment charge pursuant to ASC 360-10.

300.    Specifically, as set forth *supra*, several red flags concerning Exxon's Rocky Mountain dry gas operations and the business climate it operated in were present at year-end 2015. These *adverse* trends and negative business conditions constituted impairment triggers, as contemplated by ASC 360-10-35-21, thus requiring Exxon to test the Rocky Mountain dry gas operations at issue in the 2016 Dry Gas Impairment Charge for potential impairment by no later than the accounting period ending on December 31, 2015.  *See* Wright Decl., ¶¶ 88-95.

301.    Moreover, had Exxon properly conducted such a test at year-end 2015, it should have concluded that the carrying value of such assets was no longer recoverable, and that such assets were therefore subject to an asset impairment charge pursuant to ASC 360-10.  *See* Wright Decl., ¶¶ 96-107.

302.    This conclusion is supported by the Wright Declaration, which sets forth a detailed analysis comparing several key impairment-related factors at year-end 2016, to the same set of factors at year-end 2015, and also considers other qualitative factors, in reaching the conclusion that, "to the extent the Rocky Mountain dry gas operations at issue in the 2016 Dry Gas Impairment Charge were impaired *pursuant* to FASB ASC 360-10 at year-end 2016, as Exxon affirmatively acknowledged in its 2016 Form 10-K, those same assets *must* have been impaired pursuant to FASB ASC 360-10 by no later than year-end 2015."   Wright Decl., ¶¶ 96-101.   The key impairment-related factors analyzed by Dr. Wright are also described in detail herein.

303.    Furthermore, as concluded by Dr. Wright, had the proper asset impairment charge been taken at year-end 2015, the *charge* would have been material to investors, given the size of the charge Exxon ultimately took at year-end 2016 ($3.3 billion pre-tax, $2.03 billion after-tax),

as well as the fact that Exxon's failure to take an appropriate asset impairment charge at year-end 2015 allowed the Company to hide the fact that Exxon did not meet analysts' consensus EPS expectations for the Company's at year-end 2015.  *See* Wright Decl., ¶¶ 102-103.

304.     Moreover, the conclusion that the Rocky Mountain dry gas operations at issue in the 2016 Dry Gas Impairment Charge were impaired by no later than year-end 2015 is further bolstered by the fact that, as detailed in the Oleske Affirmation, prior to 2016, "Exxon failed to apply a proxy cost of GHGs in determining whether its long-lived assets, such as oil and gas reserves and resources, were impaired."  Oleske Affirmation, ¶ 41.  For the same reasons as set forth above, Exxon was required to include the stated GHG "proxy costs" used for its internal business planning purposes in connection with the Company's asset impairment calculations for its Rocky Mountain dry gas operations.  According to the Oleske Affirmation, and Ex. 5 attached thereto, by 2015, Exxon's internal policies would have required it to apply a $10 per ton proxy cost for emissions from its Rocky Mountain dry gas operations starting in 2018, which would then "ris[e] linearly" to $60 per ton in 2030.  *See* Wright Decl., ¶ 106.

305.     Had Exxon incorporated the GHG "proxy costs" described above into the asset impairment calculations for its Rocky Mountain dry gas operations prior to 2016, the impact upon such calculations would have been significant, and would have clearly rendered such assets impaired.  Indeed, using standard conversion rates of 117 pounds/MMBTU[12] and 2,200 pounds/ton (or, effectively, 0.05318 tons/MMBTU), a GHG "proxy cost" of $10/ton would result in the imposition of an additional cost of approximately $0.53/MMBTU, while a GHG "proxy cost" of $60/ton would result in the imposition of an additional cost of approximately $3.19/MMBTU.  The

---

[12] *See* https://www.eia.gov/environment/emissions/co2_vol_mass.php.

unquestionable materiality and impact of such costs is further illustrated by considering that, as of December 31, 2015, the Henry Hub spot price for natural gas was only $2.28/MMBTU.  Clearly, the application of future costs ranging from approximately 23% to *140%* of the current price would have materially reduced expected future cash flows from these assets and further confirmed their impairment, particularly in light of the other factors discussed above.

306.    By failing to report a ASC 360-10 impairment charge for its Rocky Mountain dry gas operations prior to 2016, Exxon improperly and materially misstated certain line item amounts in the Company's 2015 Form 10-K financial statement sections titled "Consolidated Statement of Income" and "Disclosures about Segments and Related Information," as indicated by the table at the end of this section.

307.    Additionally, each of Exxon's unaudited 2016 first, second, and third quarter condensed consolidated financial statements filed on Form 10-Q with the SEC on May 4, 2016 August 3, 2016 and November 3, 2016, respectively, advised that:

> These unaudited condensed consolidated financial statements should be read in the context of the consolidated financial statements and notes thereto filed with the Securities and Exchange Commission in the Corporation's 2015 Annual Report on Form 10-K.

308.    Moreover, in each of the unaudited 2016 Form 10-Q filings, the Individual Defendants falsely warranted that:

> In the opinion of the Corporation, the information furnished herein reflects all known accruals and adjustments necessary for a fair statement of the results for the periods reported herein.

309.    In fact, the Individual Defendants continued to fail to record the required material ASC 360-10-35 impairment charge against income for Exxon's Rocky Mountain dry gas assets in each of the Company's successive 2016 Form 10-Q reports until Exxon ultimately recorded a $3.3 billion pre-tax impairment charge for those assets at year-end 2016.  By failing to properly

recognize the impairment expense beginning in its 2015 Form 10-K, and in each successive 2016 Form 10-Q, the Individual Defendants improperly and materially misstated Exxon's "Consolidated Statement of Income" and "Disclosures about Segments and Related Information" line items amounts, as indicated by the following table:

| Line items misstated in Exxon's 2015 and 2015 Financial Statements file with the SEC | | | | | |
|---|---|---|---|---|---|
| Financial statement line item in 10-K and 10-Q | Amounts as originally report | | | | Misstatement Type |
| | *In billions, except per share amounts* | | | | |
| | 10-K Year ended 12/31/15 | 10-Q Quarter ended 3/31/16 | 10-Q Quarter ended 6/30/16 | 10-Q Quarter ended 9/30/16 | |
| Depreciation and Depletion Expense (if impairment reported as subtotal of this income statement time) | $18,048 | $4,765 | $4,821 | $4,605 | Understated |
| Net income Attributable to Exxon | $16,150 | $1,180 | $1,700 | $2,650 | Overstated |
| Earnings Per Common Share | $3.85 | $0.43 | $0.41 | $0.63 | Overstated |
| Comprehensive Income Attributable to Exxon | $11,596 | $4,937 | $1,340 | $2,928 | Overstated |

## VI.   DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

### A.   Derivative Allegations

310.   Plaintiff brings this action derivatively in the right and for the benefit of Exxon to redress injuries suffered, and to be suffered, by Exxon as a direct result of breaches of fiduciary duties, waste of corporate assets, unjust enrichment, as well as the aiding and abetting thereof, and violations of the federal securities laws by the Individual Defendants.   Exxon is named as a nominal defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

311.   Plaintiff will adequately and fairly represent the interests of Exxon in enforcing and prosecuting his rights.

312.   Plaintiff has been a shareholder of Exxon since at least 2013, has continuously been a shareholder since that time, and is a current Exxon shareholder.

**B.**     **Fiduciary Duties**

313.    By reason of their positions as officers and directors of Exxon, each of the Individual Defendants owed and owe Exxon and its shareholders fiduciary duties of care, loyalty, good faith, and candor, and were and are required to use their utmost ability to control and manage Exxon in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Exxon and not in furtherance of their personal interest or benefit.

314.    To discharge their duties, the officers and directors of Exxon were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Exxon were required to, among other things:

(a)     set internal policies and review and approve proxy costs concerning the Company's investment and asset valuation processes;

(b)     monitor, review, and approve investment and asset valuation processes for certain projects, including "Canadian Bitumen Operations";

(c)     monitor, review, and approve asset impairment determinations for its reserve assets;

(d)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(e)     remain informed as to how Exxon conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

315.    In addition to these duties, under its Charter in effect since April 26, 2017, the Audit Committee Defendants, Defendants Reinemund, Boskin, Burns, Fore, Weldon, George, Faulkner, and Brabeck-Letmathe, owed specific duties to Exxon to assist the Board in overseeing the Company's financial reporting process and the integrity of the financial statements and other financial information provided by the Company the SEC and the public.  Moreover, the Audit Committee's Charter provides that the Audit Committee shall discuss with management and the independent auditors the audited financial statements to be included in the Corporation's Annual Report on Form 10-K, including the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

## C.    Breaches Of Fiduciary Duties Including Demand Refusal

316.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Exxon, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware, or reckless in not being aware, posed a risk of serious injury to the Company.

317.    The Individual Defendants breached their fiduciary duties care, loyalty, good faith, and candor by allowing Defendants to cause, or by themselves causing, Exxon to make improper public statements and omissions concerning Exxon's: (i) misleading use of a proxy cost of carbon that differed materially in value in internal documents than the value disclosed to the public; (ii) failure to recognize an impairment of its Rocky Mountain dry gas operations; (iii) refusal to disclose material losses from its Canadian Bitumen Operations; and (iv) failure to warn investors of the high likelihood that the Kearl Operation would be "de-booked" by year-end 2016.

318.    Moreover, the Director Defendants breached their fiduciary duties of care, loyalty, and good faith by rejecting the Demand without adequate consideration and without conducting a proper investigation.  The Board had an affirmative duty under New Jersey law to conduct a reasonable, objective, and good faith investigation into the allegations set forth in the Demand, and to determine on the basis of that investigation whether the Demand's factual allegations and legal claims had merit and whether pursuing the claims in litigation would be in the Company's best interests.

319.    Boards that fulfill their duty to investigate a shareholder's litigation demand reasonably, objectively, and in good faith, and to act reasonably on the basis of the investigation, retain the protections of the business judgment rule's presumption that they acted independently, on a reasonably informed basis, and in good faith.  Boards that fail to do so may not avail themselves of this presumption, and the shareholder's litigation demand will be deemed to have been wrongfully refused.

320.    The Board's decision to ignore the Demand was not a decision made independently on the basis of reasonable conclusions drawn in good faith from the findings of a reasonable, independent, and good faith investigation.

321.    On July 7, 2017, counsel for the Plaintiff, a beneficial owner of Exxon stock, sent Exxon's Board a 17 page "Stockholder Litigation Demand" letter demanding that the Board investigate the foregoing facts and claims arising from them, and to commence litigation against the corporate fiduciaries responsible for damaging Exxon, including certain of the Company's current and former officers and directors.  These Board members include Defendants Reinemund, Palmisano, Frazier, Burns, Fore, Weldon, and Oberhelman.

322.    In response, counsel at Simpson Thacher & Bartlett LLP ("Simpson Thacher") stated they had been retained as counsel and requested Plaintiff's proof of ownership of Exxon stock on September 21, 2017.  On October 10, 2017, Plaintiff's proof of ownership in Exxon stock was provided to Simpson Thacher.  Under applicable New Jersey law, the Board had 90 days to investigate the Demand.  Since receiving proof of Plaintiff's ownership in Exxon stock, however, the Board has failed to provide Plaintiff with any information concerning any attempt to investigate the Demand, reach a conclusion, and take appropriate action.  The Board's failure to do so amounts to a *de facto* refusal and was contrary to Exxon's best interests.  The Defendants breached their fiduciary duties to Exxon and caused or permitted numerous misleading statements about Exxon's business and prospects related thereto.  The claims in the Demand are well-founded, valuable, and the Company's only hope of recovery.

323.    Moreover, a majority of the members of the Board that received the Demand were not independent.  Despite receiving in-depth briefings on and actively engaging in discussions on Exxon's financial position and risks of climate change, a majority of the Board knowingly or recklessly allowed the Class Action Defendants and the Company to make statements to the market while aware of facts that, if not disclosed, would render those statements misleading.

324.    The most important aspect of any oil and gas company's business and corporate worth is the amount and value of its oil and gas reserves.  Concerns over climate change and its impact upon Exxon's business operations and long-term prospects have been an extremely important issue for the Company for as far back as the 1970s.  As such, it follows as a matter of course that the Individual Defendants, as Exxon's key executives and most senior decision-makers, would necessarily have been aware of (or reckless in disregarding) the fraud alleged herein, which directly concerned such critical matters.  Indeed, according to the NYOAG Evidence, the

discrepancy between Exxon's internal policies and public representations "*was known at Exxon's highest levels.*"  Oleske Affirmation, ¶¶ 23-24; Oleske Affirmation, Exs. 3-5.

325.    In addition, in Exxon's "Energy and Climate" report released on March 31, 2014, the Company stated that "[t]he Outlook is reviewed and discussed *extensively* with the company's Management Committee and Board prior to its release."  As detailed above, Exxon has repeatedly described the Outlook as the "foundation for [its] business and investment planning" and one of the key means through which the Company purports to account for carbon-related future risks. Accordingly, the Outlook is one of the key documents underlying the fraud alleged in the Related Securities Class Action.

326.    Defendants Tillerson, Swiger, and Woods were members of ExxonMobil's Management Committee throughout the class period alleged in the Related Securities Class Action.   The Management Committee "extensively" reviewed and discussed the Outlook, published March 31, 2014.  The Outlook describes the foundation for business and investment planning and discusses carbon related risks, including ExxonMobil's use of a proxy cost of carbon to account for current and future government regulation of carbon emissions.  Thus, in reviewing and preparing the Outlook for publication, members of the Management Committee received in depth information on Exxon's proxy cost of carbon and its use in investments and business operations.  As members of the Management Committee, Defendants Tillerson, Swiger, and Woods would have extensive knowledge of the proxy cost of carbon and should have known a different proxy cost was stated in the Outlook than was actually applied to business operations and investments.

327.    Similarly, Defendants have also stated in responses to information requests from the CDP that, since at least 2010, the Management Committee has had "responsibility for climate change matters."  Defendants' responses have further stated that:

> On the subject of risks of *climate change*, the *full ExxonMobil Board of Directors* receives *in depth briefings* at least annually that cover updates on public policy, scientific and technical research, as well as company positions and actions in this area.
>
> In addition, the Chairman of the Board and Chief Executive Officer [Defendant Tillerson] and members of the Management Committee [which, at all times throughout the class period alleged in the Related Securities Class Action, included Defendants Tillerson, Swiger, and Woods] are actively engaged in discussions relating to greenhouse gas emissions and climate change on an ongoing basis.

328.    Such representations provide strong additional evidence concerning the involvement of the Board in, and awareness of, matters directly underlying the fraudulent conduct alleged herein.

329.    Additionally, as alleged herein, Defendants Tillerson, Swiger, Rosenthal, Boskin, Brabeck-Letmathe, Burns, Faulkner, Fore, Frazier, George, Palmisano, Reinemund, and Weldon, signed Exxon's 2014 Form 10-K, and Defendants Tillerson, Swiger, Rosenthal, Boski, and Brabeck-Letmathe, Burns, Faulkner, Fore, Frazier, Oberhelman, Palmisano, Reinemund, Weldon, and Woods signed Exxon's 2015 Form 10-K, which these Defendants had reason to know contained financial statements that were materially misleading to investors.

330.    Accordingly, a majority of the Board were aware or recklessly disregarded that Exxon's representations to investors were materially false and misleading and omitted material information necessary to properly evaluate the Company and its financial condition and prospects, and therefore could not have independently considered the Demand.

331.    The Individual Defendants, because of their positions of control and authority as officers and directors of Exxon, were able to, and did, directly or indirectly, exercise control over

the wrongful and improper acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such improper actions.  As a result, and in addition to the damage the Company has already incurred, Exxon has expended, and will continue to expend, significant sums of money to remedy the harm.

## VII.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

332.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct alleged herein giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

333.   During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did deceive the investing public, including shareholders of Exxon, regarding the Individual Defendants' management of Exxon's operations, by and through the Individual Defendants' executive and directorial positions at Exxon and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

334.   The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper statements.

335.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust

enrichment, and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

336.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

337.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VIII.   DAMAGES TO EXXON

338.   The Individual Defendants' improper conduct in breach of their fiduciary duties and as described in detail herein, wasted Exxon's assets, caused the Company to needlessly expend substantial sums of money, and caused the Company to incur substantial damage.

339.   As a result of the Individual Defendants' improprieties, Exxon disseminated improper public statements concerning the Company's: (i) misleading use of a proxy cost of carbon that differed materially in value in internal documents than the value disclosed to the public; (ii) failure to recognize an impairment of its Rocky Mountain dry gas operations; (iii) refusal to disclose material losses from its Canadian Bitumen Operations; and (iv) inadequate attempt to warn investors of the high likelihood that the Kearl Operation would be "de-booked" by year-

end 2016.   These improper statements and omissions have devastated Exxon's credibility as reflected by the Company's almost $14.9 Billion, or 4.14%, market capitalization loss.

340.   Defendants' conduct damaged Exxon's reputation within the business community and in the capital markets.   In addition to price, Exxon's current and potential customers generally consider a Company's ability to accurately value its business prospects to be important. Businesses are less likely to award contracts to companies that are uncertain about their own financial condition.   Exxon's ability to raise equity capital or debt on favorable terms in the future is now impaired.   In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections the Individual Defendants permitted to be disseminated have materially increased the perceived risks of investing in and lending money to Exxon.

341.   Moreover, as a direct and proximate result of the Individual Defendants' wrongful actions, Exxon has expended, and will continue to expend significant sums of money for government and private investigations and litigations, including, but are not limited to: (i) costs incurred from NYOAG complaint against Exxon for violations of the Martin Act Securities Fraud, Persistent Fraud and Illegality, Actual Fraud, and Equitable Fraud; and (ii) costs incurred from defending and paying any settlement in the Related Securities Class Action for violations of federal securities laws.

342.   The Individual Defendants wrongful conduct has and will continue to cause Exxon to pay substantial amounts of money from costs incurred from increased future debt offerings and borrowing costs, which include the loss of its AAA credit rating.

343.    Finally, the Individual Defendants wrongful conduct has and will continue to cause Exxon to waste resources from costs incurred from compensation and benefits paid to the Individual Defendants who have breached their fiduciary duties to Exxon.

<u>**COUNT I**</u>

**Against the Individual Defendants for Breach of Fiduciary Duty**

344.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

345.    The Individual Defendants owed and owe Exxon fiduciary duties.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Exxon the highest obligation of care, loyalty, and good faith.  Defendants also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, could have prevented the misconduct and consequential harm to Exxon alleged herein.

346.    The Individual Defendants and each of them, violated and breached their fiduciary duties of care, loyalty and good faith by creating a culture of lawlessness within Exxon, and consciously failing to prevent the Company from engaging in the unlawful acts and wrongdoing complained of herein.

347.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  By their actions and by engaging in the wrongdoing described herein, the Officer Defendants abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Exxon in a manner consistent with their fiduciary duties.  Specifically, the Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) Exxon's actual investment and asset valuation processes did not incorporate GHG or carbon "proxy costs" in a manner that was

consistent with the Company's public representations or Exxon's own internal policies; (ii) Exxon did not incorporate GHG or carbon "proxy costs" into their asset impairment evaluation processes; (iii) Exxon's Canadian Bitumen Operations were operating at a loss; (iv) Exxon knew the Kearl Operation could not satisfy the SEC definition for proved reserves at year-end 2016, absent an extraordinary, and, by Exxon's own internal estimates, unexpected rise in the price of oil; and (v) a significant portion of Exxon's Rocky Mountain dry gas operations were impaired by no later than year-end 2015, thus requiring the Company to record an asset impairment charge in its financial statements.  Accordingly, the Officer Defendants breached their fiduciary duties of care, loyalty, and good faith owed to Exxon.

348.    The Director Defendants either knew or were reckless, in disregarding the illegal activity of such substantial magnitude and duration.  By their actions and by engaging in the wrongdoing described herein, the Director Defendants abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Exxon in a manner consistent with their fiduciary duties.  The Director Defendants breached their fiduciary duties by recklessly issuing or recklessly permitting the Company to issue improper statements. Specifically, the Director Defendants knew or were reckless in not knowing that: (i) Exxon's actual investment and asset valuation processes did not incorporate GHG or carbon "proxy costs" in a manner that was consistent with the Company's public representations or Exxon's own internal policies; (ii) Exxon did not incorporate GHG or carbon "proxy costs" into their asset impairment evaluation processes; (iii) Exxon's Canadian Bitumen Operations were operating at a loss; (iv) Exxon knew the Kearl Operation could not satisfy the SEC's definition for proved reserves at year-end 2016, absent an extraordinary and, by Exxon's own internal estimates, unexpected rise in the price of oil; and (v) a significant portion of Exxon's Rocky Mountain dry gas operations

were impaired by no later than year-end 2015, thus requiring the Company to record an asset impairment charge in its financial statements.  The Director Defendants also breached their fiduciary duties by failing to cause the Company to take a timely impairment charge.  Accordingly, the Director Defendants breached their fiduciary duties of loyalty and good faith owed to Exxon.

349.    The Audit Committee Defendants breached their fiduciary duty of loyalty and good faith by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

350.    By committing and permitting the misconduct alleged herein, the Individual Defendants breached their fiduciary duties in the management and administration of Exxon's affairs and in the use and preservation of Exxon's assets.

351.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, Exxon has sustained significant damages, as alleged herein, not only monetarily, but also to its corporate image and goodwill.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

352.    Plaintiff, on behalf of Exxon, has no adequate remedy at law.

<u>**COUNT II**</u>

**Against the Individual Defendants for Waste of Corporate Assets**

353.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

354.    As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself

in the Related Securities Class Action, the NYOAG investigation, and the NYOAG Subpoena Action that they caused with their improper conduct, statements and omissions.

355.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

356.    Plaintiff, on behalf of Exxon, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

357.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

358.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Exxon.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Exxon.

359.    Plaintiff, as a shareholder and representative of Exxon, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

360.    Plaintiff, on behalf of Exxon, has no adequate remedy at law.

## COUNT IV

### Against the Class Action Defendants for Contribution
### Under Section 10(b) and 21D of the Exchange Act

361.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

362.     The Class Action Defendants, along with the Company, are all named defendants in the Related Securities Class Action alleging the Company and the Class Action Defendants violated Section 10(b) and 20(a) Exchange Act.

363.     If the Company is found liable for violating the aforementioned federal securities laws, the Company's liability will be a direct result of the intentional, knowing, or reckless acts or omissions of some or all of the Class Action Defendants.

364.     As directors and officers of Exxon, the Class Action Defendants had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of public statements about Exxon and had the power and/or ability directly or indirectly to control or influence the specific corporate statements and conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

365.     Moreover, the Class Action Defendants, themselves, are liable under Section 10(b) of the Exchange Act, pursuant to which there is a private right of action for contribution, and Section 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

366.     Thus, the Company is entitled to all appropriate contribution or indemnification from the Class Action Defendants.

## **COUNT V**

**Against the Class Action Defendants for Violations of Section 29(b) of the Exchange Act**

367.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

368.     The Class Action Defendants, along with the Company, are all named defendants in the Related Securities Class Action alleging the Company and the Class Action Defendants

violated Section 10(b) and 20(a) Exchange Act during the time they entered into contracts with Exxon regarding their compensation.

369.    If Exxon attempts to recover compensation from the Class Action Defendants, these Defendants might assert a breach of contract claim and/or seek severance.

370.    Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

371.    The Class Action Defendants violated provisions of the Exchange Act while performing their duties arising under various employment and other contracts they entered into with Exxon.

372.    Exxon was, and is, an innocent party with respect to the Exchange Act violations of the Class Action Defendants.

373.    Plaintiff, on behalf of Exxon, seeks rescission of the contracts between Exxon and the Class Action Defendants due to these Defendants' violations of the Exchange Act while performing their job duties.

374.    Even if the contracts are not rescinded by the Court as a result of the Exchange Act violations of the Class Action Defendants, the Court can, and should, award equitable remedies in the form of injunctive relief barring these Defendants from asserting breach of contract by Exxon in any action by Plaintiff on behalf of Exxon to return compensation from these Defendants.

375.    Plaintiff seeks only declaratory, injunctive, and equitable relief in this claim.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of Exxon, demands judgment as follows:

A.      Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing Exxon to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Exxon and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.      a proposal to strengthen Board oversight and supervision over Exxon's proxy costs;

2.      a proposal to strengthen the Company's controls over financial reporting;

3.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

4.      a provision to permit the shareholder of Exxon to nominate at least three candidates for election to the Board; and

5.      a proposal to strengthen Exxon's oversight of its disclosure procedures;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Exxon has an effective remedy;

D.     Awarding to Exxon restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: May 2, 2019               RON WELLS LAW OFFICE

*/s/ Ron Wells*

RON WELLS
State Bar No. 21140950
150 S. Capitol St.
Canton, Texas 75103
Telephone: (214) 720-0300
Facsimile: (903) 567-2510
E-mail: ron@ronwellslaw.com

JOHNSON FISTEL, LLP
FRANK J. JOHNSON
BRETT M. MIDDLETON
CHASE M. STERN
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
FrankJ@johnsonfistel.com
BrettM@johnsonfistel.com
ChaseS@johnsonfistel.com

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
WILLIAM W. STONE
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com
WilliamS@johsnonfistel.com

Attorneys for Plaintiff